## 12275

### DUNCAN v. THE RECORD PUBLISHING COMPANY *ET AL.*
### (143 S. E., 31)

#### On Petition for Rehearing January 12, 1928

1. Appeal and Error—Where Reviewing Court is Equally Divided, Judgment is Affirmed.—Where reviewing Court is equally divided, two of Justices favoring affirmance and two favoring reversal, result is affirmance of judgment appealed from.

2. Libel and Slander—Nonsuit for Failure to Prove Cause of Action Held Properly Overruled in State Senator's Libel Action for Publication of His Letter Soliciting Loan from Man with Whom He Dealt as Member of Canal Commission.—Publication by newspaper of letter from State Senator soliciting loan at time he was appointed to Canal Commission, which would deal with man from whom loan was solicited, *held* reasonably susceptible to mean that Senator had invited bribe, so that motion for nonsuit and directed verdict in Senator's libel action, on ground that he had failed to prove cause of action, was properly overruled.

Note: Truth as a defense to an action for libel or slander, see annotation in 21 L. R. A., 502; 31 L. R. A. (N. S.), 138; 50 L. R. A. (N. S.), 1041; 17 R. C. L, 325; 3 R C. L. Supp., 655; 4 R. C. L. Supp., 1119; 6 R. C. L. Supp., 1008.

On relative provinces of Court and jury as to privileged occasion and privileged communication in law of libel and slander, see annotation in 26 A. L. R., 830; 17 R. C. L., 329; 3 R. C. L. Supp., 656; 4 R. C. L., 1119; 5 R. C. L. Supp., 939.

Statements imputing crime as libelous *per se*, see 17 R. C. L., 265; 3 R. C. L. Supp., 642; 4 R. C. L. Supp., 1113.

3. LIBEL AND SLANDER—EVIDENCE SHOWING PUBLICATION OF WRITING CAPABLE OF CONVEYING DEFAMATORY MEANING HELD TO SUPPORT INFERENCE THAT DEFAMATORY MEANING WAS CONVEYED TO READERS.— Where publication of letter in newspaper was capable of conveying defamatory meaning charged in libel action, evidence adduced to establish its publication and circumstantial setting thereof *held* sufficient to support inference of fact that such defamatory meaning was actually conveyed to readers.

4. LIBEL AND SLANDER—OBJECTIONS THAT LIBEL INSTRUCTION MADE DEFENDANT'S SECRET INTENTION TEST OF LIBEL, AND AUTHORIZED CONSIDERATION OF CIRCUMSTANCES WITHOUT REGARD TO KNOWLEDGE THEREOF BY READERS, HELD HYPERCRITICAL.—In libel action, objections to instruction that, where words are capable of two meanings, only one of which is slanderous, jury must ascertain sense in which they were published, on ground that it erroneously made the defendants' secret intention test of libel, and authorized jury to consider circumstances, without regard to whether they were known by readers, *held* hypercritical.

5. LIBEL AND SLANDER—JURY MUST DECIDE WHETHER WORDS SUSCEPTIBLE OF TWO MEANINGS CARRIED DEFAMATORY MEANING TO READERS.—Where words sued on in action for libel are susceptible both of harmless and injurious meaning, jury must decide which meaning was in fact conveyed to readers, and plaintiff may give evidence of surrounding circumstances from which defamatory meaning can be inferred.

6. TRIAL—FAILURE TO QUALIFY INSTRUCTION AUTHORIZING CONSIDERATION OF CIRCUMSTANCES IN DETERMINING WHETHER PUBLICATION CARRIED LIBELOUS MEANING HELD NOT REVERSIBLE ERROR, IN ABSENCE OF REQUEST FOR QUALIFYING INSTRUCTION.—In action for libel, failure to qualify instruction authorizing consideration of circumstances in determining whether publication carried defamatory meaning, by instruction that only circumstances known to readers of publication could be considered, if error, *held* not reversible, in absence of specific request for qualifying instruction.

7. LIBEL AND SLANDER—FALSE, MALICIOUS, DEFAMATORY INSINUATION IS AS ACTIONABLE AS POSITIVE ASSERTION.—To render defamatory statement actionable, it is not necessary that false charge be made in direct, open, and positive manner; mere insinuation being as actionable as positive assertion, if it is false and malicious, and meaning is plain.

8. LIBEL AND SLANDER—IN ACTION FOR LIBELOUS PUBLICATION OF SENATOR'S REQUEST FOR LOAN FROM MAN WITH WHOM HE DEALT AS MEMBER OF CANAL COMMISSION, INSTRUCTION THAT FALSE, MALICIOUS INSINUATION IS ACTIONABLE HELD PROPER UNDER THE EVIDENCE.—Where libel action was based on newspaper publication

of article showing request for loan by State Senator about time he was appointed to Canal Commission, which would deal with man from whom loan was solicited, instruction that false, malicious insinuation is as actionable as positive assertion *held*˙ not error under the evidence.

9. LIBEL AND SLANDER—INSTRUCTION THAT JURY COULD NOT FIND MALICE FROM TRUE PUBLICATION OF SENATOR'S REQUEST FOR LOAN FROM MAN WITH WHOM HE DEALT AS MEMBER OF CANAL COMMISSION HELD PROPERLY REFUSED, SINCE INSINUATION IS ACTIONABLE. —Where action for libel was based on newspaper publication of State Senator's request for loan from man with whom he would deal as member of Canal Commission, loan being requested about time of his appointment to such commission, requested instruction that, if publication was true, jury could not find malicious intent from publication itself, *held* properly refused, in view of rule that insinuation is actionable.

10. LIBEL AND SLANDER—WHERE LIBEL ACTION WAS BROUGHT ON THEORY THAT PUBLICATION OF SENATOR'S REQUEST FOR LOAN INSINUATED THAT HE INVITED BRIBE, TRUTH OF PUBLICATION, TO CONSTITUTE DEFENSE, MUST BE ESTABLISHED IN SENSE IMPUTED TO IT IN DECLARATION.—In action for libel for publication of State Senator's request for loan from man with whom he would deal as member of Canal Commission, on ground that such publication was reasonably susceptible to mean that Senator had invited bribe, truth of publication pleaded by way of justification, in order to constitute complete defense, must be established in sense that publication was alleged to convey defamatory meaning.

11. TRIAL—INSTRUCTION THAT TRUTH WAS NOT DEFENSE IN LIBEL ACTION, IF MATTER PUBLISHED WAS LIBELOUS AND NOT PRIVILEGED, HELD NOT ERROR, IN VIEW OF INSTRUCTIONS GIVEN.—In action for libel, instruction that truth was not defense if matter published was not privileged, and made false insinuation against plaintiff rendering matter libelous, *held* not error, as applying doctrine that truth is not defense to civil action for libel, unless published on lawful occasion, in good faith, and for proper motive, in view of rule that plea of truth must extend to defamatory meaning alleged and of Court's previous instruction that truth of publication in sense that it conveyed defamatory meaning was complete defense.

12. LIBEL AND SLANDER—IN LIBEL ACTION, INSTRUCTION THAT DEFENDANTS MUST PROVE TRUTH OF PUBLICATION CHARGING CRIME BEYOND REASONABLE DOUBT HELD NOT INAPPLICABLE, WHERE PLAINTIFF ALLEGED PUBLICATION INSINUATED THAT HE SOLICITED BRIBE, AND DEFENDANTS PLEADED TRUTH OF PUBLICATION.—Where defendants pleaded truth as defense in action for libel for publication of Senator's request for loan, on theory that it insinuated that he

was inviting bribe, instruction that where libelous publication charges crime, defendants, seeking justification on ground that charge was true, must prove truth of charge beyond reasonable doubt, *held* not inapplicable.

13. APPEAL AND ERROR—WHERE CHARGE IS DIRECTED TO ISSUE NOT MADE BY PLEADINGS, COUNSEL MUST CALL COURT'S ATTENTION TO MISTAKE.—Where charge in action for libel was directed to issue which Court improperly assumed to be made by pleadings, it was incumbent on defendants' counsel, if aggrieved, to call Court's attention to mistake.

14. TRIAL—INSTRUCTION THAT DEFENSE OF PRIVILEGE, BASED ON RIGHT OF SELF-DEFENSE AND RIGHT TO PUBLISH MATTERS OF PUBLIC INTEREST, WAS AVAILABLE ONLY IN MITIGATION OF DAMAGES, HELD NOT ERRONEOUS, IN VIEW OF OTHER PORTIONS OF CHARGE.—In action for libel, charge that defense of privilege, based on right of self-defense and right to publish matters of public interest, was not good defense in bar, but available "only in mitigation or reduction of damages," *held* not erroneous, as limiting scope of defense to mitigation of damages, in view of other portions of charge declaring that such defense, if proved, would bar recovery.

15. TRIAL—CHARGE MUST BE CONSIDERED AS WHOLE.—In reviewing trial Court's charge, it must be considered as a whole.

16. TRIAL—REFUSAL OF INSTRUCTION COVERED BY INSTRUCTIONS GIVEN IS NOT ERROR.—Refusal of requested instruction is not error, if it is covered by instructions given.

17. TRIAL—LAW APPLICABLE TO PARTICULAR QUESTIONS MAY BE STATED IN SEPARATE CONSISTENT INSTRUCTIONS.—It is not improper to state law as applicable to particular questions in separate instructions which are consistent with each other.

18. LIBEL AND SLANDER—WHERE EVIDENCE IS OPEN TO NO OTHER REASONABLE INFERENCE THAN THAT OCCASION WAS PRIVILEGED, COURT MAY SO INSTRUCT, LEAVING TO JURY QUESTION WHETHER PLAINTIFF SHOWED EXISTENCE OF MALICE.—Where evidence in action for libel is open to no other reasonable inference of fact than that occasion of publication, in absence of actual malice, was privileged, Court may properly so instruct jury, leaving to jury only question whether plaintiff had sustained burden of showing existence of actual malice.

19. TRIAL—REFUSAL OF INSTRUCTION IN LIBEL ACTION THAT PUBLICATION WAS QUALIFIEDLY PRIVILEGED HELD NOT REVERSIBLE ERROR, WHERE GENERAL CHARGE PLACED BURDEN ON PLAINTIFF TO SHOW MALICE.— In action for libel, failure to charge, as requested, that publication made by defendants was qualifiedly privileged, *held* not reversible error, even though, under facts, Court might have charged that

occasion was privileged, where burden of showing actual malice was placed on plaintiff by instructions given.

20. LIBEL AND SLANDER—NONSUIT ON GROUND THAT DEFENSE OF PRIVILEGE WAS CONCLUSIVELY ESTABLISHED HELD PROPERLY DENIED WHERE EVIDENCE WAS REASONABLY SUSCEPTIBLE OF OTHER INFERENCES THAN THAT PUBLICATION WAS WITHOUT MALICE.—In action for libel, refusal of motion for nonsuit and directed verdict, on ground that defense of privilege had been conclusively established, *held* not error, where Court could not hold as matter of law that facts in evidence were susceptible of no other reasonable inference than that publication was made without actual malice.

21. LIBEL AND SLANDER—PLAINTIFF MAY RECOVER ACTUAL DAMAGES FOR INJURY FROM LIBELOUS PUBLICATION, INCLUDING HUMILIATION, AND EXEMPLARY DAMAGES, IF PUBLICATION WAS MALICIOUS.—In State Senator's action for libel, if publication was libelous, plaintiff is entitled to substantial actual damages to compensate for injury, including humiliation, and to exemplary damages, if defamatory publication was wantonly or maliciously published, with intent to injure.

22. TRIAL—INSTRUCTION IN LIBEL ACTION THAT, IF JURY FOUND PUBLICATION MALICIOUS, PLAINTIFF WOULD BE ENTITLED TO "SUBSTANTIAL DAMAGES," HELD NOT CHARGE IN RESPECT TO MATTERS OF FACT (CONST., ART. 5, § 26).—In action for libel, instruction that, if jury should find that publication was libelous, plaintiff would be entitled to substantial damages, *held* not erroneous, as violating Const., Art. 5, § 26, by charging in respect to matters of fact; it being apparent that words "substantial damages" were used in contradistinction to "nominal damages."

23. LIBEL AND SLANDER—PRINTED OR WRITTEN STATEMENT, FALSELY OR MALICIOUSLY CHARGING COMMISSION OF CRIME, IS "LIBELOUS PER SE."—Any printed or written statement, which falsely and maliciously charges another with the commission of a crime, is "libelous *per se.*"

24. LIBEL AND SLANDER—FROM PUBLICATION OF MATTER LIBELOUS PER SE, GENERAL DAMAGES ARE PRESUMED.—From publication of defamatory matter, which is libelous *per se,* general damages are presumed to result by inference of law, and are not required to be proved by evidence.

25. APPEAL AND ERROR—INSTRUCTION THAT PLAINTIFF WAS ENTITLED TO SUBSTANTIAL DAMAGES FOR PUBLICATION OF LIBELOUS MATTER HELD NOT REVERSIBLE ERROR, FOR USE OF WORD "SUBSTANTIAL," IN ABSENCE OF REQUEST FOR MORE PRECISE STATEMENT.—In action for libel, instruction that, if jury found publication libelous, plaintiff would be entitled to substantial damages, *held* not prejudicially

erroneous, for use of words "substantial damages," where defend-
ants failed to request fuller and more precise statement, even
though use of word "substantial" is not to be commended.

26. Trial—Instruction that Plaintiff was Entitled to Substantial
Damages, if Publication was Libelous, Held Not Erroneous, as
Eliminating Defense of Self-Defense and Privilege, and Evi-
dence Offered in Mitigation, in View of Following Instruc-
tions.—Instruction, in action for libel, that, if jury found publica-
tion libelous, plaintiff would be entitled to substantial damages,
*held* not erroneous, as eliminating consideration of defense of self-
defense and privilege, and evidence offered by defendants in miti-
gation, in view of following instructions authorizing consideration
in mitigation of damages of all facts and circumstances tending
to show publication under influence of provocation.

27. Appeal and Error—In Libel Action, Objection that Charge
Used "May" in Charging as to Mitigation of Damages, and
"Should" in Charging as to Consideration of Circumstances in
Determining Damages, Held Hypercritical, Not Warranting
Finding of Reversible Error.—In action for libel, defendants' ob-
jection to instruction that charge used "may" in charging as to
facts and circumstances in mitigation, but used "should" in charg-
ing as to circumstances for consideration in determining amount
of damages, *held* not to warrant finding of reversible error, being
manifestly hypercritical.

28. Appeal and Error—Supreme Court Cannot Review Denial of
New Trial for Excessive Verdict, Unless Record Shows Abuse
of Discretion.—Supreme Court, confined by constitutional limita-
tion to correction of errors of law in reviewing action for libel,
cannot review and reverse ruling refusing new trial on ground that
verdict was excessive, unless appeal record discloses and warrants
conclusion as matter of law that refusal was manifest abuse of
Circuit Judge's discretionary power.

29. Appeal and Error—Supreme Court Cannot Review Judgment
Merely Because Verdict is Excessive.—Supreme Court is without
jurisdiction to review judgment on ground alone that verdict is
excessive, or contrary to evidence.

30. Appeal and Error—Verdict Should be so Excessive as to War-
rant Inference of Improper Motive, to Authorize Review on
Ground that Denial of New Trial was Abuse of Discretion.—
In order to have review and correction of judgment, on ground
that trial Court abused discretion in refusing new trial on ground
that verdict was excessive, it should appear that verdict was so

excessive as to warrant inference that it was result of caprice, or some improper or corrupt motive.

31. NEW TRIAL—DENIAL OF NEW TRIAL ON GROUND THAT $50,000.00 VERDICT WAS EXCESSIVE HELD NOT ERROR OF LAW, WHERE VERDICT ESTABLISHED PLAINTIFF WAS VICTIM OF DEFENDANTS' MALICE IN PUBLISHING UNJUSTIFIED CHARGE THAT PLAINTIFF SOLICITED BRIBE. —Where jury's verdict established facts to be that plaintiff in libel action was reputable and innocent victim of defendants' express malice in publishing without justification or excuse defamatory charge to effect that he was guilty of soliciting bribe, refusal of motion for new trial on ground that verdict of $50,000.00 was excessive *held* not abuse of discretion, amounting to error of law.

32. APPEAL AND ERROR—IN DETERMINING WHETHER VERDICT WAS EXCESSIVE, COURT ASSUMES THAT FACTS ARE THOSE ESTABLISHED BY VERDICT.—Where jury in action for libel determined issues of fact in favor of plaintiff, it must be assumed that facts are those established by jury's verdict, in reviewing question of new trial on ground that verdict was excessive.

33. NEW TRIAL—JUDGE'S MISCONCEIVED STATEMENT THAT VERDICT SHOULD BE OUTRAGEOUS TO WARRANT NEW TRIAL WILL NOT JUSTIFY REVERSAL OF ORDER DENYING NEW TRIAL, PLAINLY PREDICATED ON VIEW THAT VERDICT WAS NEITHER MODERATELY NOR OUTRAGEOUSLY EXCESSIVE.—Denial of new trial will not be reversed because of Circuit Judge's misconception of power and duty, as reflected in statement that damages should be outrageous to justify new trial, where his order clearly indicated that it was predicated on view that verdict was neither moderately nor outrageously excessive.

On Petition for Rehearing and for Court *En Banc*

34. COURTS—SUPREME COURT JUSTICES AND ALL CIRCUIT JUDGES CONSTITUTE COURT EN BANC (CONST. 1895).—Court *en banc* is composed of Justices of Supreme Court and all Circuit Judges, and was created by Const. 1895.

35. COURTS—TO AUTHORIZE CALLING OF COURT EN BANC, IT MUST APPEAR TO THREE JUSTICES OF SUPREME COURT THAT CONSTITUTIONAL QUESTION IS INVOLVED; "CONSTITUTIONAL LAW" (CONST. 1895, ART. 5, § 12, AS AMENDED BY [27 ST. AT LARGE, P. 117]).—Under Const. 1895, Art. 5, § 12, as amended (27 St. at Large, p. 117), it must appear to three Justices of Supreme Court that question of constitutional law is involved in pending cause, to authorize calling of Court *en banc,* notwithstanding that clause of resolution for amendment, stating how section should read when amended, omitted word "three"; "constitutional law" being department of law treating of

Constitutions and validity of enactments, as tested by criterion of conformity to fundamental law.

36. CONSTITUTIONAL LAW—CONSTITUTIONAL PROVISIONS REGULATING ITS OWN AMENDMENT, OTHERWISE THAN BY CONVENTION, ARE MANDATORY (CONST., ART. 16, §§ 1, 2).—Provisions of Constitution regulating its own amendment, otherwise than by convention, are not merely directory, but mandatory, and strict observance of every substantial requirement set forth in Article 16, §§ 1, 2, is essential to validity of proposed amendment.

37. EVIDENCE—SUPREME COURT PRESUMES THAT GENERAL ASSEMBLY AND OFFICIALS DISCHARGED DUTIES IN AMENDING CONSTITUTION IN REQUIRED MANNER (CONST., ART. 16, §§ 1, 2; ART. 5, § 12).—In absence of showing of failure to comply with·Const., Art. 16, §§ 1, 2, in amending Article 5, § 12, Supreme Court will presume that General Assembly and all other officials charged with duties in connection with submission, adoption, and ratification of amendment discharged such duties in manner required.

38. CONSTITUTIONAL LAW—IN DETERMINING WHICH LANGUAGE OF RESOLUTION FOR CONSTITUTIONAL AMENDMENT SHOULD PREVAIL, SUPREME COURT WILL ENDEAVOR TO ASCERTAIN INTENTION OF LEGISLATORS AND WILL OF PEOPLE· (CONST., ART. 5, § 12).—In construing amendment of Const., Art. 5, § 12, to determine whether language of resolution declaring amendment, or language stating how section should read as amended, should control, Court will endeavor to ascertain intention of Legislators submitting amendment, and will of people voting favorably to it, by considering situation and conditions prior to amendment.

39. COURTS—PRIVILEGE OF CALLING COURT EN BANC IS NOT RIGHT GIVEN LITIGANT (CONST., ART. 5, § 12).—Privilege of calling Circuit Judges to aid of Supreme Court, under Const., Art. 5, § 12, is entirely for Court and its Justices and is not right given litigant, so that Court and Justices will call Court *en banc* when it is deemed advisable without petition or suggestion from party to pending cause; right of appeal not being vested one, but matter of grace.

40. COURTS—CALL FOR "COURT EN BANC" SHOULD BE MADE BEFORE SUPREME COURT DETERMINES CAUSE (CONST., ART. 5, § 12).—Call for Court *en banc,* under Const., Art. 5, § 12, should be made while Supreme Court has pending before it, and before it has determined, cause in which assistance of Circuit Judges is desired, since Court *en banc* is not independent Court, but called as consultive Court, and becomes for time being Supreme Court.

41. COURTS—CONTENTION THAT JUDGE CHARGED ON FACTS DOES NOT RAISE QUESTION OF CONSTITUTIONAL LAW, AUTHORIZING CALLING OF COURT EN BANC (CONST., ART. 5, §§ 12, 26).—Contention that Circuit Judge erred in charging on facts, in violation of Const., Art. 5, § 26, does not raise question of constitutional law, justifying calling of Court *en banc*, under Section 12, since instruction or interpretation of constitutional provisions is not involved.

42. COURTS—IT IS ASSUMED THAT DISSENTING OPINION ACQUIESCES IN CONCLUSIONS OF MAJORITY AS TO POSITIONS NOT CONTROVERTED.— Usual rule is that, when dissenting opinion does not controvert any position taken by majority opinion, it is assumed that dissenting opinion acquiesces in conclusions of majority as to positions not controverted.

43. COURTS—SUPREME COURT WILL CALL COURT EN BANC ONLY WHEN GRAVE QUESTION OF PUBLIC CONCERN IS INVOLVED (CONST., ART. 5, § 12).—Supreme Court will not exercise power, under Const., Art. 5, § 12, to call Court *en banc*, unless some grave question of public concern is involved.

44. COURTS—CONTENTION THAT CIRCUIT JUDGE CHARGED ON FACTS DOES NOT RAISE "GRAVE QUESTION OF PUBLIC CONCERN," AUTHORIZING CALLING OF COURT EN BANC (CONST., ART. 5, §§ 12, 26).—Contention that Circuit Judge charged on facts, in violation of Const., Art. 5, § 26, dies not present "grave question of public concern," justifying calling of Court *en banc*, under Section 12.

45. APPEAL AND ERROR—SUPREME COURT'S ONLY CONCERN RELATIVE TO VERDICT IS WHETHER JUDGE, IN TRIAL OF CAUSE, COMMITTED ERROR OF LAW.—So far as verdict of jury in action for libel is concerned, Supreme Court is concerned only with question whether trial Judge, in trial of cause, committed any error of law.

46. APPEAL AND ERROR—SUPREME COURT MUST ASSUME THAT JURY DID DUTY AS THEY CONCEIVED IT TO BE.—In reviewing action for libel, Supreme Court must assume that jury did duty as they conceived it to be.

47. APPEAL AND ERROR—SUPREME COURT HELD NOT AUTHORIZED TO ORDER REMISSION OF INTEREST ON JUDGMENT BASED ON JURY'S VERDICT IN LIBEL ACTION, NOTWITHSTANDING DELAY IN RENDERING FINAL DECISION (CIV. CODE 1922, § 3636; CONST., ART. 5, §§ 4, 17). —In reviewing action for libel, Supreme Court is not authorized, under Const., Art. 5, § 17, relative to time for filing decisions, to order remission of interest on judgment based on jury's verdict, notwithstanding Supreme Court's delay in rendering final decision, since in such action Supreme Court is Court for correction of

errors at law under regulations of General Assembly, under Section 4, and Civ. Code 1922, § 3636, provides that all money judgments shall draw interest at legal rate.

Before Townsend, J., Richland, May, 1925.    Affirmed.

Action by T. C. Duncan against the Record Publishing Company and another. Judgment for plaintiff, and defendants appeal.

The Judge's charge, the verdict, the order refusing a new trial, and the exceptions follow:

## Judge's Charge

This is an action brought by plaintiff to recover damages from the defendants because of the publication by defendants of an alleged libel of and concerning the plaintiff. A libel is a false and malicious defamation, expressed either by writing or printing, or by signs or pictures, or the like, tending to impeach the honesty or integrity or reputation of a person, and thereby to expose him to public hatred, contempt, ridicule, or obloquy, or to cause him to be shunned or avoided, or to deprive him of the benefits of public confidence, and to injure him in his office, business, or social standing.

To constitute an actionable libel, the writing must make a false charge or insinuation against the plaintiff; it must be inspired by malice; it must tend to impeach the reputation of the plaintiff, and to injure him in his office, business, or in the estimation of the public. To render a defamatory statement actionable, it is *not necessary* that the false charge be made in a direct, open, and positive manner. A mere *insinuation* is as actionable as a positive assertion, if it is false and malicious, and the meaning is plain.

A libel consists of written words, which impute to a party crime, immorality, vice, or dishonorable conduct, or that he is suspected of misconduct, or which have a tendency to injure him in his office, profession, calling, or trade. All words which hold a party up to contempt, hatred,

scorn, or ridicule, or which tend to deprive him of friendly intercourse and society, such as imputation of scoundrelism, or want of integrity in the discharge of the duties of an office or employment, or unfitness for such duty or office, are libelous, if written and published of a party.

Where the words written and published of another are capable of two meanings, one of which is slanderous and the other is not, it is the duty of the jury to ascertain from the evidence, by the greater weight thereof, taking into consideration all the facts and surrounding circumstances attending the uttering of the publication, in what sense the words were uttered or published. In ascertaining the sense in which the words were published, and the meaning intended to be conveyed and conveyed to readers, the jury are entitled to take into consideration both the ordinary meaning of the words, the time, place, setting, and surrounding circumstances attending and accompanying the publication thereof, including also the official position and duties of the party about whom the publication was made at that time, as they may find the same to be from the evidence by the greater weight thereof, and ascertain and determine from all of the evidence, what meaning should be given to the publication.

It is for the jury to determine from the evidence, by the greater weight thereof, the sense in which words were published. To charge one who holds a public position directly or indirectly with offering or inviting himself to be bribed from the performance of his official duty is libelous. You are not to assume that the publication had a libelous meaning, and to reject an innocent meaning as a matter of course, or *vice versa,* but you are to decide under all of the evidence what was the meaning of the publication.

The plaintiff has alleged in paragraph 8 of the complaint that defendants purposed and intended to charge, and to convey to the public the charge, that the plaintiff was susceptible to bribery; that plaintiff, by his letter of March

28, 1923, to defendant Robertson, was inviting defendant Robertson to approach and influence plaintiff in the discharge of his duties on the Canal Commission in a corrupt way; that plaintiff was dishonest and corrupt in the discharge of his public and official trusts and duties; that plaintiff was betraying the interest of the public and of the state in his official position; that plaintiff's integrity was impeached, and that he was unworthy of the confidence of the public and of the business world.

The defendants have denied that they purposed or intended to make or convey any such charges, and this throws upon plaintiff the burden of proving the affirmative of such intention or purpose on the part of the defendants by the greater preponderance or greater weight of the testimony. Unless you find from the preponderance of the testimony that defendants did intend or purpose to make and convey one or more of such charges by the publication in question, then your verdict must be for the defendants.

It is admitted, or undisputed in this case, that the Record Publishing Company is now, and was at the times mentioned in the complaint, a corporation engaged in the business of publishing and circulating a daily newspaper, known as the Columbia Record, in the city of Columbia, in this County and State, and that the defendant Roberston was, when this action was commenced, a citizen and resident of this County; that the plaintiff is a citizen and resident of Union County, in this State, and that he has been for the past six or seven years and still is a member of the State Senate from Union County; that the act of the General Assembly of this State creating the Canal Commission, which was charged with the duty and responsibility of con- trolling, safeguarding, and enforcing the rights and inter- ests of the State in the property commonly known as the Columbia Canal, was passed during the session of 1923, and approved on the 26th of March, 1923 [33 St. at Large, p. 828]; and that the plaintiff was on the 23d day of March,

1923, appointed a member of said commission, and has since that time, and up to the time of the commencement of this action, been acting in the discharge of his duties in such official position; that the defendant, Robertson, then and at the times mentioned in the complaint, was largely interested financially, and through the Columbia Railway, Gas & Electric Company, a corporation largely controlled by him, in said Columbia Canal property, as to which interests there had been, and was then pending litigation under the direction or oversight of said Commission; that during the forenoon of the 11th of March, 1924, the plaintiff, as Senator from Union County, delivered a speech in the Senate, of which the report published in the State newspaper of March 12th, introduced in evidence and attached as an exhibit to the answer, is substantially correct; that on the afternoon of March 11, 1924, during the sitting of the General Assembly of this State, the defendants published in the Columbia Record an article concerning the plaintiff in terms as follows:

"FACSIMILE OF A LETTER FROM SENATOR T. C. DUNCAN TO EDWIN W. ROBERTSON, OF COLUMBIA

"Senator Duncan is a member of the Canal Commission. He was appointed a member of the Commission on March 23, 1923. The act creating the Commission was passed by the General Assembly during the session of 1923, and was approved March 26, 1923. Senator Duncan's letter is dated March 28, 1923. The loan solicited was not granted. The first meeting of the Canal Commission was held in Columbia April 13, 1923.

"After five days return to T. C. Duncan, Union, S. C. To E. W. Robertson, % Loan & Exchange Nat. Bank. "Personal.

"T. C. Duncan, Union, S. C.   To E. W. Robertson, Columbia, S. C.   March 28, 1923.

"Dear Sir: I would like to secure a loan of $25,000.00—

for three years—interest payable semiannually. I have security worth six times the amount of loan desired.

"I will be glad for you to have your representative to inspect the property that I would offer as collateral—I can make loan from a bank, but I do not desire the constant renewal of paper. I have Building & Loan stock that will mature in three years, by means of which loan will be paid at maturity.

"If there is any one in the State who could handle the above matter, you are the individual—I would thank you for your early reply.

"Very truly, [Signed] T. C. Duncan."

It is admitted that the first copy published in the Record of the letter of plaintiff to defendant E. W. Robertson undertook and purported to be and was a facsimile or photographic copy of the envelope and letter.

Plaintiff contends and alleges that in and by the publication hereinabove set forth, including headlines, style, and manner of publication, and the circumstances attending and surrounding the same, the defendants purposed and intended to charge and to convey to the public the charge that this plaintiff was susceptible to bribery; that he was by said letter inviting the defendant E. W. Robertson to approach and influence him in the discharge of his duties on said Canal Commission in a corrupt way; that plaintiff was dishonest and corrupt in the discharge of his public and official trusts and duties; that he was betraying the interests of the public and of the State in his official position; that plaintiff's integrity was impeached, and that he was unworthy of the confidence of the public and of the business world; that the said *publication* and the *insinuations* and charges intended to be conveyed to the public and to be made against the plaintiff thereby were *false,* wanton, malicious, and libelous, and the plaintiff has suffered damage, actual and punitive, thereby in the sum of fifty thousand dollars ($50,000). Wherefore plaintiff prays judgment

against the defendants for the sum of $50,000, for costs and other and further relief.

The defendants deny the alleged purpose and intention of said publication, and that any charges or insinuations against plaintiff were therein made. Defendants deny that the said publication was either false or wanton, or malicious or libelous, and deny that it has injured the plaintiff in any way whatever. The defendants deny all of the allegations of the complaint which I have not stated in this charge are admitted.

Each defendant specifically denies that he or it purposed or intended to convey to the public the charge that plaintiff was susceptible to bribery, or that plaintiff was by said letter inviting the defendant E. W. Robertson to approach and influence him in the discharge of his duties on said Canal Commission in a corrupt way, or that plaintiff was dishonest and corrupt in the discharge of his public and official trusts and duties, or that plaintiff was betraying the interests of the public and of the State in his official position, or that plaintiff's integrity was impeached, or that plaintiff was unworthy of the confidence of the public and of the business world, and, on the contrary, the defendant Record Publishing Company alleges that it published the matter complained of without malice or intention to injure the plaintiff, and solely in fairness to all parties and as a matter of great public concern; to show the public that plaintiff's attitude in the canal controversy was possibly influenced, in part, at least, by his personal ill will toward E. W. Robertson; and defendant alleges that said publication did not exceed fair and honest criticism.

The defendant Robertson, as a *second defense,* alleges: That on the morning of March 11, 1924, as defendant is informed and believes, the plaintiff arose in the Senate of South Carolina, then sitting, and delivered a malicious and defamatory speech concerning defendant, of which Exhibit

A, attached and made a part hereof, is a fair and substantially correct report. And defendant alleges, upon information and belief:

That, while plaintiff claimed to be speaking as a Senator on a question of privilege, he was in fact venting his personal ill will and malice against defendant, which was the sole purpose of such speech, and that plaintiff well knew and intended that said speech should appear in the public press and thus be broadcasted throughout the State and country, as in fact resulted, as intended, planned, and caused by plaintiff. That, as plaintiff is informed and believes, in and by the statements made in defamatory speech, spoken and published concerning defendant, and the circumstances attending and surrounding the same, the plaintiff purposed and intended to charge and convey to the public, as in fact his many hearers and those reading the report of his speech in the newspapers understood, the following charges against defendant:

That defendant had deceitfully induced certain men to represent to the Canal Commission that it was to the interest of the State and this community to settle the canal controversy, when, as a matter of fact, such men were seeking only to promote the selfish interests of defendant, as a result of his deceitful procurement. That defendant had bribed or had improperly influenced the newspapers to circulate propaganda that it was to the interest of the State to make the settlement, when, in fact, such newspapers were seeking only to promote the selfish interests of defendant, as a result of his deceitful procurement.

That defendant had entered into a deceitful arrangement with Stone & Webster, Inc., whereby they should undertake to settle the canal controversy with the Canal Commission apparently for the benefit of themselves, when, as a matter of fact, they were acting only to promote defendant's interests, pursuant to such deceitful arrangement. That defendant had been feeding on dead men's bones;

that is, that defendant was a ghoul.   That the company
which defendant represents had and lived on its betters, had
taken advantage of the financial situation, and had never
done anything for the development or advancement of the
city of Columbia or of South Carolina.   That defendant
was an octopus.   That defendant had dominated Chambers
of Commerce and little towns, and had deceitfully persuaded
them to take an active part in the matter, apparently for
the best interest of the public, but, in reality, to promote
the selfish interests of defendant, pursuant to his deceitful
persuasion.

That said statements and charges, intended to be and
actually conveyed to the public, and so understood by them,
as made against the defendant, are and were false, wanton,
malicious, and defamatory, and were made by plaintiff, not
for the purpose of promoting or in an effort to promote or
discharge his duties as a Senator or as a member of the
Canal Commission, and not in the interest of the public
or the State of South Carolina, but for the purpose of
gratifying his personal ill will and malice against this de-
fendant, bringing defendant into public hatred, contempt,
ridicule, and obloquy, causing him to be shunned and avoided
and injuring him in his business and occupation.

That at the time of plaintiff's defamatory speech the
good will and favorable opinion of the public were of pe-
culiar value to defendant, not only in a personal, but also
in a financial way, and defendant, having been informed
concerning the speech of plaintiff soon after it was made,
was greatly shocked and grieved that he should have been
the subject of such an unjustified, malicious, and defama-
tory attack, and that he, as well as other men who were
honestly seeking to promote the best interest of their com-
munity and state, as well as their own legitimate personal
interest, had been so maliciously and falsely slandered; and
defendant, knowing that it was part of plaintiff's purpose
to cause such slanderous and malicious charges to be broad-

casted through the newspapers, and believing that it was his privilege and duty to protect himself and his reputation, as well as that of the others attacked, gave out the letter in question to the Columbia Record, so that the same might be published, together with the pertinent facts, all of which are quoted in paragraph 6 of the complaint, and all of which are true, for the purpose of showing to the public that plaintiff's defamatory attack upon defendant and others was due to plaintiff's personal ill will and malice against defendant, because defendant had refused to lend plaintiff $25,000, and defendant gave out said letter for publication, so that it might be published contemporaneously and as broadly as plaintiff's slanderous attack, and that the members of the General Assembly and the public, who, as defendant and plaintiff both knew, would read the newspaper report of plaintiff's speech, might realize that said speech was conceived and delivered in spite and malice, and not in truth, and that such charges against defendant and others would not be believed.

And defendant alleges that the foregoing justified defendant in publishing a true copy of the letter written him by plaintiff, together with a true statement of the circumstances under which it was written, without comment by defendant, and which this defendant did without malice, ill will, or intention to injure plaintiff, and only in order to defend himself against plaintiff's defamatory attack, and defendant pleads the foregoing by way of privilege and justification, as well as in mitigation.

. The defendant Record Publishing Company, further answering the complaint, alleges:

That it is the owner and publisher of a daily newspaper of wide circulation, known as the Columbia Record, the success of which is largely dependent upon its reputation for fairness, impartiality, and independence. That, as this defendant is informed and believes, the plaintiff herein on the morning of 11th of March, 1924, arose in the Senate

of South Carolina and then and there delivered a malicious and defamatory speech, in which plaintiff charged and intended to charge and convey to the public, among other things, that this defendant had been bribed, subsidized, or improperly influenced to circulate propaganda to the effect ·that it was for the best interests of South Carolina to accept the pending offer of Stone & Webster, Inc., in settlement of the so-called Columbia Canal controversy, and that this defendant was, on account of such alleged action, betraying the best interests of this community and the State of South Carolina.

That, as a matter of fact, this defendant at the time of said speech had not spoken editorially on the pending offer of settlement by Stone & Webster, Inc., and had done nothing but publish, without comment, fair and impartial news articles relating to said offer of settlement; that the charges and statements made by plaintiff in said speech with reference to this defendant were false and malicious, and were intended to be, and actually were, understood by the public as defamatory, and a grave reflection upon the integrity, fairness, independence, and impartiality of this defendant and of its newspaper, the Columbia Record, and brought this defendant into public hatred, contempt, ridicule, and obloquy, and injured and damaged it in its business and good name.

That this defendant, upon being informed of the said speech by plaintiff herein, and believing that it was its duty and privilege to protect the good name and reputation of said the Columbia Record, published the facts and letter quoted in paragraph 6 of the complaint, all of which are true, and that said publication was made for the purpose of showing to the public that the defamatory charges made by plaintiff against this defendant were actuated and induced, not by anything which this defendant had done or said with reference to plaintiff, or his attitude toward the offer of Stone & Webster, but resulted solely from the ill

will and malice which plaintiff had conceived, for personal reasons, against all whom plaintiff regarded as favoring the acceptance of said offer of Stone & Webster, Inc.

And this defendant alleges that the foregoing justified defendant in publishing the matter referred to in paragraph 6 of the complaint, which this defendant did without malice or ill will against plaintiff, or intention to injure him, but only to defend itself and its good name and reputation against plaintiff's defamatory attack. And defendant pleads the foregoing as privilege and justification as well as in mitigation.

Is the second defense of the Record practically the same as that of the other defendant, or had I better read it?

Mr. Sapp: I think it is practically the same, your Honor.

The Court: The second defense of the Record is practically the same as that of the defendant Robertson, which I have already read; then I won't have to read that defense.

Each defendant alleges that the facts—that these facts set out in this second defense and these only were published by it of and concerning the plaintiff, and that each and every one of them were true, and each defendant pleads the truth of said publication by way of justification and complete defense to this action, and that said publication was made from a sense of the moral and social duty which this defendant owed to the public.

A previous publication by a plaintiff in a libel suit, assailing a defendant in such suit, and *provoking* the publication of a libel by such defendant, may be considered in mitigation of any damages caused to plaintiff by the defendant's publication, if the publication is so recent as to induce a fair presumption that the defendant published the publication made by him during the continuance of feelings and passions excited by the provocation. But a *distinct* and *independent libel,* published by a plaintiff of and concerning a defendant, *not provoking* the publication which plaintiff complains of, could not be considered in mitigation of any

damages, if any there should be proven, due a plaintiff by a defendant on account of such complaint.

It is in our country a great principle of constitutional law, and one which prevails in favor of every member of the state Senate, that for any speech in the Senate a Senator cannot be sued for libel or slander or on account of any statement therein made; nor can a Senator be held responsible in any court for anything said by him in the performance of his official duties in the Senate. But this exemption from liability is intended as a shield to the Senator to protect him from liability, and not as a sword to enable him to provoke others to attack him. If a publication of a libel by a defendant against a Senator is provoked by a speech made by the Senator in the Senate, such speech by the Senator, although made in the Senate, may be taken into consideration by the jury as in mitigation or reduction of any damages caused to the Senator by the defendant's publication, if the defendant's publication was libelous.

If you find that charges or insinuations against this plaintiff, if any, made in the publications made by defendants in this case, were true, then your verdict as to such charges or insinuations found to be true must be for defendants. I charge you this, because in a case of this character the truth of the publication and of any charges or insinuations made therein is a complete defense. And even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication or charges were made, that they were the truth.

In an honest endeavor to vindicate himself and his own interests, a defendant is often privileged to make statements which would otherwise be regarded as defamatory. If a party's good name is assailed in a newspaper, he may reply, defending himself, and if his reply is made in good faith, without malice, and is not unnecessarily defamatory of his

assailant, it is privileged. Even though false, a publication which is fairly in answer to a libel, if published without malice and in good faith, for the purpose of repelling a charge, is privileged, and is not actionable.

An action for libel is not to be encouraged for publications made while parties are mutually engaged in making publications about each other. A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and it is for you to determine from the evidence, applying to the evidence the rules of law stated by me, whether or not, under the circumstances of this case, the publication made by defendants was qualifiedly privileged, and, if it was privileged, then you cannot award the plaintiff a verdict, unless you find that the defendants were actuated by express or actual malice in making the publication, and have abused their privilege.

I charge you that the defense of self-defense and privilege, as I have heretofore set them forth, would apply in this case in mitigation or reduction of damages, if the publication by defendants was libelous, even though plaintiff's publication resulted from a speech made by plaintiff during a session of the Senate of which he was a member, and in the Senate chamber. The law of this State is that, while plaintiff's speech was privileged, in the sense that defendants could not have sued him in a civil action for any defamatory statements that may have been contained therein, and while defendants could not prosecute him in the criminal Court for such speech, his privilege as Senator did not deprive defendants of their right to defend themselves or of their privilege to answer his attack. In other words, plaintiff's privilege as a Senator was a shield and not a sword, and you will not consider any such claim of senatorial privilege on the part of plaintiff in determining whether the defendants have made out their defenses of

self-defense and privilege according to the law as I have charged you.

The seventh request was refused. Defendants' seventh request refused as on the facts, and not read.

Where the doctrine of privileged communication is claimed, it applies where the publication is on a proper occasion and from a proper motive.

Fair and honest criticism in matters of public concern are privileged, but the privilege is limited strictly to comments and criticism, and does not extend to protect false statements, unjust inferences, imputations, or evil motives or criminal conduct and attacks upon private character, the publisher being responsible for the truth of what he alleges to be facts. The doctrine of privileged publication does not apply to protect a publication made in or from express or actual malice.

The Court charges the jury that malice means that state of mind or feeling which permits an individual to do an act whereby he consciously knows that another is or may be injured, wrongfully and intentionally, without just cause or excuse. It is the conscious doing of a wrongful act intentionally without just cause or excuse. It is not necessary, to render an act malicious, that the party be actuated by a feeling of hatred or ill will toward the individual, or that he entertained and pursued any bad purpose or design. But if, in pursuing his purpose or design, he willfully inflicts a wrong on others, which is not warranted or excused by law, such act is malicious.

Where defamatory words are falsely written or spoken of a person in regard to his public and official position and duties, prejudice to him and malice on the part of the parties publishing are implied in law. It is immaterial that the writer of a libel did so without intention to injure another person; if in fact his act has injured some other person, the publisher is liable.

In determining whether or not there is malice, the jury may take into consideration evidence, if there is any, of the repetition of the alleged libelous publication before and after the time of the publication charged in the complaint. Where one seeks to justify a publication, the law requires him to prove publication as broadly and fully as the charge was made.

The solicitation of a bribe by a public officer, to influence him in the discharge of his official duty, is a crime. Where a libelous publication consists of making a charge of a crime, and a party seeks to justify, on the ground that the charge is true, the law of this State requires him to prove the truth of his charge—that is to say, the truth of the crime—beyond a reasonable doubt, just as in criminal cases.

If the defendants, by the publication in evidence, charged the plaintiff with having solicited a bribe, while a public officer, to influence his official conduct, then the charge and publication would be libelous, and the burden would then be upon defendants to defeat liability by proving the truth of the charge, or to prove any facts or circumstances, which, under the law as stated by me in this charge, would mitigate or reduce any amount of damages recoverable by plaintiff.

The Court further charges the jury that, when a party sets up a plea of justification and fails to make it good, the jury may take this into consideration as an element in aggravation of damages. The burden is upon the defendants to prove the new and affirmative matter alleged in their answers, and pleaded in defense to, or in mitigation of, damages.

Before the plaintiff can recover any damages against either defendant, he must prove that the *publication* made by such defendant, and alleged in the complaint, was accompanied or caused by malice on the part of such defendant, and amounted to a libel against plaintiff. If the written words, published by defendants of and concerning the plaintiff, were accompanied or prompted by malice, and tend to

diminish the respectability of the plaintiff, and to expose
him to disgrace and obloquy, they are libelous and action-
able, even where no special damages are alleged and proven.
In determining whether words are libelous, they are to be
given their ordinary and popular meaning; and if they are
susceptible of two meanings, one libelous and the other in-
nocent, the former is not to be adopted and the latter re-
jected as a matter of course, but it must be left to the jury
for you to determine in what sense they were used.   The
inference of hurt, or injury, arising out of a statement of
facts, in order to become actionable, must be such an infer-
ence as is drawn or established by the general consent of
men.

Malice, as an ingredient in actions for libel, signifies
nothing more than a *false charge* consciously and intention-
ally made, without just cause or excuse.   On the question
whether or not there was malice in the publication com-
plained of, you have a right to consider the words them-
selves, and the circumstances attending the publication.
The cause and manner of publishing an alleged slander are
in all cases proper to be considered by the jury as a guide in
assessment of damages, if a libel has been published, either
as mitigating or reducing, or as aggravating, the damages,
where damages are recoverable under the law as stated by
me in this charge.   It is a legal defense to an action for
libel if it is shown that the publication was true, or if the
circumstances under which the publication was made were
such as to render it right and proper that the defendant
should make the publication in question.   In such cases the
publication is said to be privileged, and if privileged, al-
though it may be false, still its publication on such an occa-
sion is excused for the sake of the common convenience and
welfare of society at large.   In order for the plaintiff to
recover damages on account of a publication by a defendant,
the evidence should show a probability of malice on the part

of such defendant, and be more consistent with its existence than its absence.

Where the facts printed and published about a plaintiff are true, no liability for libel will arise from the mere fact that the truth stated is liable to suggest damaging inferences concerning such plaintiff, or from the mere fact that from the truth so stated natural inferences of a defamatory character might be drawn which would be untrue. But the benefit as a defense of the truth of matters published may be lost, if the matter published was a private transaction with which the public had no legitimate connection or concern, and the manner and style of publication made a false insinuation against the plaintiff, which would render the matter libelous.

If the occasion for a publication was privileged, the presumption would arise that the publication was in good faith and without malice, and it would be incumbent on plaintiff to overcome this presumption. If from a defendant's point of view strong words seem to be justified, he should not be held liable for using them, unless the jury find from the evidence that what he published was malicious and inconsistent with good faith. A publication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or proper cause. When so made in good faith, the law does not imply malice from the publication itself, but in such a case actual malice must be proven before there can be a recovery.

Fair and honest criticism in matters of public concern is privileged; but the privilege is limited strictly to comments and criticism, and does not extend to protect false statements, *unjust inferences,* imputation of evil motives or criminal conduct, and attacks upon private character or reputation; the publisher being responsible for the truth of what he alleges to be facts. It is for the jury to determine from the evidence whether or not criticisms or statements

affecting a public officer or a public matter cease to be fair and honest, or become libelous.

If the jury find from the evidence, by the greater weight thereof, that the publication in question was libelous, then the plaintiff would be entitled to recover such sum by way of actual damages as the jury in its discretion may think proper to compensate him for his injury, including the humiliation which he may feel and may have suffered by reason of the publication, and the jury are instructed that if they find the publication was libelous, the plaintiff would be entitled to substantial damages.

It is not necessary, where a publication is libelous, as the Court has defined it, that a party complaining should allege and prove any special damages. He would be entitled to general damages, if the publication in question were libelous as the Court has defined it. If the jury find that the publication in question was malicious, as the Court has hereinabove defined it, then the jury may add, in addition to actual damages, such sum by way of punitive damages as in their discretion they may deem proper to serve as a punishment, and to deter others from like acts.

In passing on the question of punitive damages, the jury may take into consideration the wealth of the defendants, or either of them, as they may find same to be from the evidence, by the greater weight thereof, and may give such sum as, taking into consideration these facts, they deem proper to serve as a punishment and to deter them and others from like acts.

If you find that the defendants, or either of them, have been proven guilty of publishing a libel, as defined in this charge, against the plaintiff, then, in determining the amount of damages to which the plaintiff may be entitled, you should take into consideration all the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language, manner, and style in which such charges were made or published and

their tendency, the occasion on which they were published, the extent of their circulation, the probable effect of the publication upon those to whose attention it came, and its natural and probable effect upon the plaintiff's personal feelings, and his standing in the community and in public estimation; and you may, in reaching your verdict, take into consideration, in mitigation or reduction of damages, any and all facts and circumstances disclosed by the evidence which tend to show that the article was published under the influence of a provocation therefor recently given by plaintiff to the defendants or either of them; and if, under the other instructions in this charge, the plaintiff is entitled to recover, you should award him such sum by way of damages as will fairly and adequately compensate him for any insult to him, including any pain and mortification and mental suffering inflicted upon him, and any injury to his standing as a man, citizen, or public officer in the public estimation; and the plaintiff would also be entitled to recover such punitive or exemplary damages as you may find to be proper under all such facts and circumstances as may be proven by the evidence, in case you find from the evidence that such defamatory publication or libel was wantonly or maliciously published with intent to injure the plaintiff.

If you find that the plaintiff is entitled to recover damages against both defendants, the form of your verdict would be: "We find for plaintiff so many dollars, stating the amount, damages."

If you find that the plaintiff is entitled to recover damages against one of the defendants, but not against the other, you would specify and name in your verdict which one you may find liable to damages.

If you find that the plaintiff has failed to prove that he is entitled to recover damages, or the defendants have proven their affirmative defenses, which I have stated would defeat plaintiff's right to recover, the form of your verdict would be: "We find for defendants."

Take the record, and, whatever verdict you find, write it on the back of the paper marked "Summons and Complaint."

### VERDICT

The jury retired at 6 p. m., on May 15, and shortly agreed on a verdict. This verdict was published about 6:30 p. m., after the trial Judge, who had gone to his residence and was sent for in an automobile, had returned to the courthouse, as follows: "We find for plaintiff fifty thousand dollars."

### ORDER REFUSING NEW TRIAL

The motion was heard on May 23, and upon the conclusion of the arguments his Honor refused the motion, stating his reasons therefor orally. These reasons were subsequently reduced to writing in an order dated and filed May 25, as follows:

This is a motion on the minutes of the Court for a new trial on the grounds stated in written notice filed herewith. I do not think the verdict inconsistent with the charge. The fifth ground of motion quotes an extract from the charge; but, read with the context and the entire charge, it is apparent that it was for the jury to determine, from the evidence, whether or not the publication was libelous and prompted by actual malice. There is sufficient evidence to sustain the verdict on both these points, and the verdict is not against the preponderance of the evidence. The jury having found that the publication was both libelous and prompted by actual malice toward plaintiff, the mere fact that they found the full amount sued for does not show that they acted under the influence of either passion or prejudice, or that they failed to consider the plea of justification, mitigation, or truth. Whether or not such plea was established by the evidence was for the jury to determine; and, if the alleged provocation was established, it was for the jury to determine

the extent of the mitigation to be allowed therefor, under the circumstances proven.

It is my duty to determine whether or not the verdict was unjust or excessive under the evidence. The responsibility of the trial Judge and the rules to govern him in passing upon this question were well stated by Judge M. L. Smith, in his order refusing a new trial in *Scott v. A. C. L. R. R. Co.,* 109 S. C., 471; 96 S. E., 305, which I have read in the case for that appeal. While the Judge may grant a new trial on account of excessive damages in a libel case (*Poppenheim v. Wilkes,* 2 Rich., 354), in order to authorize it, the damages should be outrageous, out of all proportion to the injury (*Neal v. Lewis,* 2 Bay., 204; 1 Am. Dec., 640. *Davis v. Davis,* 2 Nott & McC., 81), "flagrantly extravagant," or it should appear that the jury were not "indifferent between the parties" (*Marshall v. Gunter,* 6 Rich., 419).

On indictments for criminal libel our Constitution (Article 1, § 21) has adopted the English law expressed in the doggerel:

"Sir Philip well knows that his innuendoes
Can serve him no longer in verse or in prose,
For twelve honest men have sat on the cause
Who are judges alike of the facts and the laws."

See Judge Winston's article in the current *Scribner.* This constitutional provision is inapplicable to this civil case; but there is no exact measure of the damages to be awarded in a civil action for libel. In such a case as this, they should incude compensation for the injury done the reputation of a Senator, who inherited a good name from a revered bishop, and had been repeatedly honored by the suffrages of those who knew him best—something the value of which was most difficult to be measured. Many who heard, or read, of the libel would remember it, and overlook or forget the vindication. The poet has well said:

"A lie that is half a truth is ever the blackest of lies,
A lie that is all a lie may be fought outright,
But a lie that is half a truth is harder matter to fight."

Compensation is not the only element in the verdict: There was evidence to show actual malice on the part of defendants, and the defendant Robertson stated his individual worth was "around $300,000," and, when asked how much more, replied "that is enough for this case." The jury did not think payment of $50,000 excessive punishment for a malicious libel published by one so able to pay. In *Lewis v. Williams,* 105 S. C., 169; 89 S. E., 649, Judge Memminger said:

"It is true that we don't have many of this kind of cases in South Carolina, because, unfortunately for us and our State, when men use words which are insulting and opprobrious and defamatory against each other, the prevalent idea is that such should be remedied by a blow or with a bullet, and that is one of the reasons why it has been said so frequently that human life in South Carolina is cheaper than five-cent cotton. You will find in the old English-speaking countries, gentlemen, that these kind of actions are very prevalent; that country where law is kept better than in any other country in the world, where people do not go around with deadly weapons with them, the tendency of Courts is to encourage cases being brought into Court and litigated on the question of defamation of character, seeking their redress in the civil Courts for damages, or in a criminal Court on an indictment, rather than going out and killing and shooting and beating up."

In our earlier civilization "trial by battle," or dueling, was the remedy generally resorted to for slander and libel. The statute "descandalis magnatum," enacted in 1275, provided a civil remedy for the "great men of the realm," but dueling in the times of Elizabeth was still the common method of vindication among those who did not come within the terms of the statute. In 1613 James I issued a royal

edict against dueling, and from that time on the Courts waged a continuous war against it in all its forms, and refused to regard it as in any way an affair of honor, but held it to be an unlawful assembly in an aggravated form. Veeder, Defamation, 3 Select Essays in Anglo-American Legal History, 446, 455.

The earliest reference to trial by battle in England is in a note to the case of *Bishop Wulfstan v. Abbott Walter* in 1066. The entry is: "Therefore * * * lawful witnesses who saw and heard this, ready to prove it by oath or battle." The last judicial allowance of such trial was in Ireland in 1815, when the defendant won. It was legally abolished in Great Britain in 1819 by the Statute of 59 Geo. III, c. 46. It was never judicially sanctioned by the Courts of South Carolina. The custom of dueling had been proscribed by the amendment to our Constitution in 1881 (see Const. 1895, Art. 1, § 11), and it no longer affords an exception to the law of mutual combat. *State v. Brown,* 108 S. C., 500; 95 S. E., 61. Shooting at sight should not be invited to take its place. The remedy in the civil Courts should, and must be, ample.

The amount allowed as damages in this case is larger than any I know of heretofore rendered in this State. But a larger verdict, in Missouri, against a newspaper was reduced to $50,000. The verdict of £4,000 sterling allowed Lord Townsend, in the time of Charles II (2 Mod., 150), was relatively as large as this, taking into consideration the decreased value of gold. Upon a fair consideration of the case, I do not consider the verdict either unjust or excessive.

I see no evidence to indicate that the verdict was the result of either caprice or prejudice. The character and reputation which the plaintiff inherited from his father was his property, which he might either maintain or sully. Therefore, who his father was, was relevant on the question as to his character. *McLuny v. Buford,* 1 Nott & McC., 269.

And I had the right to elicit this information. *State v. Anderson,* 85 S. C., 229; 67 S. E., 237; 137 Am. St. Rep., 887. *State v. Driggers,* 84 S. C., 526; 66 S. E., 1042; 137 Am. St. Rep., 855; 19 Ann. Cas., 1166.

Exceptions of the Defendant Edwin W. Robertson

Upon a consideration of all grounds of the motions by each defendant for a new trial, it is ordered that said motions be and hereby are refused.

(1) Because his Honor should have granted a nonsuit and directed a verdict for this defendant, for the reasons stated in his grounds for such motions, as follows: "That plaintiff has failed to prove that the publication alleged by defendant is libelous *per se,* or by reason of special circumstances surrounding the publication, and has, therefore, failed to prove a cause of action for defamation against defendant."

(2) Because his Honor should have granted a nonsuit and directed a verdict for this defendant, for the reasons stated in his grounds for such motions, as follows: "That the testimony admits only of the inference that the publication by defendant was absolutely true, so that plaintiff has failed to establish any cause of action for defamation, as alleged."

(3) Because his Honor should have granted a nonsuit and directed a verdict for this defendant, for the reasons stated in his grounds for such motions, as follows: "That the only inference from the testimony is that the publication by defendant was justified under the law of self-defence in a mutual controversy, and therefore is not actionable."

(4) That his Honor erred in charging the jury as follows: "Where the words written and published of another are capable of two meanings, one of which is slanderous and the other is not, it is the duty of the jury to ascertain from the evidence, by the greater weight thereof, taking

into consideration all the facts and surrounding circumstances attending the uttering of the publication, in what sense the words were uttered or published. In ascertaining the sense in which the words were published and the meaning intended to be conveyed and conveyed to readers, the jury are entitled to take into consideration both the ordinary meaning of the words, the time, place, setting, and surrounding circumstances attending and accompanying the publication thereof, including also the official position and duties of the party about whom the publication was made at that time, as they may find the same to be from the evidence by the greater weight thereof, and ascertain and determine from all of the evidence what meaning should be given to the publication. It is for the jury to determine from the evidence, by the greater weight thereof, the sense in which words were published."

The error being: (a) That the question for the jury was not as to the secret intention of the publisher of the libel, but whether the publication effected a malicious purpose or injured plaintiff by conveying a defamatory charge to its readers; (b) the question being the sense in which the publication was understood by its readers, the jury should have been instructed that they could take into consideration the time, place, setting, and surrounding circumstances attending and accompanying the publication, including the official position and duties of the plaintiff, only in so far as these were known to and appreciated by the readers; and ascertain and determine from all of the evidence the meaning conveyed to such readers by the publication; (c) that the question for the jury to determine from the evidence was not the sense in which the words were published, but the sense in which the words were understood by the readers of the publication.

(5) That his Honor erred in charging as follows: "To constitute an actionable libel, the writing must make a false charge or insinuation against the plaintiff; it must be in-

spired by malice; it must tend to impeach the reputation of the plaintiff, and to injure him in his office, business, or in the estimation of the public.   To render a defamatory statement actionable it is *not necessary* that the false charge be made in a direct, open, and positive manner.   A mere insinuation is as actionable as a positive assertion, if it is false and malicious and the meaning is plain."

The error being that there was no evidence admitting of the reasonable inference that defendants made any insinuation of and concerning plaintiff, since the only publication proved by plaintiff was a statement of admittedly true facts, together with a photographic copy of plaintiff's own letter, without comment, criticism, suggestion, or insinuation of any kind or character by defendants.   And this charge amounted to a misconstruction of defendant's publication by the Court, in that it instructed the jury that they could find therein insinuations made by defendants for which defendants would be legally liable.

(6) That his Honor erred in refusing to charge defendant's seventh request, on the ground that it was a charge on the facts, the same being as follows:   "The publication alleged in the complaint in this action was of a letter written by the plaintiff to defendant Robertson, and if you find by the preponderance of the testimony that the circumstances stated in connection with the receipt of the letter are correctly stated, and that no comment was made thereon, you cannot find from the publication itself that the defendants were actuated by the motives alleged in the complaint or that they intended to give to the publication the meaning alleged in the complaint.   There must be some other evidence to establish the truth of the allegation of such meaning and motive."

The error being that this was a correct proposition of law, pertinent to the issues and should have been charged.

(7) That his Honor erred in amending this defendant's third request, which was as follows: If you find that the

publication made by defendants in this case was true, then your verdict must be for the defendants. I charge you this because, in a case of this character, the truth of the publication is a complete defense. And, even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication was made, that it was the truth. 17 R. C. L., p. 325, § 69."

And in adding thereto and modifying the same as follows: "If you find that charges or insinuations against this plaintiff, if any, made in the publications made by defendants in this case were true, then your verdict as to such charges or insinuations found to be true must be for defendants. I charge you this because in a case of this character the truth of the publication and of any charges or insinuations made therein is a complete defense. And, even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication or charges were made, that they were the truth."

The error being that defendant's third request as presented was a correct statement of the applicable law, and his Honor's addition to and modification thereof was erroneous, in that: (a) The publication made no charges nor insinuations against plaintiff, and there was no evidence of any charges or insinuations made by defendants *aliunde;* (b) that proof of the literal truthfulness of a publication is a complete defense, regardless of any insinuation sought to be placed thereon by the innuendoes alleged, or otherwise, and defendant is not responsible for any fanciful or apparently warranted explanation sought to be placed thereon by way of enlargement under the innuendoes alleged, or otherwise.

(8) That his Honor, having correctly charged the jury

as follows: "Where the facts printed and published about a plaintiff are true, no liability for libel will arise from the mere fact that the truth stated is liable to suggest damaging inferences concerning such plaintiff, or from the mere fact that from the truth so stated natural inferences of a defamatory character might be drawn which would be untrue"— erred in modifying and amending such correct charge, and in adding thereto the following: "But the benefit as a defense of the truth of matters published may be lost, if the matter published was a private transaction, with which the public had no legitimate connection or concern, and the manner and style of publication made a false insinuation against the plaintiff which would render the matter libelous."

The error being: (a) That the defense of truth applies, even though the matter published is a private transaction, with which the public had no legitimate connection or concern, as well as where it is a public transaction, and this was an erroneous limitation of the defense of truth; (b) that the only reasonable inference from the testimony was that the public was legitimately concerned in the publication; (c) that the manner and style of the publication under the facts proven did not make a false insinuation, which would make the same libelous or deprive defendants of their defense of truth; (d) that, when the defendant establishes the literal truthfulness of the publication as made by him, this is a complete defense, regardless of the fanciful or apparently warranted explanation by way of enlargement made by the innuendoes alleged by plaintiff, or otherwise; (e) that this was thus inconsistent with and a further improper limitation of this defendant's third request as erroneously modified and charged as follows: "If you find that charges or insinuations against this plaintiff, if any, made in the publications made by defendants in this case, were true, then your verdict as to such charges or insinuations found to be true must be for defendants. I charge you this because in a case of this character the truth of the publication

and of any charges or insinuations made therein is a complete defense.   And, even though evil motives may have prompted defendants to publish the truth, this will not make them liable.   And it makes no difference whether either or both of the defendants did not know, at the time that the publication or charges were made, that they were the truth."

(9) That his Honor erred in charging the jury as follows:   "Where a libelous publication consists of making a charge of a crime and a party seeks to justify on the ground that the charge is true, the law of this State requires him to prove the truth of his charge—that is to say, the truth of the crime—beyond a reasonable doubt just as in criminal cases."

The error being that defendant did not justify in this case by seeking to prove the truth of a crime that he had charged plaintiff with committing, but, on the contrary, his answer expressly denied the allegations of the complaint that he had charged plaintiff with the commission of a crime.

(10) That his Honor erred in charging as follows:   "It is in our country a great principle of constitutional law, and one which prevails in favor of every member of the State Senate, that for any speech in the Senate a Senator cannot be sued for libel or slander or on account of any statement therein made; nor can a Senator be held responsible in any Court for anything said by him in the performance of his official duties in the Senate.   But this exemption from liability is intended as a shield to the Senator to protect him from liability, and not as a sword to enable him to provoke others to attack him.   If a publication of a libel by a defendant against a Senator is provoked by a speech made by the Senator in the Senate, such speech by the Senator, although made in the Senate, may be taken into consideration by the jury as in mitigation or reduction of any damages caused to the Senator by the defendant's publication, if the defendant's publication was libelous."

The error being: (a) That his Honor thereby allowed the jury to take into consideration the speech made by the plaintiff in the Senate only by way of mitigation or reduction of any damages caused plaintiff by defendant's publication, whereas he should have allowed the jury to take into consideration plaintiff's speech in the Senate in determining defendant's defenses of self-defense and privilege as complete and entire defenses to plaintiff's cause of action; (b) that a Senator may be sued for libel or slander on account of statements made in a speech in the Senate and may be held responsible in a Court for such statements.

(11) That his Honor erred in modifying defendant's sixth request, which was submitted as follows: "I charge you that the defenses of self-defense and privilege, as I have heretofore set them forth, apply in this case, even though plaintiff's publication resulted from a speech made by plaintiff during a session of the Senate, of which he was a member, and in the Senate chamber. The law of this State is that, while plaintiff's speech was privileged in the sense that defendants could not have sued him in a civil action for any defamatory statements that may have been contained therein, and while defendants could not prosecute him in the criminal Court for such speech, his privilege as Senator did not deprive defendants of their right to defend themselves or of their privilege to answer his attack. In other words, plaintiff's privilege as a Senator was a shield, and not a sword, and you will not consider any such claim of senatorial privilege on the part of the plaintiff in determining whether the defendants have made out their defenses of self-defense and privilege according to the law as I have charged you."

And in charging the same as follows: "I charge you that the defense of self-defense and privilege, as I have heretofore set them forth, would apply in this case in mitigation or reduction of damages, if the publication by defendants was libelous, even though plaintiff's publication

resulted from a speech made by plaintiff during a session of the Senate of which he was a member and in the Senate chamber. The law of this State is that, while plaintiff's speech was privileged in the sense that defendants could not have sued him in a civil action for any defamatory statements that may have been contained therein, and while defendants could not prosecute him in the criminal Court for such speech, his privilege as Senator did not deprive defendants of their right to defend themselves or of their privilege to answer his attack. In other words, plaintiff's privilege as a Senator was a shield, and not a sword, and you will not consider any such claim of senatorial privilege on the part of plaintiff in determining whether the defendants have made out their defenses of self-defense and privilege according to the law as I have charged you."

The error being: (a) That his Honor thereby limited the defenses of self-defense and privilege to mitigation or reduction of damages, and deprived defendant of the right to have such defenses considered by the jury as complete and entire defenses to plaintiff's action; (b) that the charge as presented was a clear, correct, and pertinent statement of the applicable law, and should have been charged without qualification or limitation.

(12) That his Honor erred in charging the jury as follows: "If the defendants by the publication in evidence charged the plaintiff with having solicited a bribe, while a public officer, to influence his official conduct, then the charge and publication would be libelous, and the burden would then be upon defendants to defeat liability by proving the truth of the charge, or to prove any facts or circumstances which, under the law as stated by me in this charge, would mitigate or reduce any amount of damages recoverable by plaintiff."

The error being that his Honor thereby deprived defendants of their defenses of self-defense and privilege as complete and entire defenses to the action, and left to

the jury only the defense of truth, and those facts or circumstances going only to mitigation or reduction of damages.

(13) That his Honor erred in amending defendants' fifth request, which was submitted as follows: "An action for libel is not to be encouraged for publications made while parties are mutually engaged in making publications about each other. A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and I charge you that under the circumstances in this case that the publication made by defendants was qualifiedly privileged, and that you cannot award the plaintiff a verdict unless you find that the defendants have abused their privilege."

And in charging the same in the following form: "An action for libel is not to be encouraged for publications made while parties are mutually engaged in making publications about each other. A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and it is for you to determine from the evidence, applying to the evidence the rules of law stated by me, whether or not, under the circumstances of this case, the publication made by defendants was qualifiedly privileged, and, if it was privileged, then you cannot award the plaintiff a verdict, unless you find that the defendants were actuated by express or actual malice in making the publication, and have abused their privilege."

The error being that, under the undisputed facts in this case and the law applicable thereto, the publication made by defendants was qualifiedly privileged as a matter of law, and this should have been charged as requested by defendants, and not left as a question for the jury.

(14) That his Honor erred in charging the jury: "If the jury find from the evidence, by the greater weight

thereof, that the publication in question was libelous, then the plaintiff would be entitled to recover such sum by way of actual damages as the jury in its discretion may think proper to compensate him for his injury, including the humiliation which he may feel and may have suffered by reason of the publication, and the jury are instructed that if they find the publication was libelous, the plaintiff would be entitled to substantial damages."

The error being: (a) That this was a charge in respect to matters of fact in violation of Section 26 of Article 5 of the Constitution of this State, in that his Honor thereby told the jury that plaintiff was entitled to substantial damages, if they found the publication was libelous, when the question of the amount of damages was strictly a question of fact for the sole determination of the jury; (b) that the amount of damages to be awarded rested in the sound discretion of the jury, and should have been determined by taking into consideration all the facts and circumstances, including those in mitigation; (c) that this charge was peculiarly erroneous and prejudicial to defendant, in view of the failure of plaintiff to offer testimony of any actual damage (pecuniary or otherwise, general or special), and his testimony that the worst enemy he had in the world would not believe the alleged defamatory charges made against him, and in view of defendants' testimony going to mitigation and reduction of damages.

(15) That his Honor erred in charging the jury as follows: "If you find that the defendants, or either of them, have been proven guilty of publishing a libel, as defined in this charge, against the plaintiff, then, in determining the amount of damages to which the plaintiff may be entitled, you should take into consideration all the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language, manner and style in which such charges were made or published, and their tendency, the occasion on which they were published,

the extent of their circulation, the probable effect of the publication upon those to whose attention it came, and its natural and probable effect upon the plaintiff's personal feelings, and his standing in the community and in public estimation; and you may, in reaching your verdict, take into consideration, in mitigation or reduction of damages, any and all facts and circumstances disclosed by the evidence, which tend to show that the article was published under the influence of a provocation therefor recently given by plaintiff to the defendants or either of them; and if, under the instructions in this charge, the plaintiff is entitled to recover, you should award him such sum by way of damages as will fairly and adequately compensate him for any insult to him, including any pain and mortification and mental suffering inflicted upon him, and any injury to his standing as a man, citizen, or public officer in the public estimation; and the plaintiff would also be entitled to recover such punitive or exemplary damages as you may find to be proper under all such facts and circumstances as may be proven by the evidence, in case you find from the evidence that such defamatory publication or libel was wantonly or maliciously published with intent to injure the plaintiff."

The error being: (a) That this charge, on the one hand, made it mandatory that the jury take into consideration all the facts and circumstances, including the numerous ones specified and thereby emphasized, to increase the amount of actual damages, and to award plaintiff punitive damages, and, on the other hand, left it entirely discretionary with the jury to take into consideration any facts or circumstances (none specified or emphasized) in mitigation or reduction of damages, thereby intimating to the jury the trial Judge's opinion and impression that plaintiff's actual damages should be increased, and not diminished, and that plaintiff should be awarded punitive damages, and charging the jury in respect to matters of fact, in violation of Section 26 of Article 5 of the Constitution of this State.

(16) Because his Honor should have granted defendants' motion for a new trial on the minutes on the first ground thereof, as follows: "The verdict was capricious and the result of prejudice."

The error being that the jury in a few minutes having awarded the plaintiff the full amount asked, under all the surrounding circumstances and under the evidence the Court should have held that the verdict was capricious and the result of prejudice, and should have set same aside.

(17) Because his Honor should have granted defendants' motion for a new trial on the minutes on the third ground thereof, as follows: "The verdict was grossly excessive."

The error being that the jury obviously took no account of the pleas of the defendants in justification and mitigation, and by giving plaintiff a verdict for $50,000.00 in the full amount asked they rendered a verdict so grossly excessive that same should have been set aside on defendants' motion, and his Honor erred in refusing said motion.

(18) Because the verdict is so excessive as to impel the inference that it is the result of caprice, passion, and prejudice, or other considerations not founded in the evidence, is so outrageous and capricious as to shock the Court's ideas of right and justice, will completely confiscate all of the property of one of the defendants, is without authority of law, and it would be manifest error of law for this Court to refuse to vacate it.

(19) Because, in passing on the motion for a new trial, his Honor held that, in order to authorize the trial Judge to grant a new trial on account of excessive damages in a libel case, "the damages should be outrageous, out of all proportion to the injury, flagrantly extravagant," or that it should appear that the jury "were not indifferent between the parties," and erred in refusing to grant any relief from the verdict because it was not of this character.

The error being that it is the duty of the trial Judge' to set aside, absolutely or conditionally, a verdict which, under

the preponderance of the evidence, is only moderately excessive, as well as one that is flagrantly extravagant or outrageous, or one that indicates that the jury was not indifferent between the parties, and his Honor should have set this verdict aside, absolutely or conditionally, upon this ground.

### EXCEPTIONS OF DEFENDANT, RECORD PUBLISHING COMPANY

(1) Because his Honor should have granted a nonsuit and directed a verdict for this defendant, for the reasons stated in its grounds for such motions, as follows: "That plaintiff has failed to prove that the publication alleged by defendant is libelous *per se,* or by reason of special circumstances surrounding the publication, and has, therefore, failed to prove a cause of action for defamation against defendant."

(2) Because his Honor should have granted a nonsuit and directed a verdict for this defendant, for the reasons stated in its grounds for such motions, as follows: "That the testimony admits only of the inference that the publication by defendant was absolutely true, so that plaintiff has failed to establish any cause of action for defamation, as alleged."

(3) Because his Honor should have granted a nonsuit and directed a verdict for this defendant, for the reasons stated in its grounds for such motions as follows: "That the only inference from the testimony is that the publication by defendant was justified under the law of self-defense in a mutual controversy, and, therefore, is not actionable."

(4) That his Honor erred in charging the jury as follows: "Where the words written and published of another are capable of two meanings, one of which is slanderous and the other is not, it is the duty of the jury to ascertain from the evidence, by the greater weight thereof, taking into consideration all the facts and surrounding circumstances attend-

ing the uttering of the publication, in what sense the words were uttered or published. In ascertaining the sense in which the words were published and the meaning intended to be conveyed and conveyed to readers, the jury are entitled to take into consideration both the ordinary meaning of the words, the time, place, setting, and surrounding circumstances attending and accompanying the publication thereof, including also the official position and duties of the party about whom the publication was made at that time, as they may find the same to be from the evidence by the greater weight thereof, and ascertain and determine from all of the evidence what meaning should be given to the publication. It is for the jury to determine from the evidence, by the greater weight thereof, the sense in which words were published."

The error being: (a) That the question for the jury was not as to the secret intention of the publisher of the libel, but whether the publication affected a malicious purpose or injured plaintiff by conveying a defamatory charge to its readers; (b) the question being the sense in which the publication was understood by its readers, the jury should have been instructed that they could take into consideration the time, place, setting, and surrounding circumstances attending and accompanying the publication, including the official position and duties of the plaintiff, only in so far as those were known to and appreciated by the readers, and ascertain and determine from all of the evidence the meaning conveyed to such readers by the publication; (c) that the question for the jury to determine from the evidence was not the sense in which the words were published, but the sense in which the words were understood by the readers of the publication.

(5) That his Honor erred in charging as follows: "To constitute an actionable libel, the writing must make a false charge or insinuation against the plaintiff; it must be inspired by malice; it must tend to impeach the reputation of

the plaintiff, and to injure him in his office, business, or in the estimation of the public.    To render a defamatory statement actionable it is *not necessary* that the false charge be made in a direct, open and positive manner.    A mere insinuation is as actionable as a positive assertion, if it is false and malicious and the meaning is plain."  ·

The error being that there was no evidence admitting of the reasonable inference that defendants made any insinuation of and concerning plaintiff, since the only publication proved by plaintiff was a statement of admittedly true facts, together with a photographic copy of plaintiff's own letter, without comment, criticism, suggestion, or insinuation of any kind or character by defendants.    And this charge amounted to a misconstruction of defendant's publication by the Court, in that it instructed the jury that they could find therein insinuations made by defendants for which defendants would be legally liable.

(6) That his Honor erred in refusing to charge defendant's seventh request, on the ground that it was a charge on the facts, the same being as follows: "The publication alleged in the complaint in this action was of a letter written by the plaintiff to defendant, Robertson, and if you find by the preponderance of the testimony that the circumstances stated, in connection with the receipt of the letter, are correctly stated, and that no comment was made thereon, you cannot find from the publication itself that the defendants were actuated by the motives alleged in the complaint, or that they intended to give to the publication the meaning alleged in the complaint.    There must be some other evidence to establish the truth of the allegation of such meaning and motive."

The error being that this was a correct proposition of law, pertinent to the issues, and should have been charged.

(7) That his Honor erred in amending this defendant's third request, which was as follows: "If you find that the publication made by defendants in this case was true, then

your verdict must be for the defendants. I charge you this because in a case of this character the truth of the publication is a complete defense. And, even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication was made, that it was the truth. 17 R. C. L., p. 325, § 69."

And in adding thereto and modifying the same as follows: "If you find that charges or insinuations against this plaintiff, if any, made in the publications made by defendants in this case were true, then your verdict as to such charges or insinuations found to be true must be for defendants. I charge you this because in a case of this character the truth of the publication, and of any charges or insinuations made therein, is a complete defense, and, even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication or charges were made, that they were the truth."

The error being that defendant's third request as presented was a correct statement of the applicable law, and his Honor's addition to and modification thereof was erroneous in that: (a) The publication made no charges nor insinuations against plaintiff, and there was no evidence of any charges or insinuations made by defendants *aliunde;* (b) that proof of the literal truthfulness of a publication is a complete defense, regardless of any insinuation sought to be placed thereon by the innuendoes alleged, or otherwise, and defendant is not responsible for any fanciful or apparently warranted explanation sought to be placed thereon by way of enlargement under the innuendoes alleged, or otherwise.

(8) That his Honor, having correctly charged the jury as follows: "Where the facts printed and published about

a plaintiff are true, no liability for libel will arise from
the mere fact that the truth stated is liable to suggest dam-
aging inferences concerning such plaintiff, or from the
mere fact that from the truth so stated natural inferences
of a defamatory character might be drawn which would
be untrue"—erred in modifying and amending such cor-
rect charge and in adding thereto the following: "But the
benefit as a defense of the truth of matters published may
be lost, if the matter published was a private transaction
with which the public had no legitimate connection or con-
cern, and the manner and style of publication made a false
insinuation against the plaintiff which would render the
matter libelous."

The error being: (a) That the defense of truth applies,
even though the matter published is a private transaction,
with which the public had no legitimate connection or con-
cern, as well as where it is a public transaction, and this
was an erroneous limitation of the defense of truth; (b)
that the only reasonable inference from the testimony was
that the public was legitimately concerned in the publica-
tion; (c) that the manner and style of the publication under
the facts proven did not make a false insinuation, which
would make the same libelous or deprive defendants of
their defense of truth; (d) that, when the defendant estab-
lishes the literal truthfulness of the publication as made by
him, this is a complete defense, regardless of the fanciful
or apparently warranted explanation by way of enlargement
made by the innuendoes alleged by plaintiff, or otherwise;
(e) that this was inconsistent with and a further improper
limitation of this defendant's third request, as erroneously
modified and charged as follows: "If you find that charges
or insinuations against this plaintiff, if any, made in the
publications made by defendants in this case were true, then
your verdict as to such charges or insinuations found to be
true must be for defendants. I charge you this because in
a case of this character the truth of the publication and of

any charges or insinuations made therein is a complete defense. And, even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication or charges were made, that they were the truth."

(9) That his Honor erred in charging the jury as follows: "Where a libelous publication consists of making a charge of a crime, and a party seeks to justify on the ground that the charge is true, the law of this State requires him to prove the truth of his charge—that is to say, the truth of the crime—beyond a reasonable doubt, just as in criminal cases."

The error being that defendant did not justify in this case by seeking to prove the truth of a crime that it had charged plaintiff with committing, but, on the contrary, its answer expressly denied the allegations of the complaint that it had charged plaintiff with the commission of a crime.

(10) That his Honor erred in charging as follows: "It is in our country a great principle of constitutional law, and one which prevails in favor of every member of the State Senate, that for any speech in the Senate a Senator cannot be sued for libel or slander, or on account of any statement therein made; nor can a Senator be held responsible in any Court for anything said by him in the performance of his official duties in the Senate. But this exception from liability is intended as a shield to the Senator, to protect him from liability, and not as a sword, to enable him to provoke others to attack him. If a publication of a libel by a defendant against a Senator is provoked by a speech made by the Senator in the Senate, such speech by the Senator, although made in the Senate, may be taken into consideration by the jury, as in mitigation or reduction of any damages caused to the Senator by the defend-

ant's publication, if the defendant's publication was li-
belous."

The error being: (a) That his Honor thereby allowed
the jury to take into consideration the speech made by the
plaintiff in the Senate only by way of mitigation or reduc-
tion of any damages caused plaintiff by defendant's publica-
tion, whereas he should have allowed the jury to take into
consideration plaintiff's speech in the Senate in·determining
defendant's defense of self-defense and privilege as com-
plete and entire defense to plaintiff's cause of action; (b)
that a Senator may be sued for libel or slander on account
of statements made in a speech in the Senate and may be
held responsible in a Court for such statements.

(11) That his Honor erred in modifying defendant's
sixth request, which was submitted as follows: "I charge
you that the defenses of self-defense and privilege, as I
have heretofore set them forth, apply in this case, even
though plaintiff's publication resulted from a speech made
by plaintiff during a session of the Senate, of which he was
a member, and in the Senate chamber. The law of this
State is that, while plaintiff's speech was privileged in the
sense that defendants could not have sued him in a civil
action for any defamatory statements that may have been
contained therein, and while defendants could not prose-
cute him in the criminal Court for such speech, his privi-
lege as Senator did not deprive defendants of their rights
to defend themselves or of their privileges to answer his
attack. In other words, plaintiff's privilege as a Senator
was a shield, and not a sword, and you will not consider any
such claim of senatorial privilege on the part of the plain-
tiff in determining whether the defendants have made out
their defenses of self-defense and privilege according to the
law as I have charged you."

And in charging the same as follows: "I charge you that
the defenses of self-defense and privilege, as I have hereto-
fore set them forth, would apply in this case in mitigation

or reduction of damages, if the publication by defendant was libelous, even though plaintiff's publication resulted from a speech made by plaintiff during a session of the Senate of which he was a member and in the Senate chamber. The law of this State is that, while plaintiff's speech was privileged in the sense that defendants could not have sued him in a civil action for any defamatory statements that may have been contained therein, and while defendants could not prosecute him in the criminal Court for such speech, his privilege as Senator did not deprive defendants of their right to defend themselves or of their privilege to answer his attack. In other words, plaintiff's privilege as a Senator was a shield, and not a sword, and you will not consider any such claim of senatorial privilege on the part of plaintiff in determining whether the defendants have made out their defenses of self-defense and privilege according to the law as I have charged you."

The error being: (a) That his Honor thereby limited the defenses of self-defense and privilege to mitigation or reduction of damages, and deprived defendants of the right to have such defenses considered by the jury as complete and entire defenses to plaintiff's action; (b) that the charge as presented was a clear, correct, and pertinent statement of the applicable law and should have been charged without qualification or limitation.

(12) That his Honor erred in charging the jury as follows: "If the defendants by the publication in evidence charged the plaintiff with having solicited a bribe, while a public officer, to influence his official conduct, then the charge and publication would be libelous, and the burden would then be upon defendants to defeat liability by proving the truth of the charge, or to prove any facts or circumstances, which, under the law as stated by me in this charge, would mitigate or reduce any amount of damages recoverable by plaintiff."

The error being that his Honor thereby deprived defendants of their defenses of self-defense and privilege as complete and entire defenses to the action, and left to the jury only the defense of truth, and those facts or circumstances going only to mitigation or reduction of damages.

(13) That his Honor erred in amending defendant's fifth request, which was submitted as follows: "An action for libel is not to be encouraged for publication made while parties are mutually engaged in making publications about each other. A publication made in the course of a newspaper war and bearing some reasonable relation to the subject-matter of the controversy is qualifiedly privileged, and I charge you that under the circumstances in this case that the publication made by defendants was qualifiedly privileged and that you cannot award the plaintiff a verdict unless you find that the defendants have abused their privilege."

And in charging the same in the following form: "An action for libel is not to be encouraged for publication made while parties are mutually engaged in making publications about each other. A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and it is for you to determine from the evidence, applying to the evidence the rules of law stated by me, whether or not under the circumstances of this case, the publication made by defendants was qualifiedly privileged, and, if it was privileged, then you cannot award the plaintiff a verdict, unless you find that the defendants were actuated by express or actual malice in making the publication, and have abused their privilege."

The error being that, under the undisputed facts in this case and the law applicable thereto, the publication made by defendants was qualifiedly privileged as a matter of law, and this should have been charged as requested by defendants, and not left as a question for the jury.

(14) That his Honor erred in charging the jury: "If the jury find from the evidence, by the greater weight thereof, that the publication in question was libelous, then the plaintiff would be entitled to recover such sum by way of actual damages as the jury in its discretion may think proper to compensate him for his injury, including the humiliation which he may feel and may have suffered by reason of the publication, and the jury are instructed that, if they find the publication was libelous, the plaintiff would be entitled to substantial damages."

The error being: (a) That this was a charge in respect to matters of fact in violation of Section 26 of Article 5 of the Constitution of this State, in that his Honor thereby told the jury that plaintiff was entitled to substantial damages, when the question of the amount of damages was strictly a question of fact for the sole determination of the jury; (b) that the amount of damages to be awarded rested in the sound discretion of the jury, and should have been determined by taking into consideration all the facts and circumstances, including those in mitigation; (c) that this charge was peculiarly erroneous and prejudicial to defendant, in view of the failure of plaintiff to offer testimony of any actual damage (pecuniary or otherwise. general or special), and his testimony that the worst enemy he had in the world would not believe the alleged defamatory charges made against him, and in view of defendant's testimony going to mitigation and reduction of damages.

(15) That his Honor erred in charging the jury as follows: "If you find that the defendants, or either of them, have been proven guilty of publishing a libel, as defined in this charge, against the plaintiff, then, in determining the amount of damages to which the plaintiff may be entitled, you should take into consideration all the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language, manner, and style in which such charges were made or published, and

their tendency, the occasion on which they were published, the extent of their circulation, the probable effect of the publication upon those to whose attention it came, and its natural and probable effect upon the plaintiff's personal feelings, and his standing in the community and in public estimation; and you may , in reaching your verdict, take into consideration, in mitigation or reduction of damages, any and all facts and circumstances disclosed by the evidence which tend to show that the article was published under the influence of a provocation therefor recently given by plaintiff to the defendants, or either of them; and if, under the other instructions in this charge, the plaintiff is entitled to recover, you should award him such sum by way of damages as will fairly and adequately compensate him for any insult to him, including any pain and mortification and mental suffering inflicted upon him, and any injury to his standing as a man, citizen, or public officer in the public estimation; and the plaintiff would also be entitled to recover such punitive or exemplary damages as you may find to be proper under all such facts and circumstances as may be proven by the evidence, in case you find from the evidence that such defamatory publication or libel was wantonly or maliciously published with intent to injure the plaintiff."

The error being: (a) That this charge, on the one hand, made it mandatory that the jury take into consideration all the facts and circumstances, including the numerous ones specified and thereby emphasized, to increase the amount of actual damages, and to award plaintiff punitive damages, and, on the other hand, left it entirely discretionary with the jury to take into consideration any facts or circumstances (none specified or emphasized) in mitigation or reduction of damages, thereby intimating to the jury the trial Judge's opinion and impression that plaintiff's actual damages should be increased, and not diminished, and that plaintiff should be awarded punitive damages, and charging the jury in

respect to matters of fact in violation of Section 26 of Article 5 of the Constitution of this State.

(16) Because his Honor should have granted defendant's motion for a new trial on the minutes on the first ground thereof, as follows: "The verdict was capricious and the result of prejudice."

The error being that the jury in a few minutes having awarded the plaintiff the full amount asked, under all the surrounding circumstances and under the evidence, the Court should have held that the verdict was capricious and the result of prejudice, and should have set same aside.

(17) Because his Honor should have granted defendant's motion for a new trial on the minutes on the third ground thereof, as follows: "The verdict was grossly excessive."

The error being, that the jury obviously took no account of the pleas of the defendants in justification and mitigation, and by giving plaintiff a verdict for $50,000.00, in the full amount asked, they rendered a verdict so grossly excessive that same should have been set aside on defendant's motion, and his Honor erred in refusing said motion.

(18) Because the verdict is so excessive as to impel the inference that it is the result of caprice, passion, and prejudice, or other considerations not founded in the evidence, is so outrageous and capricious as to shock the Court's ideas of right and justice, will completely confiscate all of the property of this defendant, is without authority of law, and it would be manifest error of law for this Court to refuse to vacate it.

(19) Because, in passing on the motion for a new trial, his Honor held that, in order to authorize the trial Judge to grant a new trial on account of excessive damages in a libel case, "the damages should be outrageous, out of all proportion to the injury, flagrantly extravagant," or that it should appear that the jury "were not indifferent between the parties," and erred in refusing to grant any relief from the verdict because it was not of this character.

The error being that it is the duty of the trial Judge to set aside, absolutely or conditionally, a verdict which, under the preponderance of the evidence, is only moderately excessive, as well as one that is flagrantly extravagant or outrageous, or one that indicates that the jury was not indifferent between the parties, and his Honor should have set this verdict aside, absolutely or conditionally, upon this ground.

*Messrs. C. N. Sapp* and *W. C. McLain,* for appellant, Record Publishing Company, cite: *Charge of bribery slander per se:* 66 Cal., 339. *Defense of character permissible:* Newell on Slander and Libel (3d Ed.), 625. *Public officers subject to public discussion:* 1 N. & McC., 347; 93 S. C., 484; 241 Mo., 326; 17 R. C. L., 353. *Public may draw inferences from acts of public officers:* 113 App. Div., 510.

*Messrs. R. B. Herbert* and *J. B. S. Lyles,* for appellant, E. W. Robertson, cite. *Action for libel and slander will not lie on inference; truth of publication complete defense:* 102 Mich., 189; 60 N. W., 476; 8 Tenn. Civ. App., 159. *Publication may be malicious though not actionable:* 76 S. C., 514; 1 N. & McC., 351; 114 S. C., 53. *Complaint alleges not inducement:* 124 S. E., 7. *Innuendo cannot enlarge meaning of words used:* 60 N. W., 476; 76 S. C., 510; 17 R. C. L., 393; 116 S. C., 77; 82 S. E., 916. *Defamatory matter considered in light of surrounding circumstances known to readers:* 90 Ark., 117; 17 Ann. Cas., 271; 17 R. C. L., 314. *Verdict not supported by evidence set aside:* 81 S. C., 32. *Truth of publication complete defense:* 95 S. C., 96; 61 S. C., 141; 16 S. C., 435; Const. 1895, Art. I, Sec. 21 and Art. II, Sec. 8; 17 R. C. L., 325; 3 R. C. L. Supp., 654; 4 R. C. L. Supp., 1118; 17 Ann. Cas., 761; 21 L. R. A., 502; 31 L. R. A. (N. S.), 130; 63 Atl., 410; 36 C. J., 1232; 14 Atl., 51; 50 L. R. A. (N. S.), 1040; Newell on L. & Sl. (3d Ed.), 966; 36 C. J., 1231. *Same, application of rule:* 60 N. W., 476; 39 Pac., 969; 46 Pac., 1049; 48 N. W., 507; 149 Fed., 704. *Cases dis-*

*tinguished:* 95 S. C., 90. *Publication of libelous matter in self-defense privileged:* 127 S. E., 606; 126 S. C., 366; 17 R. C. L., 364. *Quantum of damages in action for libel:* 117 S. C., 236; 74 S. C., 185; 48 Atl., 730; 86 A. S. R., 414; 147 N. Y., 59; 49 A. S. R., 646. *Rule as to setting aside verdict as excessive:* 127 S. E., 265; 19 S. C., 579; 96 S. C., 267; 120 S. E., 381; 81 S. C., 522; 75 S. C., 162; 81 S. C., 203; 31 S. C. L., 354; 2 S. C. L., 204; 11 S. C. L., 81; 40 S. C. L., 419; 13 S. C. L., 230; 21 S. C. L., 271.

*D. W. Robinson* and *D. W. Robinson, Jr.,* for respondent, cite: *Charge must be considered as a whole:* 116 S. C., 48; 115 S. C., 232; 114 S. C., 130; 99 S. C., 468. *"Libel":* 99 S. C., 438; 71 S. C., 116; Newell on L. & Sl. (4th Ed.), 6, 9, 39, 156; 17 R. C. L., 263; 124 N. W., 229; 27 L. R. A. (N. S.), 1038. *Words to be given ordinary meaning in determining whether libelous in nature:* 116 S. C., 82; 93 S. C., 475; 76 S. C., 513; 17 R. C. L., 312; Newell on L. & Sl. (4th Ed.), 734. *Words clearly libelous or not libelous present question for Court:* 93 S. C., 476; 76 S. C., 513. *Publication must be considered as a whole:* 124 N. W., 229; 27 L. R. A. (N. S.), 1038; 125 Mo., 517; 28 L. R. A., 676; 116 A. S. R., 807; 12 R. C. L., 313; 250 U. S., 293; 63 L. Ed., 989. *Jury to determine meaning of words susceptible of more than one meaning:* 130 S. C., 183; 231 U. S., 594; 58 L. Ed., 389; Newell on L. & Sl., 286, 294, 736; 93 S. C., 475; 76 S. C., 510; 96 S. C., 299. *Court and jury may consider thought conveyed by words; not confined to literal interpretation:* 167 N. W., 584; 3 A. L. R., 1589; 28 L. R. A., 676; 94 Am. Dec., 457; 35 Am. Dec., 179; 17 R. C. L., 312. *Object of innuendo:* 129 S. C., 251; 116 *publication:* 195 U. S., 152; 49 L. Ed., 134; 17 R. C. L., 395. *Surrounding circumstances admissible to show meaning of words as used:* 167 N. W., 584; 3 A. L. R., 1590; 106 A. S. R., 132; 17 R. C. L., 313; Newell on L. & Sl. (4th Ed.), 736. *Headlines must be considered as part of publication:* 195 U. S., 152; 49 L. Ed., 134; 17 R. C. L.,

350; 104 A. S. R., 133; 15 A. S. R., 347. *To charge public officer with inviting bribery libelous per se:* 16 Am. Rep., 569; 116 N. W., 467; 3 A. & E. Enc. L. (2d Ed.), 250; 2 Bishop on Crim. L. (9th Ed.), Sec. 1211; 3 Whart. Cr. L. (11th Ed. Kerr), Sec. 2215; 2 Cyc. Cr. L., Sec. 1211; 25 L. R. A., 435. *Duty of party desiring more specific charge to request same:* 131 S. C., 249; 128 S. C., 214; 117 S. C., 58; 113 S. C., 54; 111 S. C., 428; 107 S. C., 224. *Charge on weight and sufficiency of evidence prohibited:* 131 S. C., 47. *Justification of slander must be as broad as charge:* Newell on L. & Sl., 766. *Publications made at risk of publisher:* 214 U. S., 189; 53 L. Ed., 962; 228 N. Y., 58; 126 N. E., 260; 10 A. L. R., 666. *Justification must be in the sense imputed to the publication by complainant:* 3 A. L. R., 1590; 143 N. W., 519; 31 L. R. A. (N. S.), 140; Newell on L. & Sl. (4th Ed.), 764. *Justification of libel charging crime must be proved beyond a reasonable doubt:* 95 S. C., 94; 16 S. C., 440. *Objection should be made to charge by Court on point not in issue:* 95 S. C., 94. *Failure to sustain plea of truth of libel considered in aggravation:* 21 S. C., 345; 16 S. C., 441. *Provocation not justification of libel; mitigation of damages only:* 105 A. S. R., 46; 65 L. R. A., 940; 51 L. R. A. (N. S.), 1201; 80 S. E., 1109; 170 Fed., 298; 46 La. Ann., 1303; 126 S. C., 366; 127 S. E., 607; Newell on L. & Sl. (4th Ed.), 456. *Libel published in self-defense must be connected with original libelous act:* 80 S. E., 1109; 51 L. R. A. (N. S.), 1201; 17 R. C. L., 364; Odgers on L. & Sl., 225. *Essentials of qualified privilege:* 119 S. C., 241; Newell on L. & Sl. (4th Ed.), 416. *Criticism of public officer proper within limits:* 99 S. C., 442; Newell on L. & Sl. (4th Ed.), 516, 520, 529, 534; 17 R. C. L., 352. *Circumstances indicating malice in publication of libel may be shown:* 2 McC., 288; 17 R. C. L., 321. *"Malice":* 99 S. C., 440; 68 S. C., 312; Newell on L. & Sl. (4th Ed.), 313. *Express malice:* 70 S. C., 429; 16 S. C., 398. *May be shown by surrounding circum-*

*stances:* 119 S. C., 242; 109 N. W., 63; 12 L. R. A. (N. S.), 93; 12 A. L. R., 1017; Newell on L. & Sl. (3d Ed.), 315. *Refusal to retract libel evidence of malice:* Newell on L. & Sl. (4th Ed.), 318; 17 R. C. L., 327. *Malice destroys qualified privilege:* 128 S. W., 878; 30 L. R. A. (N. S.), 204; 68 Atl., 566; 24 L. R. A., 594; Newell on L. & Sl. (4th Ed.), 382; 12 L. R. A. (N. S.), 91. *Malice may be shown by extrinsic evidence in publication of libel:* 119 S. C., 242; 3 Hill, 88; 2 McC., 288; 3 L. R. A. (N. S.), 699; 118 N. W., 35; Newell on L. & Sl., 315, 738. *Qualified privilege no defense to one publishing private matters:* 80 S. E., 1109; 51 L. R. A. (N. S.), 1201; Newell on L. & Sl. (4th Ed.),456. *Qualified privilege question for jury:* 99 S. C., 458; 51 L. R. A. (N. S.), 1201; 80 S. E., 1109; 3 L. R. A. (N. S.), 699; 24 L. R. A. (N. S.), 592; 68 Atl., 566; Newell on L. & S. (4th Ed.), 381. *Conflict of authority as to whether provocation justifies qualified privilege or mitigation of damages:* 127 S. E., 607; 126 S. C., 365; 66 L. R. A., 940; 18 A. & E. Enc. L. (2d Ed.), 1007; 51 L. R. A. (N. S.), 1202; 80 S. E., 1109; 17 R. C. L., 365; Newel on L. & Sl. (4th Ed.), 456. *Proof of provocation to libel limited to question of punitive damages:* 123 S. C., 329. *Immunity of legislator from action for slander based upon remarks made in legislature:* 2 Brev., 77; 164 N. W., 421; 31 L. R. A., 675; 6 Ann. Cas., 802; 78 N. E., 394; 3 Am. Dec., 189; 17 R. C. L., 330; Jefferson's Manual of Rules of U. S. Senate, 1903, 68; 25 Cyc., 376; Newell on L. & Sl. (3d Ed.), 508; Id. (4th Ed.), 388; Starkie on L. & Sl., 230; Townsend on L. & Sl. (2d Ed.), 342; Odger on L. & Sl. (5th Ed.), 186; Cooley on Torts, 213; 1 Kent's Com. .(14th Ed.), 235; Cooley on Const. Lim. (7th Ed.), 634. *Not necessary to prove special damages in case of libel per se to recover substantial damages:* 165 App. Div., 729; 60 Hun., 321; 45 N. Y., 405; 6 Am. Rep., 105; 70 Pac., 18; 67 S. W., 6; 55 S. W., 595; 84 Fed., 758; 85 Atl., 379; 55 Atl., 287; 73 So., 718; 150 N. W., 188; 63 S. C., 530; 117

S. C., 238; 113 S. C., 512. *Action for libel lies though libelous matter would not be believed:* 18 L. R. A. (N. S.), 624; 97 Pac., 21; 90 Am. Dec., 169; 32 Am. Dec., 44; 17 R. C. L., 313. *Jury to consider all circumstances related to publication of libelous matter:* 170 Fed., 910; 137 Mass., 136; 4 Sutherland on Dam. (4th Ed.), 4535; Newell on L. & Sl. (4th Ed.), 812; 17 R. C. L., 435; 37 Cyc., 116. *Quantum of damages determined by jury:* 40 S. C. L., 435; 11 S. C. L., 82; 2 Bay, 207; 180 N. W., 264; 127 N. W., 332; 35 L. R. A., 824; 178 Pa., 481; 209 N. Y. S., 267; 17 R. C. L., 429; Newell on L. & Sl. (4th Ed.), 820, 823, 882; 86 Fuller Reprint Eng. Rep., 994. *New trial on ground of excessive verdict question for trial Court only:* 131 S. C., 250; 124 S. C., 473; 109 S. C., 477; 103 S. C., 117; 100 S. C., 38; 96 S. C., 278; 92 S. C., 151; 78 S. C., 556; 74 S. C., 314; 86 S. C., 530; 11 S. C., 591.

September 21, 1927.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The appeal in this case was first heard in this Court on the 10th day of November, 1925. At the hearing, the Court consisted of Associate Justices Watts, Cothran, and Marion and Hon. R. O. Purdy, Acting Associate Justice. After the hearing, and prior to the disposition of the cause, Mr. Justice Marion resigned on January 1, 1926, but was appointed and commissioned by his excellency, Hon. Thomas G. McLeod, Governor of the State, to act as an Associate Justice in all causes which had been heard by him and which had not been determined. Mr. Associate Justice Marion wrote an opinion affirming the judgment of the Court below, and Mr. Justice Watts concurred therein. Mr. Justice Cothran wrote an opinion reversing the judgment and ordering the entry of a nonsuit, as provided by Rule 27. With that opinion, Mr. Acting Associate Justice Purdy concurred. The opinions were not filed. If they had been filed, the result would have been an affirmance of

the judgment below, since the Court was equally divided; two of the Justices favoring affirmance, and two favoring reversal. *Hutchinson v. Turner,* 88 S. C., 318; 70 S. E., 410, 806. *Owings v. Graham,* 120 S. C., 408; 113 S. E., 279. Thereafter the Justices who participated in the hearing of the appeal ordered a reargument of the cause to be had at the June, 1927, term of the Court; the opinions mentioned before being lodged with the Clerk of Court for the information of counsel and not as the judgment of the Court. See *Owings v. Graham, supra.* Pursuant to the order of rehearing, the appeal was reargued on June 14, 1927.

We have examined carefully the record in the cause, and the able and interesting opinions of Justices Marion and Cothran. It is our opinion that the opinion of Acting Associate Justice Marion ably and correctly disposes of all the questions raised by the appellants, and that it plainly and properly sets forth all the legal principles applicable to the facts of the cause. An effort on the part of this Court to attempt to improve upon what he has so well said would be unnecessary and fruitless. We are entirely satisfied with and adopt his opinion as the opinion of this Court. That opinion was as follows:

MR. ACTING ASSOCIATE JUSTICE MARION: This is an action for libel, brought by the plaintiff, T. C. Duncan, against the Record Publishing Company and E. W. Robertson. The plaintiff recovered, and from judgment on verdict the two defendants have appealed upon exceptions, which assign error in the refusal of defendants' motions for nonsuit, for a directed verdict, and for a new trial, and in the charge to the jury. The exceptions, together with the Circuit Judge's charge, should be set out in the report of the case.

The material facts out of which the action arose are as follows:

The plaintiff, Duncan, was a member of the State Senate. On March 23, 1923, he was appointed a member of a

commission of seven known as the Canal Commission, created by an Act of the General Assembly, approved March 26, 1923 (33 St. at Large, p. 828). This commission was vested "with full and exclusive power and authority to take full control of the interest of the State, * * * in the Columbia Canal property, * * * in the cause entitled '*The State of South Carolina v. Columbia Railway, Gas and Electric Co.*'" then pending in the Courts. The defendant Robertson was an officer of and the owner of a controlling interest in the stock of the Columbia Railway, Gas & Electric Company, hereinafter referred to as the Street Railway Company, and was also president of a bank.

On March 28th, two days after the approval of the Act creating the Canal Commission, and five days after his appointment on the commission, the plaintiff, Duncan, addressed a letter to the defendant Robertson, making application for a loan of $25,000, which application was refused. During the year following the refusal of this loan the Canal Commission held a number of meetings, and had before it offers of settlement of the canal litigation submitted by the Street Railway Company and by Stone & Webster, who had obtained from the defendant Robertson an option on the controlling stock in the Street Railway Company. These offers had been published in the newspapers, publicly discussed, and a settlement advocated by the Chambers of Commerce of Columbia and of Winnsboro, and by the signers of a petition bearing more than 1,000 names, which had been presented to the Canal Commission. The offers of the Street Railway Company had been rejected, but no decision as to the proposal of Stone & Webster had been made public, when on the morning of March 11, 1924, the plaintiff, Duncan, arose from his seat in the Senate "to a point of personal and official privilege" and delivered a speech on the "canal situation," in the course of which he charged that this situation had been handled by the press of Columbia in a manner to put out "the most appalling propaganda ever put out

in South Carolina"; that Stone & Webster, "aided and abetted by the powerful newspapers of Columbia," had come into the situation as a "Trojan horse" for "the Columbia concern "; that the Street Railway Company was a company that had "feasted on its betters, by taking advantage of the financial situation," etc. The address contained references to "the gentleman who sits in the offices in the back of the Loan & Exchange Bank" and to a "Columbia octopus," and proclaimed the speaker's intention "to make the men who have been feeding on dead men's bones take their medicine."

On the day the foregoing address was delivered by the plaintiff, Duncan, the Columbia Record, an afternoon newspaper, published on the front page the following:

"Facsimile of a Letter from Senator T. C. Duncan to Edwin W. Robertson, of Columbia

"Senator Duncan is a member of the Canal Commission. He was appointed a member of the commission on March 23, 1923. The Act creating the commission was passed by the General Assembly during the session of 1923, and was approved March 26, 1923. Senator Duncan's letter is dated March 28, 1923. The loan solicited was not granted. The first meeting of the Canal Commission was held in Columbia, April 13, 1923.

"Union, Mar. 28 6 P. M. S. C.

"After five days return to T. C. Duncan, Union, S. C. To Mr. E. W. Robertson, % Loan & Exchange Nat. Bank, Columbia, S. C.

"Personal.

"T. C. Duncan, Union, S. C. To E. W. Robertson, Columbia, S. C. March 28, 1923.

"Dear Sir: I would like to secure a loan of $25,000.00— for three years—interest payable semiannually. I have security worth six times the amount of loan desired.

"I will be glad for you to have your representative to inspect the property that I would offer as collateral—I can

make loan from a bank, but I do not desire the constant renewal of paper. I have Building & Loan stock that will mature in three years, by means of which loan will be paid at maturity.

"If there is any one in the State who could handle the above matter, you are the individual—I would thank you for your early reply.

"Very truly,          [Signed] T. C. Duncan."

This action for libel is based upon the foregoing publication. Plaintiff alleged that "in and by the publication hereinabove set forth, and the circumstances attending and surrounding the same, the defendants purposed and intended to charge and to convey to the public the charge that this plaintiff was susceptible to bribery; that he was by said letter inviting the defendant E. W. Robertson to approach and influence him in the discharge of his duties on said Canal Commission in a corrupt way; that plaintiff was dishonest and corrupt in the discharge of his public and official trusts and duties; that he was betraying the interests of the public and of the State in his official position; that plaintiff's integrity was impeached, and that he was unworthy of the confidence of the public and of the business world." The defendant, Robertson, by his answer, admitted the pubication, but denied the innuendoes alleged, and pleaded, by way of self-defense and privilege, that he made the publication to defend himself against plaintiff's defamatory attacks and that the publication made was true. The answer of the Record Publishing Company presented substantially the same defenses.

The appellants' first general proposition is that the facts alleged and proved, when subjected to the correct legal test or tests applicable, do not make out a case of actionable defamation. To that contention, according to appellants' grouping, Exceptions 1, 4, 5, and 6 are directed, and the contention itself is broadly presented by Exception 1, which imputes error to the trial Court in refusing defendants' motion for nonsuit and for a directed

verdict, upon the ground that plaintiff had "failed to prove that the publication alleged was libelous *per se* or by reason of special circumstances surrounding the publication," and had, "therefore, failed to prove a cause of action for defamation" against defendants.

In support of that position it is argued that the publication itself contained "no defamatory statement or implication, suggestion, or insinuation"; that the publication itself fully disclosed the situation and occasion and contained all the relevant facts, and that no extraneous facts and circumstances (inducement), which coupled with the language used would affect the construction and render it actionable, had been alleged or proved; that construing the words published, as they must be construed, in their ordinary and popular meaning, in the light of the occasion and all of the relevant circumstances disclosed by the publication itself, the publication was not reasonably susceptible of the defamatory meaning attributed thereto by the innuendo of plaintiff's complaint; and that it was, therefore, within the province of the Court to determine as a matter of law that the publication was not actionable as a libel and the duty of the Court to hold that the defendants were entitled to a nonsuit or directed verdict. The publication, as we have seen, consisted of a facsimile of Duncan's letter to Robertson, soliciting a loan, the statement that Duncan was a member of the Canal Commission, the date of his appointment, the date of the approval of the Act creating the Canal Commission, the date of Duncan's letter, the date and place of the first meeting of the Canal Commission, and the statement that the loan solicited by Duncan was not granted.

In the view that the publication itself disclosed the occasion and contained all the facts relevant to the matter published, the validity of appellants' conclusion that it contained no implication or suggestion of improper conduct on Duncan's part, and was not reasonably susceptible of the meaning ascribed thereto by the innuendo of the complaint, might

well be doubted. But in addition to the facts contained in the publication itself the plaintiff alleged and adduced evidence to establish the significant and relevant facts (1) that the Canal Commission, upon which Duncan had been appointed a member just five days prior to the date of his letter to Robertson, was vested with "plenary authority with respect to" certain litigation then pending between the State of South Carolina and the Columbia Railway, Gas & Electric Company; (2) that Edwin W. Robertson, to whom said letter was addressed, owned a controlling interest in said company, and (3) that on the very day of the publication Duncan from his seat in the State Senate had made a bitter and sensational public attack upon Robertson and his company and upon the press of Columbia. Certainly, when the matter contained in the publication is read in the light of the foregoing significant facts, it would seem scarcely open to argument that the publication was reasonably susceptible of the meaning which the innuendo of the complaint ascribed thereto, viz., that Duncan had invited the defendant, Robertson, to influence him in the discharge of his official duty by the extension of a personal loan, and had thereby been guilty to all intents and purposes of the crime of soliciting a bribe. For the Court to have held otherwise would, we think, have required the indulgence of a presumption for which unfortunately there is no basis in the common experience of mankind—that the average reader of the modern newspaper lives and thinks in the rarified atmosphere of "the pure, to whom all things are pure."

It is further contended that there was neither allegation nor proof that the publication effected a libelous purpose "by conveying to those to whom it was sent" the defamatory meaning charged (*Hubbard v. Furman University,* 76 S. C., 514; 57 S. E., 479), and that in the absence of such allegation and proof the cause of action for libel was not established. No demurrer was interposed upon the ground that the allegations of the complaint were insuffi-

cient, and the testimony of readers of the publication, offered by plaintiff to establish that it was understood in the defamatory sense charged, was excluded by the Court upon defendants' objection. The Court excluded the testimony offered upon the ground that the question was one for the jury, "because they could tell what impression the writing conveyed as well as any individual could." If, as we have held, the writing as published was capable of conveying the defamatory meaning charged, the evidence adduced to establish its publication and the circumstantial setting thereof was, we think, sufficient to support the inference of fact that such defamatory meaning was actually conveyed to the readers of the publication. The motions for nonsuit and for a directed verdict could not, therefore, have been properly granted upon the ground of failure to allege and prove that a libelous purpose was effected.

It is virtually conceded by appellants that the foregoing conclusions are required, if the Circuit Judge's view of the law, as embodied in the portions of his charge to which Exception 4 is directed, is correct. Exception 4 imputes error to the Circuit Judge in charging as follows:

"Where the words written and published of another are capable of two meanings, one of which is slanderous and the other is not, it is the duty of the jury to ascertain from the evidence, by the greater weight thereof, taking into consideration all the facts and surrounding circumstances attending the uttering of the publication, in what sense the words were uttered or published. In ascertaining the sense in which the words were published and the meaning intended to be conveyed and conveyed to readers, the jury are entitled to take into consideration both the ordinary meaning of the words, the time, place, setting, and surrounding circumstances attending and accompanying the publication thereof, including also the official position and duties of the party about whom the publication was made at that time, as they

may find the same to be from the evidence by the greater
weight thereof, and ascertain and determine from all of the
evidence what meaning should be given to the publication.
It is for the jury to determine from the evidence, by the
greater weight thereof, the sense in which words were pub-
lished."

The objections urged to the foregoing instruction are, in
substance, that it erroneously makes the defendants' "secret
intention" and "the sense in which the words were pub-
lished" the test by which to determine the question of libel
or no libel, and authorizes the jury "to take into considera-
tion the time, place, setting, and surrounding circumstances"
without regard to whether "these were known to and appre-
ciated by the readers" of the publication.   We think the ob-
jections are hypercritical.   The charge was in accord with
the law as thus stated in Newell on Libel and Slander (4th
Ed.), pp. 736, 737, § 672:

"Wherever the words sued on are susceptible both of a
harmless and an injurious meaning, it will be a question for
the jury to decide which meaning was in fact conveyed to
the hearers or readers at the time of the publication.   * * *
The plaintiff may give evidence of surrounding circum-
stances from which a defamatory meaning can be inferred.
* * * If, however, the words are capable of the meaning
ascribed to them by the innuendo, and there is any evidence
to go to the jury that they were used with that meaning,
then it will be for the jury to decide whether in fact the
words were understood in that sense by those who first heard
or read them."

That statement is in substantial accord with the law as
stated and applied by this Court in several cases (*Hubbard
v. Furman University,* 76 S. C., 510; 57 S. E., 478.   *Black
v. State Co.,* 93 S. C., 475, 476; 77 S. E., 51; Ann. Cas.,
1914-C, 989.   *Nunnamaker v. Smith's,* 96 S. C., 294; 80 S.
E., 465), and with the views expressed and applied by the
Supreme Court of the United States in *Baker v. Warner,*

231 U. S., 594; 34 S. Ct., 175; 58 L. Ed., 389, and in *Washington Post Co. v. Chaloner,* 250 U. S., 293; 39 St. Ct., 448; 63 L. Ed., 989.

It is true that, if the extraneous circumstances relied upon to give a defamatory meaning to a publication were unknown to the readers of the publication, such circumstances could, of course, have no probative force to establish that the published writing conveyed a libelous meaning to such readers. But in correctly charging generally that the jury were entitled to take the surrounding and attendant circumstances into consideration, "in ascertaining the sense in which the words were published and the meaning intended to be conveyed and conveyed to readers," the Court was not bound to assume that evidence, if any, as to attendant circumstances which were unknown to the readers of the publication, would be given a probative force to which it was not entitled. And even if it be conceded that the general principle embodied in the charge as given might properly have been qualified by an instruction to the effect that in determining whether the publication conveyed a libelous meaning only attendant circumstances which were known to the readers of the publication could be considered (25 Cyc., 357; 17 R. C. L., 314, § 54), in the absence of a specific request for such an instruction, the Court's failure so to charge cannot be held for reversible error. *Mrs. Hall's Cafeteria v. Insurance Co.,* 128 S. C., 214; 122 S. E., 580. *Strickland v. Moskos,* 131 S. C., 249; 127 S. E., 265. *Langley v. So. Ry.,* 113 S. C., 54; 101 S. E., 286.

It is further contended that the Circuit Judge erred (Exception 5) in charging as follows:

"To constitute an actionable libel, the writing must make a false charge or insinuation against the plaintiff; it must be inspired by malice; it must tend to impeach the reputation of the plaintiff, and to injure him in his office, business, or in the estimation of the public. To render a defamatory statement actionable, it is *not necessary* that

the false charge be made in a direct, open, and positive manner. A mere insinuation is as actionable as a positive assertion, if it is false and malicious, and the meaning is plain."

The charge was a correct statement of the law, 17 R. C. L., pp. 312–314, §§ 53–55. *Turner v. Brien,* 184 Iowa, 320; 167 N. W., 584; 3 A. L. R., 1589, 1590. Appellants do not contend to the contrary, but say that it was inapplicable, in that the evidence was not reasonably susceptible of an inference that defendants had made any defamatory insinuation concerning the plaintiff, and that the foregoing charge was tantamount to an instruction that the jury could find in defendants' publication insinuations for which they "would be legally liable." That contention is essentially the same as is embodied in the defendants' request to charge, the refusal of which is made the basis of Exception 6, which request was as follows:

"The publication alleged in the complaint in this action was a letter written by the plaintiff to defendant Robertson, and if you find by the preponderance of the testimony that the circumstances stated in connection with the receipt of the letter are correctly stated, and that no comment was made thereon, you cannot find from the publication itself that the defendants were actuated by the motives alleged in the complaint, or that they intended to give to the publication the meaning alleged in the complaint. There must be some other evidence to establish the truth of the allegation of such meaning and motive."

If, as we have held in disposing of Exceptions 1 and 4, the issue, as to whether the publication, in the light of the extrinsic facts established, bore and conveyed the defamatory meaning charged, was properly submitted to the jury as an issue of fact, it is apparent that appellants' position as to the errors assigned by Exceptions 5 and 6 is untenable. Upon that issue the charge given (Exception 5) was sound and clearly applicable, and the request to charge refused (Excep-

tion 6) was properly refused as involving an invasion of the jury's province.

The second general proposition advanced by appellants is that the publication alleged to be libelous "was absolutely true" and that its "literal truthfulness" was a complete defense, "irrespective of the occasion of the publication or the motive or purpose of the publisher." Under this general proposition appellants group their Exceptions 2, 7, 8, and 9.

Exception 2 makes the contention that the Circuit Judge "should have granted a nonsuit and directed a verdict," upon the ground that "the testimony admits only of the inference that the publication by defendant was absolutely true, so that plaintiff has failed to establish any cause of action for defamation, as alleged." Exception 7 imputes error to the trial Judge in charging as follows:

"If you find that charges or insinuations against this plaintiff, if any, made in the publications made by defendants in this case were true, then your verdict as to such charges or insinuations found to be true must be for defendants. I charge you this because in a case of this character the truth of the publication, and of any charges or insinuations made therein, is a complete defense. And, even though evil motives may have prompted defendants to publish the truth, this will not make them liable. And it makes no difference whether either or both of the defendants did not know, at the time that the publication or charges were made, that they were the truth."

The specifications of error are (a) "that the publication made no charges nor insinuations against plaintiff, and there was no evidence of any charges or insinuations made by defendants *aliunde*," and (b) "that proof of the literal truthfulness of a publication is a complete defense, regardless of any insinuation sought to be placed thereon by innuendoes alleged or otherwise," etc. That the publication was "absolutely true," in the sense that each and every statement

therein contained was literally true, we do not understand
to be disputed.   But it does not follow that such literal truth
was a complete defense, as appellants contended.   The plain-
tiff's cause of action for libel was predicated upon the charge
that the publication, literally true as it was, was intended to
convey and conveyed to the readers thereof the defamatory
meaning attributed thereto by the innuendo of the complaint.
The trial Court having properly held as a matter of law that
the publication was capable of the construction placed upon
it by the plaintiff, and the issue of fact as to whether the
statement was published and understood in the sense charged
having been properly submitted to the jury, it was necessary
that the truth of the publication, pleaded by way of justifica-
tion, in order to constitute a complete defense, should be es-
tablished in the sense that the publication was alleged to con-
vey a defamatory meaning.   36 C. J., p. 1233, § 194, and
the numerous cases cited in footnote 29.   *Turner v. Brien,*
184 Iowa, 320; 167 N. W., 584; 3 A. L. R., 1590.   *Snyder
v. Tribune Co.,* 161 Iowa, 671; 143 N. W., 519.   *Julian
v. Kansas City Star Co.,* 209 Mo., 35; 107 S. W., 496.   The
rule is thus stated in Newell on Libel and Slander (4th Ed.),
p. 766, § 699:

"A plea is bad which falls short of a justification of the
slanderous words in the sense imputed to them by the dec-
laration, for the plea necessarily confesses that such sense is
correctly imputed.   * * *   The whole libel must be proved
true, not a part merely.   * * *   Justification must be of the
very charge it is attempted to justify, and it is not permis-
sible to set up a charge of the same general nature, but dis-
tinct as to the particular subject."

The author of the note to *Hutchins v. Page,* 31 L. R. A.
(N. S.), at page 140, states the law as follows:

"In order that the truth constitute a complete defense, it
must be established in the sense in which it is charged.   As
said by Lord Chief Justice De Gray in *R. v. Horne,* Cowp.,
pt. 2, p. 687, a man cannot defame in one sense, and defend

himself in another.   Hence the sufficiency of evidence to justify a defamatory matter depends upon the question whether the facts are charged with an innuendo, since if this is the case, according to the weight of authority, it is necessary to allege and prove the truth of the charge according to the imputation of the innuendo, or the defendant will fail in his attempt to justify, assuming, of course, that the words are capable of the meaning imputed to them, and that the defendant seeks to justify according to that meaning. *Jones v. Townsend,* 21 Fla., 431; 58 Am. Rep., 676.   *Stowell v. Beagle,* 57 Ill., 97; s. c. on subsequent appeal, 79 Ill., 525.   *Downey v. Dillon,* 52 Ind., 442.   *Samples v. Carnahan,* 21 (Ind.) Ill. App., 55 (51 N. E., 425).   *McGuire v. Vaughan,* 106 Mich., 280; 64 N. W., 44.   *Fidler v. (Delavan) Delevan,* 20 Wend. (N. Y.), 57.   *Wahle v. Cincinnati Gazette Co.,* 4 Ohio L. J. (Wkly. Law Bul.), 61.   *Gage v. Robertson,* 12 Ohio, 250.   *Nott v. Stoddard,* 38 Vt., 25; 88 Am. Dec., 633.   *Royce v. Maloney,* 57 Vt., 325."

Thus, "where the innuendo imputes to the facts a charge involving dishonesty, corrupt or criminal intent, it is necessary, in order to justify the charge, not only to allege the truth of the facts, but also their truth according to the intent imputed to them."   *Gage v. Robinson,* 12 Ohio, 250; and see *Clifton v. Lange,* 108 Iowa, 472; 79 N. W., 276. *Paxton v. Woodward,* 31 Mont., 195; 78 P., 215; 107 Am. St. Rep., 416; 3 Ann. Cas., 546.   Since appellants do not contend, but, on the contrary, expressly disclaim, that they sought to justify by showing the truth of the charge which plaintiff's innuendo imputed to the publication, it is clear that their contention that the "literal truthfulness" of the publication constituted a complete defense is untenable and Exceptions 2 and 7, which are predicated upon the validity of that contention, must be overruled.

The instruction complained of in Exception 8 was to the effect that "the benefit as a defense of the truth of matters published may be lost, if the matter published

was a private transaction with which the public had no legit-
imate connection or concern, and the manner and style of
publication made a false insinuation against the plaintiff,
which would render the matter libelous." That instruction
followed the broad statement that, "where the facts printed
and published are true, no liability for libel will arise from
the mere fact that the truth stated is liable to suggest dam-
aging inferences concerning such plaintiff, or from the mere
fact that from the truth so stated natural inferences of a de-
famatory character might be drawn which would be untrue"
—the purport of which statement was to clarify and empha-
size the point, which the trial Judge had previously made in
his charge, that "the inference of hurt, or injury, arising
out of a statement of facts, in order to become actionable,
must be such an inference as is drawn or established by the
general consent of men." Upon analysis it will be perceived
that the modification here complained of does not, as appel-
lants suggest in argument, go to the extent of applying the
doctrine announced by certain Courts (*Hutchins v. Page,*
75 N. H., 215; 72 A., 689; 31 L. R. A. [N. S.], 132.
*Burkhart v. North American Co.,* 214 Pa., 39; 63 A., 410),
that truth is not a defense to a civil action for libel, unless
published "upon a lawful occasion, in good faith, and for a
proper motive." The Circuit Judge merely said, in effect,
that truth would not be a defense if the matter published was
not privileged *and* if it "made a false insinuation against the
plaintiff which would render the matter libelous"—a propo-
sition which is not open to valid criticism, when considered
in the light of the rule that the plea of truth must extend to
the defamatory meaning alleged to have been conveyed by
the publication and of the Court's previous instruction to
the effect that the truth of the publication, in the sense that
it conveyed any such defamatory meaning, "is a complete
defense," "even though evil motives may have prompted"
the publication. Exception 8 must therefore be overruled.

In this phase of the case relating to truth as a defense, 12, 13 appellants' next contention (Exception 9) is that the trial Court erred in charging that, "where a libelous publication consists of making a charge of a crime and a party seeks to justify on the ground that the charge is true, the law of this State requires him to prove the truth of his charge—that is to say, the truth of the crime—beyond a reasonable doubt just as in criminal cases." The error assigned is not that the foregoing instruction was an incorrect statement of the law (*Gill v. Ruggles,* 95 S. C., pages 94, 95; 78 S. E., 536. *Burckhalter v. Coward,* 16 S. C., 440; but see *Salley v. Globe Indemnity Co.,* 133 S. C., 342; 131 S. E., 616; 43 A. L. R., 971), but that defendants "did not justify in this case by seeking to prove the truth of a crime," but, on the contrary, by their answer "expressly denied the allegations of the complaint" that they "had charged plaintiff with the commission of a crime." Hence, as we understand appellants' point, it is contended that the charge was irrelevant and misleading. The defendants pleaded the truth of the "facts" published, and the truth of the publication "by way of justification and complete defense" to the action. Upon the issue thus raised, clearly the charge complained of may not be pronounced erroneous upon the ground that it was inapplicable. While the defendants did disclaim any intent to charge plaintiff with the commission of a crime, they did not withdraw or abandon the plea of truth "by way of justification and complete defense"—a plea which, as we have seen, could not be sustained without meeting the facts published in the sense imputed to them by plaintiff's innuendo. But, in any event, if the charge was directed to an issue which the Court improperly assumed to be made by the pleadings, "it was incumbent on defendants' counsel to call the Court's attention to its mistake." *Gill v. Ruggles,* 95 S. C., 100; 78 S. E., 540. That was not done, and Exception 9 must be overruled.

Appellants' third general proposition is that the trial Court misapprehended and erroneously applied to the facts of this case the law of "self-defense and privilege." For the purpose of presenting their position upon this question, appellants in argument have grouped their Exceptions 3, 10, 11, 12, and 13. The main contention made is, in substance, that the Circuit Court erred in holding and in charging that the defense of privilege, based upon the right of self-defense and upon the right to publish and comment upon matters of public interest, interposed by both of the defendants, was not a good defense in bar, but was available and effective "only in mitigation or reduction of damages." By reference to the Judge's charge it will be seen that the facts as to the defamatory attack upon the defendant by the plaintiff, Duncan, in the State Senate, on the day of the alleged libelous publication by defendants, upon which the defense of privilege was based, were as fully stated in the charge as pleaded in the defendants' answers. Those facts were pleaded "as privilege and justification, as well as in mitigation." The portions of the charge complained of in Exceptions 10, 11, and 12, standing alone, would unquestionably be open to the criticism leveled against them, if such portions of the charge could properly be construed to constitute the whole of the Court's charge upon the defense of privilege.

Thus, in the instruction referred to in Exception 10, the Court charged that, "if a publication of a libel by a defendant against a senator is provoked by a speech made by the senator in the Senate, such speech by the senator, although made in the Senate, may be taken into consideration by the jury in mitigation or reduction of any damages caused to the senator by the defendants' publication, if the defendants' publication was libelous." In the instruction referred to in Exception 11, the Court charged that "the defense of self-defense and privilege, as I have heretofore set them forth, would apply in this case in mitigation or reduction of dam-

ages, if the publication by defendants was libelous, even though plaintiff's (defendants') publication resulted from a speech made by plaintiff during a session of the Senate, of which he was a member, and in the Senate chamber"; and, in the instruction complained of in Exception 12, the Court charged that "if the defendants, by the publication in evidence, charged the plaintiff with having solicited a bribe, while a public officer, to influence his official conduct, then the charge and publication would be libelous, and the burden would then be upon defendants to defeat liability by proving the truth of the charge, or to prove any facts or circumstances, which under the law as stated by me in this charge would mitigate or reduce any amount of damages recoverable by plaintiff."

We think, however, that a fair consideration of the charge as a whole, consecutively read, clearly discloses that in the portions of the charge excepted to the trial Judge was endeavoring to give the defendants the full benefit of the proposition of law advanced by them in their sixth request—that the plaintiff's senatorial privilege "did not deprive defendants of their right to defend themselves or of their privilege to answer his attack"—and to cover the contention made in the answer that the facts upon which defendants based their claim of privilege were to be considered not only in the aspect of justification or as a compete defense, but in mitigation of damages as well. See Section 426, Vol. I, Code 1922. The portion of the charge referred to in Exception 10 was followed, and that referred to in Exception 11 was preceded, by the following:

"In an honest endeavor to vindicate himself and his own interests, a defendant is often privileged to make statements which would otherwise be regarded as defamatory. If a party's good name is assailed in a newspaper, he may reply, defending himself, and, if his reply is made in good faith, without malice, and is not unnecessarily defamatory of his assailant, it is privileged. Even though false, a publication

which is fairly in answer to a libel, if published without malice and in good faith, for the purpose of repelling a charge, *is privileged, and is not actionable.*

"An action for libel is not to be encouraged for publication made while parties are mutually engaged in making publications about each other. A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and it is for you to determine from the evidence applying to the evidence the rules of law stated by me, whether or not, under the circumstances of this case, the publication made by defendants was qualifiedly privileged, and, if it was privileged, then you cannot award the plaintiff a verdict, unless you find that the defendants were actuated by express or actual malice in making the publication, and have abused their privilege."

After giving the instruction referred to in Exceptions 10, 11, and 12, the Court charged:

"It is a legal defense to an action for libel if it is shown that the publication was true, *or if the circumstances under which the publication was made were such as to render it right and proper that the defendant should make the publication in question.* In such cases, the publication is said to be privileged; and, if privileged, although it may be false, still its publication on such an occasion is *excused* for the sake of the common convenience and welfare of society at large." (Italics added.)

And subsequently the Court charged:

"If from a defendant's point of view strong words seem to be justified, *he should not be held liable* for using them, unless the jury find from the evidence that what he published was malicious and inconsistent with good faith." (Italics added.)

In view of the foregoing instructions it cannot be said that the trial Court limited the scope and sufficiency of the defense of "self-defense and privilege"

to mitigation of damages. Under the well-settled general principles that the charge must be considered as a whole, that the refusal of an instruction covered by others given is not error, and that it is not improper to state the law as applicable to particular questions in separate instructions which are consistent with each other, the portions of the charge complained of in Exceptions 10, 11, and 12 cannot be pronounced erroneous. 38 Cyc., 1598. *Union Bleaching & Finishing Co. v. Barker Fuel Co.,* 124 S. C., 458; 117 S. E., 735. *Sanders v. Hayes,* 128 S. C., 181; 122 S. E., 572.

It is further contended that this defense of privilege, interposed by both defendants, was so conclusively established by the evidence that the trial Judge should have charged, "under the circumstances in this case, that the publication made by defendants was qualifiedly privileged" (Exception 13) and should have directed a verdict for defendants upon that ground (Exception 3). In his able dissenting opinion in the case *Switzer v. Am. Ry. Express Co.,* 119 S. C., 242, 248; 112 S. E., 110, 113 (26 A. L. R., 819), Mr. Justice Cothran thus states the questions of fact involved in determining the issue as to whether a communication or publication is qualifiedly privileged:

"Was the 'communication,' alleged to have been slanderous, one of qualified privilege; this question depending upon the further question whether or not, the 'occasion' being shown to have been one of qualified privilege, the occasion was so abused, or its bounds so exceeded by ill motive, as to deprive the communication of the qualifiedly privileged character which is presumed by the fact of its utterance upon a qualifiedly privileged occasion?"

In Newell on Libel and Slander (4th Ed.), pp. 315, 316, § 277, it is said:

"The effect, therefore, of showing that the communication was made upon a privileged occasion is *prima facie* to rebut the quality or element of malice, and casts upon the plaintiff

the necessity of showing *malice in fact;* that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff; and this malice in fact, resting as it must upon the libelous matter itself and the *surrounding circumstances* tending to prove fact and notice, *is a question to be determined by the jury.* The question whether the occasion is such as to rebut the inference of malice, if the communication be *bona fide,* is one of law for the Court; but whether *bona fides* exist is one of fact for the jury. And the jury may find the existence of actual malice from the language of the *communication itself,* as well as from extrinsic evidence."

In the case of *Switzer v. American Ry. Express Co.,* 119 S. C., 242, 243; 112 S. E., 111; 26 A. L. R., 819, this Court said:

"While, as stated by Judge Earle in the case of *Smith v. Youmans, supra* (3 Hill, 85), the privileged 'occasion affords a *prima facie* presumption to rebut the inference of malice, and the plaintiff would fail without further proof,' the presumption thus raised is a presumption or inference of fact sanctioned by law, to be applied by the jury under appropriate instructions of the Court."

It is true, where the evidence is open to no other reasonable inference of fact than that the *occasion,* in the absence of actual malice, was privileged, the Court might properly so instruct the jury, leaving to the jury only the question of whether the plaintiff had sustained the burden of showing the existence of actual malice. Or, as pointed out in the majority opinion in the *Switzer case,* where the evidence is susceptible of no other reasonable inference than that (1) the occasion was privileged, and (2) that the occasion was not employed in bad faith and with actual malice, for the purpose of making a defamatory communication, it would be the duty of the Court to hold that the defense of qualified privilege was established and to grant a nonsuit or to direct a verdict for the defendant.

In the case at bar the Court modified defendants' fifth request which contained the language, "A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and I charge you that under the circumstances in this case that the publication made by defendants was qualifiedly privileged, and that you cannot award the plaintiff a verdict, unless you find that the defendants have abused their privilege," by charging as follows:

"A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and it is for you to determine from the evidence, applying to the evidence the rules of law stated by me, whether or not, under the circumstances of this case, the publication made by defendants was qualifiedly privileged, and, if it was privileged, then you cannot award the plaintiff a verdict, unless you can find that the defendants were actuated by express or actual malice in making the publication, and have abused their privilege."

In the light of the principle enunciated by the foregoing authorities, we do not think the failure to charge, as requested, "that the publication made by defendants was qualifiedly privileged," may be held for reversible error, even in the possible view that under the facts of the case the Court might properly have held and charged that the *occasion* was *privileged*. And since the only effect of holding by the Court that the occasion was privileged would have been to require the placing on plaintiff of the burden of showing "express or actual malice"—a burden which, in effect, was as clearly devolved on plaintiff by this instruction as modified and by the general charge as if the Court had expressly assumed and held that the occasion was privileged—we are of the opinion that the point raised by Exception 13 is without substantial merit and must be overruled. And unless the Court could have held as a matter of law that the facts

in evidence were susceptible of no other reasonable inference than that the publication was made without actual malice—and it is not seriously contended in argument that under the facts here the trial Court could properly have so held—it follows that there was no error in refusing the motion for nonsuit and for a directed verdict, upon the ground that the defense of privilege had been conclusively established by the evidence, and Exception 3 must therefore be overruled. See *Switzer v. American Ry. Express Co., supra. Smith v. Youmans,* 3 Hill, 88, 89. *Miller v. Kerr,* 2 McCord, 288; 13 Am. Dec., 722; Newell on Libel and Slander, pp. 315, 316, § 277. *Denver Pub. W. Co. v. Holloway,* 34 Colo., 432; 83 P., 131; 3 L. R. A. (N. S.), 699; 114 Am. St. Rep., 171; 7 Ann. Cas., 840; and editorial notes and cases cited and reviewed, 3 L. R. A. (N. S.), 697, and *Sunley v. M. L. Ins. Co.,* 132 Iowa, 123; 109 N. W., 463; 12 L. R. A. (N. S.), 93.

Appellants' fourth general proposition is that the trial Judge erred in charging the law of damages. It is contended (Exception 14) that the Court erred in charging as follows:

"If the jury find from the evidence, by the greater weight thereof, that the publication in question was libelous, then the plaintiff would be entitled to recover such sum by way of actual damages as the jury in its discretion may think proper to compensate him for his injury, including the humiliation which he may feel and may have suffered by reason of the publication, and the jury are instructed that, if they find the publication was libelous, the plaintiff would be entitled to substantial damages."

The error assigned is (a) that the charge was in respect of matters of fact, and so violated Section 26 of Article 5 of the Constitution; (b) that the amount of damages was in the sound discretion of the jury, etc.; and (c) that the charge was peculiarly prejudicial, "in view of plaintiff's failure to offer testimony of any actual damage," and "in view of de-

fendants' testimony going to mitigation and reduction of damages." It is further contended (Exception 15) that the Judge, in violation of the constitutional inhibition, intimated to the jury his opinion that plaintiff's actual damages should be increased, and not diminished, and that plaintiff should be awarded punitive damages, by charging as follows:

"If you find that the defendants, or either of them, have been proven guilty of publishing a libel, as defined in this charge, against the plaintiff, then, in determining the amount of damages to which the plaintiff may be entitled, you should take into consideration all the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language, manner, and style in which such charges were made or published, and their tendency, the occasion on which they were published, the extent of their circulation, the probable effect of the publication upon those to whose attention it came, and its natural and probable effect upon the plaintiff's personal feelings, and his standing in the community and in public estimation; and you may, in reaching your verdict, take into consideration, in mitigation or reduction of damages, any and all facts and circumstances disclosed by the evidence which tend to show that the article was published under the influence of a provocation therefor recently given by plaintiff to the defendants or either of them; and if, under the instructions in this charge, the plaintiff is entitled to recover, you should award him such sum by way of damages as will fairly and adequately compensate him for any insult to him, including any pain and mortification and mental suffering inflicted upon him, and any injury to his standing as a man, citizen, or public officer in the public estimation; and the plaintiff would also be entitled to recover such punitive or exemplary damages as you may find to be proper under all such facts and circumstances as may be proven by the evidence, in case you find from the evidence that such defamatory publication or libel was wantonly or maliciously published with intent to injure the plaintiff."

Reading the foregoing portions of the charge, referred to in Exceptions 14 and 15, together, it is sufficiently apparent, we think, that the applicable law as to damages was fully and fairly charged, and that the instructions are not open to valid criticism, unless it can be said that the Judge trenched upon the facts in stating that, if the jury should "find the publication was libelous, the plaintiff would be entitled to substantial damages." In their printed argument, that is the gist of the objection urged by appellants to the Court's charge upon this phase of the case.

It is argued that since, under the well-established rule in actions for libel, "the amount of damages is peculiarly within the province of the jury" (17 R. C. L., 429, § 188. *Gambrill v. Scholey,* 93 Md., 48; 48 A., 730; 52 L. R. A., 87; 86 Am. St. Rep., 414; note 86 Am. St. Rep., 422. *Holmes v. Jones,* 147 N. Y., 59; 41 N. E., 409; 49 Am. St. Rep., 646), the instruction to the effect that upon the basis of a finding by the jury that the publication was libelous "plaintiff would be entitled to substantial damages" was an improper expression of opinion by the Court as to a question of fact which was exclusively for the jury. It is to be borne in mind that the sense in which the publication was alleged by plaintiff to be libelous was that it conveyed a charge of corruption and crime. The Judge's definitions of libel had been directed to the issue thus raised by the pleadings. Hence a finding by the jury that the publication was libelous would be equivalent to a finding that the publication had falsely and maliciously charged plaintiff with the commission of a crime.

Since "any printed or written statement which falsely and maliciously charges another with the commission of a crime is libelous *per se*" (17 R. C. L., 265, § 5. *Smith v. Bradstreet,* 63 S. C., 530; 41 S. E., 763), and since, from the publication of defamatory matter which is libelous *per se,* general damages are presumed to result "by inference of law" and "are not required to be proved by evidence" (37

C. J., 91, § 516; see *Lorick v. Bank,* 74 S. C., 185; 54 S. E.,
206; 7 Ann. Cas., 818), it is apparent that the words "sub-
stantial damages" were here used by the Circuit Judge, as
they were used in *Wilson v. Palmetto National Bank,* 113
S. C., 508, 512; 101 S. E., 841, in contradistinction to "nom-
inal damages." The question, therefore, is whether, upon the
assumption that the jury found that plaintiff had been falsely
and maliciously charged with the commission of a crime, the
Court could properly charge that he would be entitled to re-
cover "substantial" damages. In the case of *Lorick v. Bank,*
*supra,* in a concurring opinion, Mr. Justice Woods said:

"The liability of a bank to its depositor for substantial
damages, temperate in amount, for refusing to pay his check,
not exceeding his credit, is generally, if not universally, recog-
nized. And it is not necessary to recovery that there should
be proof of special damages, the law presuming that the re-
sult is injury to the credit of the depositor from the general
experience of men in such transactions. It is the application
of the rule established in cases of slander, the refusal to pay
the check being a declaration against the solvency and correct
business dealing of the drawer."

In *Wilson v. Bank, supra,* which, like the *Lorick case,* was
an action for damages for improper refusal to honor a check,
the Court (Mr. Justice Hydrick) said:

"The next assignment of error is in charging the jury that
the damages awarded in a case like this should be something
more than nominal; that they should be substantial, but tem-
perate in amount. The error complained of is in the use of
the word 'substantial'. It appears that 'substantial' was
used in contradistinction to 'nominal'; that is, damages
which are so small as scarcely to be entitled to the name,
and such as are given for a mere technical invasion of a
right, when no real or actual loss or injury has resulted.
The authorities agree, and this Court has held, that, in a
case like this, plaintiff is entitled to something more than

nominal damages, but that the recovery should be temperate in amount."

In *Lee v. McCrory Stores Corporation,* 117 S. C., 236, 238; 109 S. E., 111, which was an action for slander, in passing on an exception which charged that "the presiding Judge invaded the province of the jury in instructing them that they must find general damages substantial in amount, if they found that defendant's employee had used the language set forth in the complaint," this Court said:

"The case of *Wilson v. Palmetto National Bank,* 113 S. C., 508; 101 S. E., 841, is full authority for the charge as made.   The charges made the same distinction as to substantial and nominal damages in both cases.   This is a stronger case than the *Wilson case,* in that an overdraft may be the result of carelessness.   Stealing cannot be the result of a mistake.   This exception is overruled."

In the light of the foregoing expression of this Court, we do not think the use by the trial Judge of the words "substantial damages" can soundly be held for reversible error.   Conceding that under our practice the use of the word "substantial" in a charge of this character is not to be commended, and that the idea to be conveyed could more accurately and safely be expressed by the words "more than nominal damages," where, as here, it appears that the word "substantial" was used in that sense, if defendants desired a fuller and more precise statement, an appropriate request for such an instruction should have been preferred. *Mrs. Hall's Cafeteria v. Insurance Co.,* 128 S. C., 214; 122 S. E., 580.   Nor do we think there is merit in appellants' further contention in this connection that the charge as given eliminated consideration of the defense of self-defense and privilege and of the strong evidence offered by defendants in mitigation.   The instruction was based upon the hypothetical finding that defendants had published a libel as charged, and was followed by instructions which very clearly authorized the jury to "take into consideration, in mitiga-

tion or reduction of damages, any and all facts and circumstances which tend to show that the article was published under the influence of a provocation therefor recently given," etc.

But appellants say that in charging as to the facts and circumstances in mitigation the Judge used the permissory "may," while in charging as to the facts and circumstances which the jury might take into consideration in determining the amount of damages he used the mandatory "should" (Exception 15), and thereby unfairly discriminated against the defendants. We think an objection predicated on this refinement in the use of words is manifestly hypercritical, and rests upon too tenuous a basis to warrant a finding of reversible error. Exceptions 14 and 15 must therefore be overruled.

Appellants' fifth general proposition is that the Circuit Judge committed reversible error in refusing defendants' motions for a new trial upon the ground that the verdict was "capricious and the result of prejudice" (Exception 16) and "was grossly excessive" (Exception 17). It is contended that the action of the jury in awarding a verdict for the full amount asked for within a few minutes after the case had been submitted strongly indicates that it was the result of caprice and prejudice, and that the jury took no account of defendants' pleas in justification and mitigation of damages, and that the amount of the verdict is so "excessive as to impel the inference" as a matter of law that it was "the result of caprice, passion and prejudice, or other considerations not founded in the evidence" (Exception 18).

It is well settled that this Court, confined by constitutional limitation to the correction of errors of law in cases of this character, has no power to review and reverse the ruling of the Circuit Judge refusing to grant a new trial upon the ground that a verdict was excessive, unless the appeal record discloses and warrants the conclusion, as a matter of law, "that the Circuit Judge's refusal to grant a new trial

amounted to manifest abuse of the discretionary power exclusively vested in him by law to grant new trial for or on account of matters of fact. *Southerland v. Davis,* 122 S. C., 511, 515; 115 S. E., 768. *Huggins v. Railroad Co.,* 96 S. C., 267, 278; 79 S. E., 406. *Bing v. Railroad Co.,* 86 S. C., 530; 68 S. E., 645. Or, as was said by this Court in *Union Bleaching Co. v. Barker,* 124 S. C., 458; 117 S. E., 735:

"This Court is without jurisdiction to review a judgment upon the ground alone that the verdict upon which it is based is excessive or contrary to the evidence. If upon a motion for a new trial it should be made to appear, as a matter of law, an inference from admitted facts, or of facts admitted for the purpose of the motion, that the verdict is excessive, this Court may review a contrary ruling by the trial Court."

In numerous decisions this Court has said that, in order to authorize the review and correction of a judgment upon this ground, "it should appear that the verdict is so excessive as to warrant an inference that it was the result of caprice, or some improper or corrupt motive." *Leppard v. W. U. Telegraph Co.,* 88 S. C., 388; 70 S. E., 1004, and other cases cited in *Strickland v. Moskos,* 131 S. C., 247; 127 S. E., 265.

But, obviously, before an inference can be drawn as a matter of law that a verdict was excessive or that it was so excessive as to reveal caprice, prejudice, or passion, the facts must be "admitted," as pointed out in *Union Bleaching Co. v. Barker, supra,* or, if not admitted, it must be assumed, in so far as the evidence warrants, that the facts are as found by the jury. In the case at bar, since the material facts are not admitted, and the jury has determined all issues of fact in favor of the plaintiff, it must be assumed that the facts are those established by the jury's verdict; and the only question which this Court is authorized to consider is whether the Circuit Judge committed error of law in not granting a new trial upon the ground that the

facts are susceptible of no other reasonable inference than that the verdict was so excessive as to indicate that it was the result of prejudice, caprice, or passion, or other consideration not founded on the evidence. In his order refusing the defendants' motion for a new trial upon the ground that the verdict was excessive, the Circuit Judge thus states his views and conclusions as to the facts:

"There is sufficient evidence to sustain the verdict on both these points (libelous publication and actual malice), and the verdict is not against the preponderance of the evidence. The jury having found that the publication was both libelous and prompted by actual malice toward plaintiff, the mere fact that they found the full amount sued for does not show that they acted under the influence of either passion or prejudice, or that they failed to consider the plea of justification, mitigation, or truth. Whether or not such plea was established by the evidence was for the jury to determine; and, if the alleged provocation was established, it was for the jury to determine the extent of the mitigation to be allowed therefor, under the circumstances proven. It is my duty to determine whether or not the verdict was unjust or excessive under the evidence. * * * There is no exact measure of the damages to be awarded in a civil action for libel. In such a case as this they should include compensation for the injury done the reputation of a Senator, who inherited a good name from a revered bishop, and had been repeatedly honored by the suffrages of those who knew him best— something the value of which was most difficult to be measured. Many who heard, or read, of the libel would remember it, and overlook or forget the vindication. * * * Compensation is not the only element in the verdict. There was evidence to show actual malice on the part of defendants, and the defendant Robertson stated his individual worth was 'around $300,000,' and, when asked how much more, replied, 'That is enough for this case.' The jury did not think payment of $50,000 excessive punishment for a mali-

cious libel published by one so able to pay. * * * Upon a fair consideration of the case, I do not consider the verdict either unjust or excessive.   I see no evidence to indicate that the verdict was the result of either caprice or prejudice."

However difficult it may be to understand the mental processes of jurors in arriving at a verdict, and however widely this Court may differ with the Circuit Judge in the conclusion, reached in the discharge of the duty exclusively imposed upon him by law, that the verdict of a jury was not against the preponderance of the evidence, if the facts in this case are assumed to be the facts established by the jury's verdict—that the plaintiff was the reputable and innocent victim of the defendants' express malice in publishing, without justification or excuse, a defamatory charge to the effect that he had been guilty of the foul crime of soliciting a bribe, etc., as alleged—then it is manifest, we think, that it may not soundly be held that the facts are susceptible of no other reasonable inference than that the verdict was so excessive as to indicate that it was the result of prejudice, caprice, or passion, or other consideration not founded in the evidence. If so, the contention that the Circuit Judge committed error of law in refusing the motion for a new trial upon the ground that the jury's award of damages was excessive cannot be sustained.

It is further contended, however (Exception 19), that the Circuit Judge's failure to grant a new trial was due to his misconception of "his power and duty," in that he held that, "in order to authorize the trial Judge to grant a new trial on account of excessive damages in a libel case, 'the damages should be outrageous, out of all proportion to the injury, flagrantly extravagant,' or that it should appear that the jury 'were not indifferent between the parties.' "   It is true that in his order refusing the motion for a new trial the Circuit Judge, upon the authority of certain of our decisions, used the expressions quoted to define or describe what might be considered excessive damages

in a libel case. It cannot be held that his use of those expressions was inaccurate; but, if it could, it does not appear that his conclusion upon the motion for new trial was controlled, or in any wise influenced, thereby. The Judge's conclusion, as we think is clearly indicated by the extracts from his order above set out, was predicated upon the view that under the facts the verdict was neither moderately nor outrageously excessive.

It follows that all exceptions must be overruled, and the judgment of the Circuit Court is affirmed.

It is the judgment of this Court that the judgment of the Court of Common Pleas for Richland County be and the same is hereby affirmed.

Mr. Chief Justice Watts, and Messrs. Justices Stabler and Carter concur.

Mr. Justice Cothran (dissenting): In my opinion, this appeal turns largely, if not entirely, upon the correctness of the legal conclusion, announced in the opinion of Mr. Justice Marion, that the publication in question, taken in connection with certain extrinsic facts alleged in the complaint and established beyond controversy by the evidence, is susceptible of a defamatory imputation against the plaintiff, Mr. Duncan. In the opinion of Mr. Justice Marion, it is said:

"In the view that the publication itself disclosed the occasion, and contained all the facts relevant to the matter published, the validity of the appellants' conclusion that it contained no implication or suggestion of improper conduct on Duncan's part, and was not reasonably susceptible of the meaning ascribed thereto by the innuendo of the complaint, might well be *doubted*."

He adds:

"But, in addition to the facts contained in the publication itself, the plaintiff alleged and adduced evidence to establish the significant and relevant facts: (1) That the Canal Commission, upon which Duncan had been appointed a member

just five days prior to the date of his letter to Robertson, was vested with 'plenary authority with respect to' certain litigation then pending between the State of South Carolina and the Columbia Gas & Electric Company; (2) that Edwin W. Robertson, to whom said letter was addressed, owned a controlling interest in said company; and (3) that on the very day of the publication, Duncan, from his seat in the State Senate, had made a bitter and sensational public attack upon Robertson and his company and upon the press of Columbia."

And he concludes thus:

"Certainly, when the matter contained in the publication is read in the light of the foregoing significant facts, it would seem scarcely open to argument that the publication was reasonably susceptible of the meaning which the innuendo of the complaint ascribed to it, viz., that Duncan had invited the defendant Robertson to influence him in the discharge of his official duty by the extension of a personal loan, and had thereby been guilty, to all intents and purposes, of the crime of soliciting a bribe"; in other words, that Mr. Duncan's letter amounted to a proposition that, if Mr. Robertson would render the financial accommodation applied for, he (Mr. Duncan) as a member of the Canal Commission, would in return favor Mr. Robertson's interests in the canal controversy. With this conclusion I am not in accord, and will endeavor to show that it is not only "open to argument, but is erroneous."

Mr. Justice Marion has evidently proceeded in conformity with the settled principles of law clearly laid down by the Supreme Court of the United States in the case of *Baker v. Warner*, 231 U. S., 588; 34 S. Ct., 175; 58 L. Ed., 384, where Mr. Justice Lamar, speaking for the Court, says:

"Where words are libelous *per se* the Judge can so instruct the jury, leaving to them only the determination of the amount of damages. Where the words are not libelous *per se* and, in the light of the extrinsic facts averred could not

possibly be construed to have a defamatory meaning, the Judge can dismiss the declaration on demurrer, or, during the trial, may withdraw the case from the jury [I interpolate by granting a nonsuit or by directing a verdict for the defendant]. But there is a middle ground where, though the words are not libelous *per se,* yet, in the light of the extrinsic facts averred, they are susceptible of being construed as having a defamatory meaning. Whether they [actually] have such import is a question of fact. In that class of cases the jury must not only determine the existence of the extrinsic circumstances, which it is alleged bring to light the concealed meaning, but they must also determine whether those facts, when coupled with the words, make the publication libelous."

From this declaration of the law, I understand that, in the determination of the issues involved in a libel suit, it is the duty of the Judge in the first instance to declare whether or not the words used are libelous *per se;* if so, the sole issue for the jury is the amount of the damages to be awarded; if not, the plaintiff goes out of Court by an order sustaining a demurrer, granting a nonsuit, or directing a verdict, unless the Judge, whose prerogative it is, should decide that although the words are not libelous *per se,* taken in connection with the extrinsic facts averred, the publication is susceptible of a defamatory meaning. The Judge decides that issue as a question of law, and, if so held, the double issue is presented to the jury as to the truth of the alleged extrinsic facts, and whether these facts, established, coupled with the words used, make the publication libelous.

It is not contended by the plaintiff that the publication was libelous *per se;* so the first hypothesis stated by Mr. Justice Lamar passes out of the case. The question is: Do the facts present a case which fits either the second or third hypothesis; that is: (2) Where the words are not libelous *per se,* and in the light of the extrinsic facts averred could not possibly be construed to have a defamatory meaning; or (3) where, though the words are not libelous *per se,* yet

in the light of the extrinsic facts averred, they are susceptible of being construed as having a defamatory meaning? My very firm conviction is that the facts of this case come under the second hypothesis of Mr. Justice Lamar: "Where the words are not libelous *per se,* and in the light of the extrinsic facts averred could not possibly be construed to have" the defamatory meaning alleged in the innuendo of the complaint.

The extrinsic facts relied upon, in connection with the publication, to support the conclusion that both combined are susceptible of the defamatory imputation of *soliciting a bribe* are, as stated by Mr. Justice Marion: (1) That the Canal Commission was vested with plenary powers in reference to the litigation then pending between the State and the Railway Gas & Electric Company; (2) that Mr. Robertson owned a controlling interest in that company; and (3) that on the day of the publication Mr. Duncan had made in the Senate a bitter attack against Mr. Robertson and the press of Columbia. (Note.—In reference to this last alleged extrinsic fact, which is detailed as one alleged in the complaint, it was not only not alleged in the complaint, but was made the subject of a motion by the plaintiff to strike it out of the defendant's answer, the favorable result of which motion, on circuit, was reversed by this Court. 131 S. C., 485; 127 S. E., 606.)

However great may have been the impropriety of Mr. Duncan, a member of the Canal Commission, in presenting an application for a loan to Mr. Robertson, who was directly interested in the settlement of the canal controversy, naturally creating the apprehension in the mind of Mr. Robertson that a refusal would generate a hostile attitude on the part of Mr. Duncan, and subject Mr. Robertson to criticism, such conduct falls very far short of the offense of *soliciting a bribe,* the only innuendo that has received any consideration in the opinion.

This case is different in one remarkable aspect from any other libel suit that I imagine could be found in the books. It is not based upon the publication of a communication of which the *defendant* was the author, but upon one of which the plaintiff was the author, at a time when he had full knowledge of every extrinsic fact connected with the controversy. He knew that he had become a member of the Canal Commission; he knew that Mr. Robertson was vitally interested in the canal litigation; he knew that he had written the letter two days before the act constituting the commission had been approved. It is difficult for me to understand, if Mr. Robertson is to be charged with a defamatory imputation in publishing Mr. Duncan's own letter, with the extrinsic facts within his knowledge, why Mr. Duncan should not be charged with a consciousness of the same imputation; a consciousness which he emphatically disavows, and which, if not present with him, could hardly have been so with Mr. Robertson.

The setting of this controversy, in my opinion, shows that Mr. Robertson, rather than Mr. Duncan, was the most aggrieved; that he was decidedly "more sinned against than sinning." A year after the application of Mr. Duncan for a loan had been declined by Mr. Robertson, during which time it does not appear that any specific act had been committed by Mr. Robertson, or the parties with whom he was connected, to stir his indignation, Mr. Duncan arose from his seat in the Senate, of which body he was a member, to a question of "personal and official privilege," and delivered a broadside phillipic, full of vindictive vituperation against Mr. Robertson, the Columbia press, and the citizens who favored a certain settlement of the canal litigation, in terms of condemnation and most horrible suggestion, which are thus analyzed by the presiding Judge from the defendant's answer:

"That defendant had deceitfully induced certain men to represent to the Canal Commission that it was to the interest

of the State and this community to settle the canal contra-
versy, when, as a matter of fact, such men were seeking
only to promote the selfish interests of defendant, as a re-
ult of his deceitful procurement. That defendant had bribed
or had improperly influenced the newspapers to circulate
propaganda that it was to the interest of the State to make
the settlement, when in fact such newspapers were seeking
only to promote the selfish interests of the defendant, as a
result of his deceitful procurement.

"That defendant had entered into a deceitful arrangement
with Stone & Webster, Inc., whereby they should undertake
to settle the canal controversy with the Canal Commission
apparently for the benefit of themselves, when, as a matter
of fact, they were acting only to promote defendant's in-
terests, pursuant to such deceitful arrangement. That defend-
ant had been feeding on dead men's bones; that is, that de-
fendant was a ghoul. That the Company which defendant re-
presents had lived on its betters, had taken advantage of the
financial situation, and had never done anything for the de-
velopment or advancement of the City of Columbia or of
South Carolina. That defendant was an octopus. That de-
fendant had dominated Chambers of Commerce and little
towns, and had deceitfully persuaded them to take an active
part in the matter, apparently for the best interests of the
public, but in reality to promote the selfish interests of de-
fendant, pursuant to his deceitful persuasion."

In his "usual vigorous style" he held the defendant up in
the most august deliberative body in the State to the contempt
and hatred of all good men, as one who had done nothing for
the community of his birth, but had feasted upon the mis-
fortunes of others—as one who was then through fraud and
deceit, and the domination and control of his fellow citizens,
evading his just obligation to the State. He ransacked his-
tory, sacred and profane, for the outstanding figures of per-
fidy, treachery, and deceit, with whom to compare his
victim; he characterized him as a ghoul, among Eastern

nations an imaginary evil being who robs graves and feeds
upon corpses, the hyena of the human race:

"They are neither man nor woman;
   They are neither brute nor human;
   They are ghouls."

He could not have been more vituperative and vindictive
than if he had invoked—

"* * * * some chosen curse,
   Some hidden thunder in the stores of Heaven,
   Red with uncommon wrath, to blast the man
   Who owes his greatness to his country's ruin."

It is apparent that he desired the fullest publicity to his
address, which could have been delivered in executive session,
but was not; he admits that he wanted it broadcast through-
out the State; he knew that newspaper reporters were pres-
ent, and gave them afterwards information about his speech,
knowing that it was to be published; he admitted, when asked
for the evidence upon which he had made the damnifying
charges, *that he had "nothing in the world but the atmos-
pheric evidence."*

Mr. Duncan has convicted himself of having made a most
bitter personal attack upon Mr. Robertson, within the safety
zone of the State Senate, under circumstances of extreme
vindictiveness; an attack gratuitous and uncalled for by any
urge of personal or official duty; most extraordinary in
coming from a man who less than a year before had made
a "personal" appeal for financial assistance; an attack upon
such baseless "atmospheric evidence" that upon the trial of
the case not the slightest effort was made to sustain the
charges. I am not surprised that his counsel were not willing
that it should appear in the record.

I see nothing in his address to the Senate which justifies
the invocation of *personal privilege* in making such an *attack;*
not a defense, as is customary. If any part of it related to
"official" privilege (which is not familiar to me, although
with some experience in such matters), the proper course

for presentation would have been through the commission of which he was a member.

It was in reply to such an attack, slanderous to the last degree, that the publication, true, absolutely true, in every detail, admittedly so, was issued. The most natural, and, I think the only, inference to be drawn from it is that Mr. Robertson, smarting under the charges of chicanery and corrupting practices, presented in most repulsive form, and with the scorn which blistered as the leash of a scorpion's tongue, was moved in self-defense to show that Mr. Duncan had made them because of the refusal of his application for a loan, under the circumstances set forth in the publication, and not from the spirit of truth; in keeping with the apprehension he entertained upon receipt of the letter in the event of refusal, but worse, as it was personal, and not official, antipathy that he had provoked. As Mr. Robertson says in his testimony:

"When I was advised of Mr. Duncan's speech in the Senate, I was naturally very much incensed, and I intended that the public should have the benefit of his communication to me, so that they could see both sides, and why possibly his motive was rather that of ill will than trying to do any good for the State."

I feel assured that Robertson intended this, and only this, and that no other reasonable inference can be drawn from the publication; and, even if it went to the extent of suggesting impropriety, Mr. Duncan is shown to have been the author of his own misfortune. It is very clear, from Mr. Robertson's reply to Mr. Duncan's application for a loan, that he did not then consider that Mr. Duncan had committed the crime of soliciting a bribe. He doubtless thought then, as he testified, that it was an act of impropriety, embarrassing both to himself and to Mr. Duncan. As he states:

"When I got the letter, I was very much perplexed and worried, because I knew if I declined, I would run the risk of

incurring the enmity of a member of the Canal Commission, and, if I made the loan, I would lay myself liable for being suspected for [of?] trying to influence the commission."

That the act of Mr. Duncan, in attempting to negotiate a loan with Mr. Robertson under the circumstances, was one of impropriety, I do not think that any one will deny. The extrinsic facts alluded to by Justice Marion, and stated above, simply emphasize that impropriety, and add nothing in the way of an inducement in supporting the innuendo. It was an act of impropriety, affecting both himself and Mr. Robertson; in subjecting himself to the suspicion that he was using the great power of his official position to induce a loan; and in placing Mr. Robertson in the embarrassing situation of apprehension that, if he refused the loan, he would generate a hostile attitude in Mr. Duncan to the great financial interests he had at stake, and that, if he granted it, he would subject himself to the suspicion of attempting to influence a most "vigorous" member of the Canal Commission.

It seems clear that, before Mr. Duncan could have been convicted of soliciting a bribe, the State would have been obliged to show, not only that Mr. Duncan had requested a loan of Mr. Robertson, but that he had promised to give something out of his official relation in return for the accommodation; and it seems equally clear that the imputation or inference should contain these elements of the offense before the publication can be held libelous *per quod.*

It is significant, in view of the interpretation that the publication amounted to a charge of solicitation of a bribe, that not a word was said in Mr. Duncan's letter to Mr. Robertson in reference to his position on the Canal Commission; not a word by Mr. Duncan suggesting any favor to be extended by him to Mr. Robertson in return for the loan. It is upon its face a plain, open business proposition, that Mr. Robertson should make him a loan of $25,000.00, upon security six times in value and to be inspected by a

representative of Mr. Robertson on the ground. If the interpretation contended for by the plaintiff is to be sustained, then it must be inferred *from the letter* that such was Mr. Duncan's intention; a conclusion which Mr. Duncan repudiates, and which, to my mind, is altogether unthinkable. It is hardly conceivable that Mr. Duncan would have offered security "worth six times the amount of the loan desired," to be inspected and approved by Mr. Robertson's representative, if he had not intended to repay the loan, assuring Mr. Robertson, in addition, of the maturity of certain building and loan stock, which would mature in three years, the length of the credit, out of which the loan would be repaid. It seems to me an exceedingly far-fetched innuendo that Mr. Duncan expected to render Mr. Robertson favorable consideration as a member of the commission, in return for a loan which he says in his letter he could readily obtain from other sources, in return for a plain business, well-secured, accommodation; and it is evident that the charge of soliciting a bribe could not be sustained, in the abence of an intention on Mr. Duncan's part to render some official service in return for the accommodation.

But, putting the very worst construction possible upon the publication of the letter with a statement of the extrinsic facts, and assuming that Mr. Robertson intended to convey the impression that Mr. Duncan applied for the loan, under the circumstances, upon the assurance or belief that Mr. Robertson would be afraid, on account of his official connection with matters in which Mr. Robertson was vitally interested, not to grant the financial accommodation requested; in other words, that Mr. Duncan was using the "big stick" of his official position to induce favorable action upon his application; in the first place, no such innuendo is suggested in the complaint or discussed in the opinion of Mr. Justice Marion.

Inferences are attributed to Mr. Robertson from the publication. Without the slightest intention to reflect upon

Mr. Duncan, except as to the impropriety of his application under the circumstances, it must be conceded that that act of impropriety was susceptible of the inference that he was using his official position to induce the loan. If the innuendo had charged that as an inference to which the publication, coupled with the extrinsic facts alleged in the complaint, was susceptible, I think that the Court would have been justified in so holding. Mr. Duncan had never before had financial dealings with Mr. Robertson; he had but two days before his application for the loan been appointed a member of the Canal Commission under the Act approved that day; he knew that Mr. Robertson was largely interested in the pending matter of a disposition of the canal; he knew that the Canal Commission was vested with large recommendatory powers at least, in connection with a settlement of the pending differences between the State and the canal owners; he had need of financial assistance; he must have known that his position as a commissioner would naturally incline Mr. Robertson to act favorably upon his application.

This may have savored of the inference that he was using his newly acquired power and influence to further his obtainment of the desired loan, which he intended fully to secure and pay at maturity; to inspire a fear in Mr. Robertson that his influence on the commission would be inimical to his interests, if the loan should be refused; but I cannot see how it is possible to say that it savored of the inference that he was "susceptible of bribery," or that he was thereby "soliciting a bribe," which are the innuendoes charged.

The crux of the inquiry is whether or not the extrinsic facts, stated by Justice Marion to have been alleged in the complaint, add anything to the construction of the publication as a defamatory imputation. They are, as stated, that the Canal Commission had plenary powers in the settlement of the litigation, and that Mr. Robertson was financially interested in that settlement. As I have stated, those

facts simply emphasize the impropriety of Mr. Duncan's application, and lend color to the innuendo that might have been alleged, but was not, that Mr. Duncan was using his official position to induce the loan. This innuendo not having been alleged in the complaint, the defendant had no opportunity of establishing the truth of the inference of which the facts were susceptible, and it cannot be said that he would not have had a fair chance of establishing it.

If, then, the extrinsic facts referred to, add nothing by way of inducement to the strength of the inference alleged in the innuendo, the plaintiff is confined to the terms of the publication as uttered. The facts there stated are not only admittedly true, but the publication is not only not libelous *per se,* but legally innocuous, because absolutely true. A plaintiff in a libel suit has the right, if he so chooses, to rely solely upon the publication as it was uttered; and if the Court should decide it libelous *per se,* he is entitled to damages; or, conceding that it is not libelous *per se,* he has the right to allege certain extrinsic facts—that is, facts dehors the publication—which, coupled with the actual publication, develop the defamatory meaning of the publication. Where he alleges no such extrinsic facts, as in the case at bar, it seems to me clear that he is confined to a reliance upon the publication as it stands as being libelous *per se.*

In complaints for libel there are (where the publications are not libelous *per se)* three distinct parts: The *inducement,* the *colloquium,* and the *innuendo.* The *inducement* contains a statement of the extrinsic facts which, coupled with the actual publication, form the basis of the *innuendo;* the *colloquium* contains the application of the alleged defamation to the plaintiff (necessary at common law, but dispensed with by Section 425, Code C. P.); the *innuendo* contains a declaration giving point and meaning to the matters expressed in the actual publication, coupled with the extrinsic facts alleged to the *inducement,* not as a statement of new facts, but as the defamatory construction of which

the entire combined elements are susceptible to the minds of those who might read the publication. 17 R. C. L., 393. *Bell v. Clinton Mill,* 129 S. C., 242; 124 S. E., 7.

In the last-cited case the Court said that notwithstanding Section 425 of the Code of Civil Procedure, "the *inducement* and the *innuendo* are as essential, under the circumstances stated, as they were at common law." (Note.— Attention is called to the omission of a line in the printed report of this case. 129 S. C., at page 251, line 15 from bottom, which correctly appears in 124 S. E., at page 10, line 7 from bottom of first column, and the insertion of a line which is a duplicate of line 15 from top, 129 S. C., at page 251.)

So in *Hubbard v. University,* 76 S. C., 510; 57 S. E., 478, the Court, referring to the change as to the *colloquium* made by Section 425 of the Code, said:

"The change, however, does not obviate the necessity of setting out the facts which make language, not in itself defamatory, have that import [I interpolate, the *inducement*]."

In that case it is declared that the "universally accepted rule" is as thus stated in 13 Enc. P. & P., 32:

"If the alleged defamatory words are not actionable on their face, but derive their defamatory import from extrinsic facts and circumstances, *such extrinsic facts and circumstances must be set forth and connected with the words charged, by proper averment.*" (Italics supplied.)

Reaffirmed in *Oliveros v. Henderson,* 116 S. C., 77; 106 S. E., 855.

And the Court adds this:

"Many authorities will be found in other jurisdictions to the effect that the Code of Procedure has made no change in this rule of pleading. * * * Indeed, the rule is so manifestly founded on common sense and justice that probably

---

NOTE: In 129 S. C., 251, line fifteen from the bottom should read: "the bystanders understood. The import of the words used."

*—Reporter.*

nothing but an explicit enactment would lead the Courts to depart from it."

In the *Hubbard case,* it was held that, as the publication was not libelous *per se,* and as the complaint contained no allegation that on account of certain extrinsic facts it was understood by those who read it as defamatory, the complaint was demurrable. Exactly the situation in the case at bar.

In *Power v. Miller,* 2 McCord, 220, it was held that words charging a person with perjury are not actionable "unless it appear by a colloquium [*inducement?*] or by the words themselves, that they had reference to an oath taken in the course of a judicial proceeding."

In *Ashbell v. Witt,* 2 Nott & McC., 364, it was held likewise that, where words are not actionable without a *colloquium (inducement?),* of which no evidence is given, the case will not be referred to the jury, but the Court will nonsuit the plaintiff.

In 37 C. J., 22, it is said:

"When the words are not actionable *per se,* it is necessary to plead in the *inducement* such extrinsic facts as will render the words actionable.   *   *   *   The averments must be of facts and circumstances which, by way of introduction, show the words in question to be actionable."

It is universally held that, the office of the *innuendo* being as above stated, the actual publication, coupled with the extrinsic facts alleged in the *inducement,* in its import, cannot be enlarged, extended, or changed by the *innuendo.* Thus in the *Bell case, supra,* the Court said:

"The import of the words used, coupled with the inducement,   *   *   *   the innuendo cannot enlarge, extend, or change" (citing *Hubbard v. University,* 76 S. C., 510; 57 S. E., 478; 17 R. C. L., 393).

In *Wilson v. Hamilton,* 9 Rich., 382, the Court said:

"The new matter introduced by an introductory averment, in explanation of words doubtfully or ambiguously expressed, admits of proof; but an *innuendo* which is only

explanatory, and connects together facts already known, either from the face of the paper or by reference to extrinsic matter, is never proved, nor admits of proof.  *  *  *  An *innuendo* cannot supply this defect, apparent on the declaration, and, as the necessary allegations are omitted, there was no evidence submitted proper for the consideration of the jury, and the nonsuit was, therefore, properly ordered."

In 37 C. J., 23, it is said:

"The want of a proper inducement or colloquium cannot be supplied by the innuendo. The innuendo cannot be used for the purpose of alleging new matter and extrinsic facts necessary in connection with the alleged publication to constitute a cause of action."

"Words not actionable *per se* cannot be made so by innuendoes." *Penry v. Dozier,* 161 Ala., 292; 49 So., 909. *Moore v. Johnson,* 147 Ky., 584; 144 S. W., 765. *Holt v. Ashby,* 150 Ky., 612; 150 S. W., 810. *Brown v. Independent Publishing Co.,* 48 Mont., 374; 138 P., 258. *Lanston Co. v. Mergenthaler Linotype Co.* (C. C. A.), 147 F., 871; Id. (C. C. A.), 154 F., 42. *Wofford v. Press Co.* (C. C. A.), 211 F., 961. *Smith v. Agee,* 178 Ala., 627; 59 So., 647; Ann. Cas., 1915-B, 129. *Fitzpatrick v. Age-Herald Publishing Co.,* 184 Ala., 510; 63 So., 980; 51 L. R. A. (N. S.), 401; Ann. Cas., 1916-B, 753. *Pollock v. Evening Herald Publishing Co.,* 28 Cal. App., 786; 154 P., 30. *Whitley v. Newman,* 9 Ga. App., 89; 70 S. E., 686. *Wisner v. Nichols,* 165 Iowa, 15; 143 N. W., 1020. *Cooper v. Seaverns,* 81 Kan., 267; 105 P., 509; 25 L. R. A. (N. S.), 517; 135 Am. St. Rep., 359. *Hanson v. Bristow,* 87 Kan., 72; 123 P., 725. *Curtis v. Iseman,* 137 Ky., 796; 127 S. W., 150. *Moore v. Johnson,* 147 Ky., 584; 144 S. W., 765. *Spears v. McCoy,* 155 Ky., 1; 159 S. W., 610; 49 L. R. A. (N. S.), 1033. *Bishop v. Smith,* 198 Ky., 230; 248 S. W., 538. *Vinson v. O'Malley,* 25 Ariz., 552; 220 P., 393; 37 A. L. R., 877. *Med. Co. v. Caulk* (D. C. Del.), 4 F. (2d), 126. *Bowie v. News,* 148

Md., 569; 129 A., 797. *Manley v. Harer,* 73 Mont., 253; 235 P., 757. *Bradburg v. Segal,* 121 Me., 146; 116 A., 65. *Crossland v. Freeman,* 7 Boyce (Del.), 195; 105 A., 145. *Hendrix v. Register,* 202 Ala., 616; 81 So., 558. *Wall v. Railroad Co.,* 18 Ga. App., 457; 89 S. E., 533. *Wright v. Great Northern Railroad Co.* (Mo. App.),186 S. W., 1085. *Furlong v. German American Press* (Mo.), 189 S. W., 385. *Irvine v. Barrett,* 119 Va., 587; 89 S. E., 904; Ann. Cas., 1917-C, 62. *Vitagraph Co. v. Ford* (D. C.), 241 F., 681. *Talbot v. Mack,* 41 Nev., 245; 169 P., 25.

In *Flaks v. Clarke,* 143 Md., 377; 122 A., 383, the syllabus is:

"The office of an innuendo is to explain the words published, and to give them their true meaning, but it cannot introduce new matter, add to or enlarge the sense of those words, or impute to them a meaning not warranted by the publication, when taken alone, or read in connection with the inducement and colloquium."

"An innuendo cannot be used to. change the ordinary meaning of words pleaded and give them a construction which they do not bear." *McCormick v. Weinstein,* 81 Pa. Super., 163.

"Words not actionable *per se* may be made to appear actionable by averring such extrinsic facts as will show that they were intended to be slanderous and were so understood. These averments must be distinctly stated in the inducement, and applied. to the plaintiff by a proper colloquium, with the intended and understood meaning correctly set out in the innuendoes." *Phœnix Co. v. Robertson,* 80 Okl., 191; 195 P., 487.

In that case the plaintiff averred no extrinsic facts, and the Court said:

"The publication, without pleading extrinsic facts, would not bring the case within the rule stated above."

In its opinion the Court quotes an exceedingly clear state-

ment from the Alabama Court in *Gaither v. Advertising·Co.,* 102 Ala., 458; 14 So., 788:

"In other words, the Court determines whether the words used are susceptible of the meaning sought to be given to them by the innuendo. If this inquiry is decided by the Court against the contention of the pleader, this puts an end to it; for it is not permissible to make proof that the words employed were uttered in the sense, or with the meaning, imputed to them in the innuendo. That is not the subject of proof. If it be decided by the Court that the words are susceptible of the meaning the innuendo seeks to ascribe to them, then it becomes a question for the jury to determine, under all the circumstances, whether they were intended to mean what the innuendo avers they did."

The complaint in this case contains no *inducement;* there are no extrinsic facts stated to add a new complexion to the publication; there is no *implication* stated in the publication from which an inference derogatory to the plaintiff might be inferred; the publication states only conceded facts; there is no controversy or doubt as to a single one of them; the reliance of the plaintiff is upon an inference or inferences drawn from these admitted facts; this is not permissible in order to make out the charge of libel.

In *Simons v. Burnham,* 102 Mich., 189; 60 N. W., 476, it is said:

"Actions for slander and libel do not lie upon inferences (Townsh., Sland. & L., § 133), though we must recognize a distinction between inferences which are the natural result of implications contained in the language of the publication—which may, in a sense, render it ambiguous, and justify a construction at variance with the strict meaning of the words as ordinarily used—and inferences drawn only from the facts themselves. In the former case the action may lie—not because of the inference, but by reason of the implication; in the latter it will not."

"A party sued for libel may justify the charge as laid and deny the innuendo, and that when the truth is made to appear the fanciful or apparently warranted explanation by way of enlargement must disappear." *American Tel. & Tel. Co. v. Fry,* 8 Tenn. Civ. App., 159.

It may be suggested that the foregoing furnished the ground for a general demurrer, and that, if the evidence supplied the needed averment, the defendant cannot now be heard to complain. While the Code specifically provides that the objection that a complaint does not state facts sufficient to constitute a cause of action is not waived by a failure to demur upon that ground, which means that, notwithstanding such failure, the defendant may object to testimony tending to supply the deficiency, and may move for a nonsuit or a directed verdict, I think that, if the evidence is received without objection, the defendant will have lost the benefit of his adversary's neglect. In the case at bar there is in the evidence not a single extrinsic fact that would lend color to the alleged defamatory character of the publication. The only fact which bears even the suggestion of such color is that the occasion of the publication was the vitriolic explosion of the Senator from Union County, which furnished the amplest justification in Mr. Robertson to present the facts in explanation of his unwarranted gratuitous attack; *a fact which the plaintiff in the former appeal in this case* (131 S. C., 485; 127 S. E., 607) *sought to have stricken out.*

The foregoing considerations, in my opinion, sufficiently demonstrate the duty of the Circuit Judge to have granted a nonsuit; but there is another ground upon which it should have been granted, and that is the immunity to which Mr. Robertson was entitled under the principle of qualified privilege, much more substantial, in my opinion, than the "personal and official privilege" under the justification of which Mr. Duncan secured the ear of the Senate. Upon the former appeal in this case (131 S. C., 485; 127 S. E., 607), in

which the plaintiff sought to have stricken from the defendant's answer all reference to his senatorial tirade, the Court said, approving *McLeod v. Publishing Co.,* 126 S. C., 366; 120 S. E., 70:

"Indeed, there is authority for the proposition that one, in an honest effort to defend himself from a charge, if it is done without malice, may make statements that would otherwise be slanderous and then go free because his reply is entitled to a privilege,"

—citing 17 R. C. L., 364, where it is said:

"In an honest endeavor to vindicate himself and his own interests, a person is often privileged to make statements which would otherwise be regarded as defamatory. Thus, if one's good name is assailed in a newspaper, he may reply, defending himself, and, if his reply is made in good faith, without malice, and is not unnecessarily defamatory of his assailant, it is privileged. Even though false, a publication which is fairly an answer to a libel, if published in good faith for the purpose of repelling a charge, is privileged."

"The law justifies a man in repelling a defamatory charge by a denial or by an explanation. He has a qualified privilege to answer the charge, and if he does so in good faith, and what he publishes is fairly in answer, and is published for the purpose of repelling the charge, and not with malice, it is privileged." 36 C. J., 1267.

I think that both of these conditions concur in establishing the qualified privilege of Mr. Robertson. There can be no question but that his "good name" was not only assailed, but absolutely annihilated, if the senatorial audience gave heed to the invectives of Mr. Duncan. The only basis for his excoriation was "atmospheric evidence," the floating rumors of the unresponsible. What was Mr. Robertson to do? Submit like a cowering cur, or resent it with violence? The law forbids the latter; he was unwilling to adopt the other, and, in my opinion, did what he was legally justified

in doing, explain the motive behind the attack, and leave the public to question its truth or justice.

In my opinion, the judgment of this Court should be that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for the entry of an order of nonsuit under Rule 27.

ON PETITION FOR REHEARING AND FOR COURT EN BANC

*Per Curiam.* The appellants have asked for a rehearing of this appeal, and in their petition therefor have also requested that upon such rehearing all of the Judges of the Circuit Court be called to the assistance of the Supreme Court to take part in the decision of this cause, pursuant to the provisions of Section 12 of Article 5 of the Constitution.

The appellants have also filed "Reasons and Argument in Support of Petition for Rehearing." In this "argument," the appellants take the position that, if it appears to the Justices of this Court, or any *one* of them, that there is involved in the appeal a question of constitutional law, "upon the determination of which the entire Court is not agreed," it is mandatory that the Chief Justice "shall call to the assistance of the Supreme Court all of the Judges of the Circuit Court." The request of the appellants, and the question they make, are of considerable importance, and the Court deems it proper to pass directly thereon at this time.

The Court *en banc*—composed of the Justices of this Court and all the Circuit Judges—was created by the Constitution of 1895. We quote from Section 12 of Article 5 thereof, as originally adopted, such portions as are deemed necessary now:

" * * * Whenever, upon the hearing of any cause or question before the Supreme Court, * * * it shall appear to the Justices thereof, *or any two of them,* that there is involved a question of constitutional law, * * * upon the determination of which the entire Court is not agreed, * * * the Chief Justice, or in his absence the presiding

Associate Justice, shall call to the assistance of the Supreme Court all of the Judges of the Circuit Court.   *   *   * "

By Joint Resolution of the General Assembly, at its session of 1910, the question of amending Section 12 of Article 5 was submitted to the qualified electors at the ensuing general election.  By an act of that body, at its session of 1911, it was recited that the proposed amendments had been adopted by the people and the General Assembly ratified the same.  In the official printed Code of 1922, the provision before quoted from the Constitution of 1895 appeared in this changed form:

" *   *   *   Whenever, upon the hearing of any cause or question before the Supreme Court,   *   *   *   it shall appear to the Justices thereof, *or any three of them,* that there is involved a question of constitutional law,   *   *   * upon the determination of which the entire Court is not agreed,   *   *   *   the Chief Justice, or in his absence the presiding Associate Justice, shall call to the assistance of the Supreme Court all of the Judges of the Circuit Court. *   *   * "

The appellants assert that Section 12 of Article 5 was incorrectly printed in the Code of 1922; that the word "three," as used in the provision last quoted, was improperly inserted therein; that the language *"any three of them"* should not so read, but should read *"any of them";* and that accordingly, in and by the terms of Section 12 of Article 5, when "it shall appear to the Justices" of this Court, *or any of them,"* that a question of constitutional law is involved in a cause pending in this Court, it is required that the Court *en banc* shall be called.

The claim set forth rests upon the contention that the amendment of Section 12 of Article 5, voted favorably by the people in the general election of 1910, as submitted to them by the Joint Resolution of that year, was only to strike out the word "two" in the provision quoted from the original section of the Constitution, and that the pur-

pose of the amendment as proposed by the General Assembly, voted by the people, and ratified thereafter by the General Assembly, was to require the calling of the Court *en banc* in a cause where a question of constitutional law was involved, at the instance of *only one Justice* of this Court, and not at the instance of at least three of the Justices, as it appears to be necessary from the wording of the section in the printed Code of 1922.

Pointing to both the Joint Resolution of 1910 (No. 594, Acts 1910, p. 1063), and the ratifying Act of 1911 (No. 58, Acts 1911, p. 117), the appellants particularly call our attention to this discrepancy; that in the respective parts of both of these legislative enactments, where it is declared what amendments were proposed and ratified, it was declared that the word *"two,"* as found in the original section, was to be stricken out and the word *"three"* was to be inserted in lieu thereof; but that the language used in the other parts of the enactment, when it was stated how Section 12 of Article 5 should read "when amended," did not contain the word *"three,"* but only the words *"any of them"* appeared. And it is urged that a proper construction of both the Joint Resolution and the ratifying Act requires that it be held that the Constitution was so amended as to require a calling of the Court *en banc* at the request of *one Justice,* when this Court is not entirely agreed upon a constitutional question which may be involved in a cause. It is to the proper construction of the said Joint Resolution and the ratifying Act that we now direct our attention.

We agree with the following legal proposition advanced by the appellants:

"Provisions of a Constitution regulating its own amendment, otherwise than by a convention, are not merely directory, but are mandatory, and a strict observance of every substantial requirement is essential to the validity of the proposed amendment." 12 C. J., 688.

These "substantial requirements" for the amendment of our Constitution are set forth in Sections 1 and 2 of Article 16 of the Constitution. There is no showing before this Court that there was failure in any respect to comply with either of the requirements made in the sections and article last mentioned as to the amendments of Section 12 of Article 5 now under consideration. In the absence of any such showing, this Court will presume, of course, that the General Assembly, and all other officials charged with duties in connection with the submission, adoption, and ratification of the amendment, discharged such duties in the manner required by the Constitution.

The inquiry, therefore, turns to an examination of the Joint Resolution of 1910 and the ratifying Act of 1911. These enactments are so much alike, except wherein changes in language were necessary, that hereafter it will only be required to refer to the Joint Resolution. The real question is this: Which language in the Resolution must control—that contained in the part of the Resolution where it was declared what amendment was to be made, or that set out in the clause which stated how the section sought to be amended should read "when amended"?

The appellants contend for the view that the language contained in the "when amended" clause must control, and they cite in support of their position the case of *Bush v. Western Union Telegraph Co.,* 93 S. C., 176; 76 S. E., 197, seemingly in harmony with the position taken in certain language of Mr. Justice Hydrick, who delivered the opinion of the Court in that case, which we quote:

" * * * But we think the question to be decided is: Which part of the Act shall control and be looked to to ascertain the legislative will, the part which declares what amendments were to be made, or the part which sets out the section, as it read, 'when amended'? There can be no doubt of the power of the Legislature to amend an Act or section by declaring, in the amending Act, what words shall

be inserted or omitted, or, it may declare, in the amending Act, that the Act to be amended shall be amended so as to read as follows, and then set out the Act as amended, or it may, as it undertook to do in this case, combine the two methods, and declare in the first part of the amending Act what amendments are intended, and also set out the Act, as it will read 'when amended.' But, when there is a conflict in the provisions of the amending part of the Act and the Act 'as amended,' to which must we look to find the legislative intent? This question naturally suggests another: To which part of the Act would a legislator most naturally look, in considering it on its passage, to determine its intent and effect, and whether he would favor or oppose its passage? It requires only a moment's reflection to answer: The Act as it would read 'when amended.' It follows, therefore, that we can ordinarily look to that part of an amending Act with greatest certainty of finding the legislative will, and, therefore, that part of the Act should ordinarily control."

The appellants, in line with the quoted expressions from the *Bush case*, argue that, in the instance of the Resolution under consideration, the words *"any of them,"* appearing in the "when amended" portion of the Resolution, are controlling over the words *"any three of them"* set out in the declaratory part of the enactment, since both legislators and qualified electors were more likely to have read the "when amended" clause, and voted for the proposed amendment with the idea in mind that the section would be so amended as to permit one Justice to require the calling of the Court *en banc*. The principles referred to by Mr. Justice Hydrick must be given due regard in construing the intention and effect of the Joint Resolution, but they are not absolutely conclusive, for as that distinguished jurist himself said in the same opinion and in the same connection:

*"We do not mean, however, to say that this is always so, or to lay it down as a hard and fast rule, applicable to all*

*cases; for it is conceivable that a case might arise in which the evil to be remedied, or the defect in the statute to .be amended, the amendment proposed, and the Act as amended, when considered altogether in the light of all the circum-stances and the rules of statutory construction, might lead to the conclusion that the legislative will is to be found in the amending part of the Act. If so, of course, that must control, for it is the intention only which we seek.".* (Italics ours.)

Supporting these last-stated declarations of Mr. Justice Hydrick, to the effect that this Court should seek first of all, in construing a legislative enactment, the legislative *intent* and *will* (and, we may interpolate, the intent and will of the people as expressed at the ballot boxes), we call attention to what was said by Mr. Justice Watts, now Chief Justice, speaking for this Court, in *Heintish v. Floyd,* 130 S. C., 434; 126 S. E., 336:

"While the Legislature, in proposing a constitutional amendment, is, in many respects, not subject to the rules controlling ordinary legislative action, still *the fundamental purpose in construing an amendment is to ascertain and give effect to the intent of its framers and of the people who adopted it; and the Court must keep in mind the object sought to be accomplished, and the evils sought to be reme-died.* 12 C. J., 700." (Italics ours.)

And very much analogous to the expressions of both Justices Hydrick and Watts, is the language of Mr. Justice Marion in *Kirkland v. Allendale County,* 128 S. C., 541; 123 S. E., 648:

"Another familiar general principle of interpretation of Constitutions is that *a provision should be construed in the light of the history of the times in which it was framed,* and with due regard to the evil it was intended to remedy so as to give it effective operation and suppress the mischief at which it was aimed." (Italics ours.)

In endeavoring to ascertain the intention of the legislators who submitted the amendment to Section 12 of Article 5 to the people, and the will of the people who voted favorably to that amendment, and the intention of the General Assembly when the amendment was ratified, we accordingly look back to the situation and conditions from the time of the adoption of the Constitution in 1895 to the ratification of the amendment in 1911.

The present Constitution originally established a Supreme Court consisting of only four Justices, a Chief Justice and three Associate Justices (Section 2 of Article 5). It was provided that "the concurrence of three of the Justices shall be necessary for a reversal of the judgment below, but if the four Justices equally divide in opinion the judgment below shall be affirmed." Section 12 of Article 5. As shown before, when it appeared to the Justices, or any two of them, that the Court was not entirely agreed on a constitutional question involved in a cause then pending, the Court *en banc* should be called at the instance of those two Justices. The population of the State growing, and much progress in development of numerous new industries and enterprises occurring, the result was a great increase of litigation in the Courts of the State; so much so that the General Assembly had to increase the number of judicial circuits from 8 to 12 and likewise increased the number of Judges and Solicitors in the same proportion. More business for the Circuit Courts, of course, meant, naturally, there would be more business for the Supreme Court.

Again, it must have been apparent that it was rather unfortunate for the Supreme Court to be composed of an even number of Justices, and the necessary provision, under the circumstances, that when the Justices were evenly divided the judgment of the lower Court should be affirmed. The result of this last-mentioned provision was that, if two Circuit Judges disagreed upon the same legal question, which happened to be presented to them, at different times

and in different causes, the judgment of the one whose decision was appealed from first reviewed by the Supreme Court, and affirmed by a divided Court, became not only the law of the particular case in which the decision was rendered, but such decision thereafter was binding authority in all similar subsequent cases. *City of Florence v. Berry,* 62 S. C., 469; 40 S. E., 871. So, if two of the Justices of the Supreme Court and eleven of the twelve Circuit Judges were of one opinion on a legal question, and two of the Justices and one of the Circuit Judges thought otherwise, it was not only possible, but oftentimes probable, that the judgment of the three Judges should, and would, overcome the opinion of the thirteen who concluded to the contrary, unless the two Justices of this Court exercised their right to call together the Court *en banc.*

Whatever the reasons—because the business of the Supreme Court required it, or because it was better to have a Court composed of an uneven number of Justices, or to do away with the holding of so many Courts *en banc,* or for other reasons—the General Assembly and the people amended Section 2 of Article 5 of the Constitution by adding another Associate Justice to this Court. This amendment was proposed in 1910 and ratified in 1911. There is no question here as to the validity of that amendment.

In 1895, when the Constitution was adopted, the wise and foreseeing framers of that most important instrument must have realized that there would likely arise immediately upon the going into effect of the Constitution a multitude of questions as to the meaning and effect of many provisions, clauses, and words contained therein. Realizing, too, that these questions should not be determined by only a divided Supreme Court, the provision for the Court *en banc,* at the instance of only two of the Justices, to pass upon constitutional questions, was, doubtless, thereupon inserted in Section 12 of Article 5. Fifteen years after, however, in 1910, when numerous questions as to the meaning of the Consti-

tution·had been passed upon by the Court of last resort,. it was, more than likely, the belief of both legislators and people that there would be fewer questions of constitutional law to be determined thereafter.   Looking forward to a decreased number of constitutional questions, and with little chance of a divided Supreme Court, it was altogether natural for the General Assembly and the qualified electors to believe that there would be less necessity in the future than there had been in the past for the meeting of the Court *en banc*.   It must be presumed, also, that the members of the General Assembly, and perhaps a great number of our citizens, knowing of the insistent and repeated demands for more judicial circuits and a larger number of Circuit Judges and Solicitors, had repeatedly their attention called to the statement of. the then wise Chief Justice, Hon. Henry McIver, who, speaking for the entire Court, although the Justices were then evenly divided on a question before them, in 1896, had said:

"In view of the expense, delay, and interference with the ordinary duties of the Circuit Judges, which will in many, if not most, cases result from calling the Circuit Judges to the assistance of this Court, we are not disposed to exercise the power vested in this Court, except where some grave question of public concern is involved."  *City of Florence v. Brown*, 49 S. C., 332; 26 S. E., 880; 27 S. E., 273.

The amendment to Section 2 of Article 5, increasing the number of Associate Justices from three to four, and the one making the change in Section 12 of the same article, as to the number of Justices who might call for a session of the Court *en banc* on. a constitutional question, were both proposed at the same session of the General Assembly, voted upon by the electors in the same general election, and were ratified at the same legislative session; evidently they were companion propositions.   Expecting the amendment for the additional Associate Justice to become a part of the Constitution, the plan, obviously, was also to increase at the

same time the number of Justices who might require the calling in of the Circuit Judges on constitutional questions. It seems easily reasonable to suppose that, when only two Justices were required to call the Court *en banc* at the time when the Supreme Court was composed of only four members, and often divided in their decisions, with an increased Court of five members, with little chance at any time of even division, that the plain intention was to strike out the word "two" and insert in lieu thereof the word "three."

As a matter of grammatical construction, we think it is also apparent that if the General Assembly, in framing its Joint Resolution, had intended that *one Justice,* and not two or three Justices, should have the power to demand a session of the Court *en banc,* it would have been the most natural thing for the language used to have been expressed in the words *"any one of them."* This would have been a complete following of the former style of the language used in the section originally. The fact that the word "one" was not used in the section "when amended" leads us strongly to the conclusion that in the drafting of that part of the Resolution the word "three," used in the amendatory part of the Resolution, was inadvertently left out.

In speaking of the amendatory Act, then under review, in the case of *Bush v. Western Union Telegraph Co., supra,* where the case was decided only some three years after the passage of the Act, Mr. Justice Hydrick stated:

"We are gratified that our construction is most strongly fortified by the fact that the Act of 1909, as amended, has been re-enacted, without change, by the Legislature in the Code of Laws of 1912, which seems to be conclusive of the question."

While our construction of the Joint Resolution and the ratifying Act, under examination, has not been strengthened by any direct legislative action, or by any further vote of the electors of the State, still we feel that such construction has been "most strongly fortified" by other facts and

circumstances. The amendment, in the form we think it must have been adopted, was published to the people early in 1911; it was so printed in the official Code of 1912; and, again, it was similarly printed in the official Code of 1922. The opponents of the proposition to amend at all, both in the General Assembly and among the electorate, at no time questioned the effectiveness of the necessary Acts to accomplish the purpose sought, or raised a doubt that the amendment as published in our law books was otherwise than what had been the declared intention of the people and their chosen Senators and Representatives.

The General Assembly, in 1920, looking forward to the codification of all the laws of the State in the year 1922, as required by the Constitution (Article 6, § 5), in its Act thereabut, directed the Code Commissioner and his collaborators to insert in the official Code of 1922 the Constitution of the State. A committee of the General Assembly was appointed to supervise this work and its progress. This compilation, including the Constitution, was printed and laid upon the desks of the members of the two Houses in 1921, that full and careful examination thereof could be had prior to the session of 1922, when the Code was to be adopted. Surely, if there had been the least question as to what was the intention of legislators and voters in a matter so important as the amendment to Section 12 of Article 5, and any doubt that the expressed will of the people and the General Assembly had not been correctly recorded in the official Codes of 1912 and 1922, such question and doubt would have been made known much earlier than this. The bench and bar of the State, including especially this Court, have acquiesced for more than 16 years in the provisions of the section as it was supposed to have been amended.

Accordingly this Court is gratified that under the well-considered decisions of the Court, rendered in former times and under other circumstances, it can, and does, conclude that the clearly expressed will of our people and the de-

clared intention of two General Assemblies have been effectually carried out, and that such will and intention are correctly set forth in the official printed Code of 1922.

Referring further to the provisions of the Constitution for the Court *en banc,* and to the appellants' request that such Court be called, we regard this as an opportune time to announce what we conceive to be the only proper course and practice to be followed in calling a session of the Court *en banc.*

There is no provision, constitutional or statutory, in our law for an appeal from the Supreme Court to the Court *en banc.* Unless such right has been expressly given by proper authority, no litigant has the privilege of claiming it; nor can it be granted when requested. Mr. Justice Cothran, speaking for the Court *en banc,* has said:

"The right of appeal is not a vested one, but a matter of grace." *Osteen v. A. C. L. R. R. Co.,* 119 S. C., 438; 112 S. E., 352.

The already much-discussed Section 12 of Article 5 of the Constitution provides when and how the Court *en banc* shall be called. We quote from Hon. W. H. Townsend, Circuit Judge, who sat as a Judge in the Court *en banc* in the case of *Citizens' Bank v. Heyward,* 142 S. E., 651, decided on June 14, 1926, some of the interesting observations he made in his concurring opinion as to that Court:

"Like our former Courts of Error under the Acts of 1836, 7 Stats. at Large, 340, as noted by Chancellor Harper in *Pell v. Ball,* 1 Rich. Eq., 421, 426, and of 1859, 12 Stats. at Large, 648, the Court *en banc* differs materially from the Supreme Court, in that it is merely a consultative one, like the English Court of Exchequer Chamber, whose judgments were authoritative, though the suitor had no right of appeal to it. The Court *en banc* is called into existence by the Justices of the Supreme Court, only when they may desire to consult with the Circuit Judges as to particular

causes or questions. It has no fixed terms, and loses jurisdiction when it has answered the questions submitted. *Interstate Coal, etc., Co. v. Clintwood Coal, etc., Co.,* 105 Va., 574; 54 S. E., 593, by filing with the Clerk of the Supreme Court its written decisions, signed by a majority of the Justices and Judges. *Hinson v. Pickett,* 2 Hill [Eq.], 354. Its functions are then exhausted."

In the same case of *Bank v. Heyward,* Mr. Justice Cothran, in his dissenting opinion, made some interesting and forceful comments as to the Court *en banc,* and its relations to the Supreme Court, a part of which we reproduce:

"While it is quite common to refer to 'the Court so constituted' as the 'Court *en banc,*' there is, as a matter of fact, no such Court, considered as an independent tribunal, separate and distinct from the Supreme Court (a species of super-Supreme Court). It has no supervisory control, no appellate jurisdiction, over the Supreme Court; in fact, it is called together in cases only in which the Supreme Court, as ordinarily constituted, has failed to render a judgment, on account of the facts which require the calling in of the Circuit Judges, in which event the parties litigant are summoned before a Court, *still the Supreme Court,* but differently constituted from the ordinary elements, a Chief Justice and four Associate Justices."

As remarked before, and as indicated by both Mr. Justice Cothran and Mr. Circuit Judge Townsend, the Court *en banc* is not an independent Court, but, called as a consultative Court, it becomes for the time being the Supreme Court, and, in our opinion, the call for such Court should be made while the Supreme Court has pending before it, *and before it has determined,* the cause in which the assistance of the Circuit Judges is desired. It must be apparent that, if this Court is to have the full benefit of the assistance of the learned and honored Circuit Judges of the State, when it shall be deemed necessary, the call for their aid should be made before the cause in which

their learning and wisdom is wished has been decided by this Court, so that the Circuit Judges may aid the Justices in reaching a correct conclusion. To hold the Court *en banc* after the Supreme Court has rendered its decision is but to ask the Circuit Judges to review the action of this Court in the cause decided, not to assist its Justices in rendering proper judgment, as contemplated by the Constitution.

As indicated above, not only the power, but the privilege, of calling to the aid of the Court the Circuit Judges, is a matter entirely for the Court and its Justices; it is not a right given to a litigant. The Court, and the Justices thereof, will, therefore, when it is deemed advisable, without petition or suggestion from a party to a cause pending before it, call the Court *en banc.*

The opposing view, that the right to request a session of the Court *en banc* is given to a party to a cause, and the position that, when there is any kind of difference in this Court as to a matter involving a constitutional question, it is the duty of the Court to call in the Circuit Judges, so earnestly presented in the dissenting opinion, were completely answered almost a century ago by the Court of Errors, then composed of those distinguished jurists, Chancellors David Johnson, Job Johnstone, William Harper, B. F. Dunkin, and Judges John Belton O'Neall, J. J. Evans, A. P. Butler, D. L. Wardlaw, and Edward Frost, with Chancellor Harper speaking for the Court, in the case of *Pell v. Ball, supra,* decided in 1845. When referring to the opinion in that case, let it be recalled that the Court of Errors, created by the Act of the General Assembly in 1836, composed of the chancellors in equity and all the law Judges, was the pattern after which was framed our present Court *en banc.* The requirements for the calling of the Court of Errors were remarkably similar to those stated in our Constitution to be necessary for a convocation of the Supreme Court Justices and the Circuit Judges. Since

what Chancellor Harper wrote, so learnedly and forcibly, refutes the arguments advanced against the conclusion we have announced, we quote much at length from his interesting opinion, emphasizing some expressions which are peculiarly appropriate to present conditions and significantly in point upon the question presented.   Said the Chancellor:

"I admit that, when an appeal is given, it is generally understood as of course to imply that it shall be at the option of the party against whom judgment is pronounced.  But it is absolutely impossible to give this meaning to the word, in two of the instances in which it is used in the clause in question.   *   *   *   *And I am satisfied that the power given to two Judges of demanding a Court of Errors can, only be exercised before judgment rendered.*

"*If the right of appeal were the right of the suitor, he could only exercise it after judgment against him;* but the appeal Courts have familiarly, and without doubt or question, ordered cases to the Court of Errors, if upon the opening of them any constitutional question appeared to be involved.   *   *   *

"The right of two Judges to demand a Court of Errors indicates the Court to be merely a consultative one, like the English Court of Exchequer Chamber, which any of the Superior Courts may assemble, *and whose judgments are authoritative, though the suitor has no right of appeal to it.* Then, what was the evil in the case of constitutional questions?  *Certainly, it was not that the suitor had not a double appeal, or it would have been allowed in all cases, whether constitutional questions were involved or not.  The suitor is as much aggrieved by an erroneous decision, depriving him of property or any other right, if the question be one of law merely, as if it were of law affected by the Constitution.  Constitutional questions were regarded by the Legislature as of great importance, and the decision of them as affecting not only the party, but the public.*

"It concerns the public that the Constitution should be maintained inviolate; and the Legislature has, therefore, made it the duty of the Court to submit all such questions to all the Judges of the State. It is said that the Courts whose errors are intended to be corrected are thus made the Judges in the last resort of the propriety of their own decisions. But every Court in the last resort must, of necessity, be the judges of the correctness of their own decisions, as of their own jurisdiction.    *    *    *

"There is no time fixed by law for the meeting of the Court of Errors; but this depends entirely on the action of the two Courts. *Yet, if the suitor may appeal at his option, he must of necessity have the right of requiring the Court to assemble to hear his appeal.*    *    *    *

"It is argued that to decide that no constitutional question is involved is to decide the constitutional question.    *    *    *    To decide in favor of the validity of a law which is charged to be contrary to the Constitution, is certainly to decide that there is no constitutional question involved in the case. The Constitution does not touch the question.    *    *    *

"*It certainly enters into our consideration that the construction contended for would render the administration of justice, under our present system, utterly impracticable.* It is already very onerous.    *    *    *    But if it were left to the option of the parties, in every case, to have an ulterior appeal, it is plain that it would be impossible to get on. On the construction contended for, this would be, in effect, the result. *There is hardly a case in which some pretext of raising a constitutional question might not be found.*    *    *    *    This would be often resorted to for purposes of delay, and when the docket of the Court shall have accumulated, the delay would be interminable. Is it not safer to leave it to the Court, whose duty it will be to send the cause to the whole of the Judges, not only in cases in which a con-

stitutional question is clearly involved, but in those in which a question can fairly be made?

*"There must be a discretion which is not precisely defined.* If there is any danger of abuse in this, it is that the discretion will be too liberally exercised; *and there is no hardship on the suitor, who has already exercised all the right of appeal which the Constitution intended him to have."*

Even though it be sought to make it otherwise appear, we are confident our holdings are not in conflict with anything appearing in or about the case of *State v. Holleyman,* 55 S. C., 207; 31 S. E., 362; 33 S. E., 366; 45 L. R. A., 567, or the case of *Traynham v. C. & W. C. Railway Co.,* 92 S. C., 43; 75 S. E., 381, referred to somewhat at length in the dissenting opinion. In both these cases the Supreme Court was divided on a question as to whether or not a statute of this State was in conflict with the Constitution of the United States. The session of the Court *en banc* in each of the cases was ordered at the instance of the entire Court, and not because it was desired by just one member of the Court. It nowhere appears in the decision of either of the cases that it was the opinion of the Justices of the Supreme Court, or the opinion of the Justices and the Circuit Judges sitting *en banc,* that a party to a cause at any time had the right to demand, *as a matter of law,* that the Court *en banc* should be called to hear his appeal.

The situations that occurred in the *Holleyman* and *Traynham cases* are the very kind of situations that ought to be avoided, if possible, and it is the purpose now of this Court to prevent, as far as possible, their recurrence. In the first hearing of the appeal in the *Holleyman case,* the judgment of the Circuit Court was affirmed. When the case was heard by the Court *en banc,* the judgment of the Circuit Court was reversed, and, as seen, the Supreme Court, composed of its Justices alone, was reversed in the same case on the same legal question by the Supreme Court, composed of its Justices and the Circuit Judges, called the Court *en*

*banc*. The identical thing occurred in the *Traynham case.* Who will dare say otherwise than that it would have been better for the Justices of the Supreme Court, when it developed that there was a situation requiring that the Circuit Judges be called to the assistance of the Supreme Court, for the Supreme Court, or a majority of its Justices, before announcing the decisions of the Court, to have first called the Court *en banc*? Had that course been pursued, then the Supreme Court would have rendered but one decision, and the Court would not have been placed in the unfortunate position of having it appear that it had reversed itself.

We deem it entirely unnecessary to attempt to review the many decisions from jurisdictions other than our own to which attention has been called in the dissenting opinion. The provisions of the Constitution of South Carolina as to the Court *en banc* are peculiarly singular in this State. We do not know of another State in the American Union which provided for a Court of that kind in its system of jurisprudence. It must be manifest that a decision of any foreign jurisdiction could have no bearing whatever upon any question now before this Court in this case. The very fact that it is necessary to look to the decision of Courts outside of South Carolina for arguments to use that this Court is wrong in the views it holds is but a concession that the decisions in South Carolina sustain the opinions of the majority of the Court.

The dissenting opinion observes, with some interest, that the present Chief Justice sat as a member of the Court *en banc* in both the *Holleyman* and *Traynham cases,* and joined in the action of that Court, which resulted in the reversal of the judgments of the Circuit Court, and thereby also reversed the former decisions of the Supreme Court. The implication, we assume, is that the present Chief Justice is not now in harmony with some positions he has formerly taken. The facts do not warrant even a suggestion of inconsistency on the part of the present Chief Justice,

for there is no change in his position in any way. The question as to the proper procedure for calling the Court *en banc* was not in the slightest way adverted to in either the *Holleyman* or *Traynham cases.* Whatever the petitions for rehearing may have contained, the fact remains that the Justices of the Supreme Court were divided in their opinion in both cases, and the Court *en banc* was convened in both cases by the Supreme Court. The experience attained from the results of those two cases has caused the present Chief Justice, and the members of the Court who now agree with his view, to more strongly feel the propriety of marking out for the efficient administration of justice the procedure which, it is thought, should be followed in the convocation of the Court *en banc.*

As will be clearly seen by reference to Article 5, Section 12, of the Constitution, already quoted, the Circuit Judges are to be called in only when *three* of the Justices shall have decided that "there is involved a question of *constitutional law*," upon the determination of which the entire Court is not agreed, and the decision as to whether or not the Circuit Judges shall be called in involves the exercise of their discretion. "Constitutional law" is defined in Mr. Black's Law Dictionary as follows:

"That department of the science of law which treats of Constitutions, their establishment, construction, and interpretation, and of the validity of legal enactments as tested by the criterion of conformity to the fundamental law."

That definition, in somewhat varying language, but practically with the identical meaning, is approved by many well-recognized authorities.

We do not think the alleged error on the part of the Circuit Judge, that he charged on the facts in violation of Section 26 of Article 5, raised a question of constitutional law. There is not involved here the construction or interpretation of the provisions of that section, which are: "Judges shall not charge juries in respect to matters

of fact, but shall declare the law." All the appellants have
done was to allege that, as a matter of fact, not as a matter
of constitutional law, the Circuit Judge violated the quoted
provision. The question, therefore, before this Court, has
been not as to the intention or effect of the constitutional
provision, but if the language used by the Circuit Judge
in his charge to the jury was within the constitutional inhi-
bition. An apt analogous illustration is this: One convicted
in the Court of General Sessions of crime alleges, on appeal
to this Court, that he was tried, over his protest, by a jury
of 11 men, in violation of the constitutional provision giving
him the right to trial by a jury of twelve. The State
contends that the jury consited of twelve. The question
then before this Court would not be a construction or in-
terpretation of the constitutional provision referred to, for
it would be conceded by all interested that the accused was
entitled to trial by a jury of twelve. The only question
before the Court would be one of fact  as to the number
of jurors who sat in the trial.

So here it is conceded by all the parties to this
cause, and by all the members of the Court, that
the Circuit Judge should not have charged on the
facts of the case. All this Court has had to do was to
read the testimony, from which the facts of the case were
derived, and then to read the charge of the Circuit Judge,
and see if in any respect the Circuit Judge contravened
the constitutional provision. In the opinion of Mr. Jus-
tice Marion, which was adopted as the opinion of the
Court, the position was taken that, under the decisions of
this Court, the Circuit Judge did not charge on the facts
of the case at bar. The dissenting opinion filed in the case
did not discuss this question. The usual rule is that, when
a dissenting opinion does not controvert any position taken
in the majority opinion, it is assumed that the dissenting
opinion acquiesces in the conclusions of the majority as to
positions not controverted. Chancellor Harper stated:

"To decide in favor of the validity of a law which is charged to be contrary to the Constitution is certainly to decide that there is no constitutional question involved in the case. The Constitution does not touch the question."

To decide that the charge of the trial Judge does not violate the constitutional inhibition against charging on the facts is certainly to decide that there is no constitutional question involved in the case; for, as said by the Chancellor, "the Constitution does not touch the question." Now, perhaps even more so than in 1845, "there is hardly a case in which some pretext of raising a constitutional question might not be found." The good old standby intended for honest use, and so frequently abused, that no person shall be deprived of property without due process of law, is always eagerly anxious to be the "unbidden and perhaps unwelcome guest   *   *   *   at the door."

And of late keeping close company with that "constitutional question" is the other, that imputes error because the trial Judge charged on the facts. In almost every case decided by a jury, now brought to this Court, complaint is made, and generally without foundation therefor, that the Circuit Judge has violated the provisions of Article 5, Section 26, by charging on the facts. If this Court should accept this "pretext" of raising a constitutional question, and on account thereof call in the fourteen Circuit Judges of this State every time there is a disagreement as to an exception raising a "constitutional question" as to charge on the facts, and every time a defeated litigant made demand therefor, because the Constitution, in his opinion, had been violated, we would bring about a situation even more unfortunate than the one suggested by the great McIver. The Circuit Judges would be engaged practically all of their time in attendance upon the Court *en banc,* therewith the incidents of "expense, delay, and interference with the ordinary duties of the Circuit Judges." This would necessitate the probable continuous appointment of fourteen

or more Special Judges to conduct the business of the Circuit Courts.

This Court is of the opinion that we can safely follow the precedent laid down by this Court, composed of Justices McIver, Pope, Gary, and Jones, all of whom served the State ably in the high office of Chief Justice, when they declared in *Florence v. Brown, supra:* "We are not disposed to exercise the power vested in this Court, except *where some grave question of public concern is involved."* The question whether or not a Circuit Judge in some particular case charged on the facts of that case is certainly not a grave question of public concern. Mr. Justice Cothran has said:

"It is a proverb as old as the law that it is to the interest of the State that there be an end of litigation." *Sumter Trust Co. v. Holman,* 134 S. C., 412; 132 S. E., 811.

This case, as already stated, has been heard by this Court twice, and the conclusions reached have been against the appellants in both instances.

It is not our purpose to go again into the facts of the case. We have only legal questions before us.

We have no desire to fire "a parting shot" at either of the parties to this cause. The one fired in the dissenting opinion, like most "parting shots," was too late to be effective. It is an argument that the verdict of the jury was wrong. So far as that verdict is concerned, this Court is concerned only with the question if the trial Judge, in the trial of the cause, committed any error of law. We are only judges of the law. We are not advocates of either of the parties to the cause. The arraignment of the respondent in the dissenting opinion in all likelihood would have been interesting to the trial jury, if used by counsel for the appellants in the addresses to that tribunal. We are not called upon here to defend him from that arraignment. It is sufficient to say that the jury has vindicated him. We shall not undertake to criticize the verdict of a jury, who, it must be

assumed, did their duty as they conceived it to be, and who have not the privilege or opportunity of making any reply to any criticism we might offer as to their conduct.

In their petition now before this Court the appellants ask, in any event, if the judgment below be affirmed, that the same be made effective within 60 days from the last day of the term of this Court (November —, 1925), when the appeal was first heard, and that the plaintiff be required to cancel and remit interest on his judgment accruing since said time. The reasons for this request, briefly stated, are that Section 17 of Article 5 of the Constitution provides that "it shall be the duty of the Justices of the Supreme Court to file their decisions within sixty days from the last day of the Court at which the cases were heard," and that the delay in rendering the judgment herein has not been caused by the laches of the appellants. To sustain this request there is cited the case of *Griffith v. Cromley,* 58 S. C., 448; 36 S. E., 738.

The facts relating to the hearing and determination of this appeal are these: It was heard first on November 10, 1925; the Court was then composed of Chief Justice Gary, Associate Justices Watts, Cothran, and Marion, and Acting Associate Justice R. O. Purdy. Chief Justice Gary, because of illness, did not participate in the case. Mr. Justice Marion resigned, effective January 1, 1926, but he was appointed by the Governor to serve as an Acting Associate Justice in all causes formerly heard by him. In May, 1927, the four Justices who sat in the cause, being evenly divided in their opinions as to affirmance or reversal, on account of the great importance of the cause, deemed it best that there be a rehearing before a full Court, and so directed. In the meantime, Chief Justice Gary had died; Mr. Associate Justice Watts became Chief Justice, and Justices Blease, Stabler, and Carter became members of the Court. The rehearing was had on June —, 1927, without objection or question of any kind by appellants or

respondent. The decision of the Court affirming the judgment below was handed down on September 21, 1927, and within ten days thereafter the appellants filed their petition for another rehearing.

It is well known to the bar of the State that the work of this Court for several years past has been exceedingly heavy, and, unfortunately, it has been interfered with to a great extent by both the illness and deaths of several members of the Court. This case has been here a long time, due much to the facts related above, but even more so because this Court has agreed at all times with one thing so frequently and insistently urged by the appellants, that the issues involved were of great importance, and that the financial interests of appellants at stake were large.

It has required much time for the Court as a whole, and for several Justices and Acting Associate Justices, to properly consider the cause. This will be quite apparent to the appellants, as well as all others concerned, when they are reminded that the transcript of record contains 236 pages; that each of the appellants made 19 exceptions, all important; that the printed arguments for the appellants contain 83 pages, and the argument of the respondent has 77 pages; that the total number of authorities cited by both sides, including textbooks, aggregate at least 150; and, most important of all, that the Court was divided in two instances as to the determination it should make. These facts have been related that the seeming delay of the Court may be understood.

Even in the circumstances, however, as a matter of law, we do not see how this Court, though it felt disposed to do so, could grant the request of the appellants. We do not think the *Griffith case, supra,* warrants our doing so. In that case, which was an action in equity, it was contended that the decree of a Judge of the Court of Common Pleas was void, because it was not filed within 60 days after final adjournment of the Court at which the cause was

heard, but this Court held otherwise. It was decided, in effect, that the Court would not, where it could prevent, permit a party to a cause to suffer by delay, not occasioned by his fault, but due to the Court itself.

In an equitable action, this Court has very great latitude in rendering its judgments, and might, in proper cases, order a remission of interest. In an action at law, however, and such is the case at bar, this Court is "a Court for the correction of errors at law under such regulations as the General Assembly may by law prescribe." Section 4, Article 5, Constitution. We are not advised of any statutory enactment which permits the Court to order a remission of interest on a judgment, based upon the verdict of a jury. To the contrary, the General Assembly has expressly declared that all money judgments shall draw interest at the legal rate. Section 3636, Vol. 3, Code 1922. It follows, therefore, that the Court cannot relieve the appellants, even if it were thought proper to do so.

As to the other matters mentioned in the petition for rehearing, the Court has again, at appellants' instance, reviewed the trial below, and we are satisfied with the opinion of the Court, as written by former Associate Justice Marion, which covered all the exceptions of the appellants, and we find no error of law therein. In connection with the opinion of the Court, however, we direct that the charge of the trial Judge and his order refusing a new trial be reported.

It is hereby ordered that the petition for rehearing be denied, and that the order staying the remittitur be revoked.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE CARTER concurs in result.

MR. JUSTICE COTHRAN (dissenting): I agree entirely with the denial, in the proposed order, of the contention that a single Justice has, under any circumstances, the right to demand a convocation of the Court *en banc*, as it is de-

nominated. As to certain other matters discussed in the order, and as to the conclusion that the petition should be dismissed, I do not agree, for the reasons which follow:

In the proposed *per curiam* order it is stated:

"* * * The call for such Court should be made while the Supreme Court has pending before it, and *before it has determined,* the cause in which the assistance of the Circuit Judges is desired."

If this statement is intended to announce simply a matter of *preferred course of procedure,* I have no objection to it, provided that the custom heretofore prevailing is observed that, where a dissenting opinion has been submitted, both opinions shall be held for consultation. The statement, however, may be construed as a denial of the power to convoke the Court *en banc, after the filing of the opinion.* As to this, I think that, until the remittitur shall have been transmitted by the Clerk of this Court to the lower Court, this Court has absolute control of the case. It may withdraw the opinion which has been filed; it may substitute another for it; it may modify it in any manner; it may order a reargument of the appeal; or it may convoke the Court *en banc,* and open up the entire appeal before the Court as thus constituted.

While perhaps in a majority of instances of the convocation of the Court *en banc,* it has been ordered *before* the opinions have been formally filed, this Court has distinctly recognized its power to do so *after such event.* The case of *State v. Holleyman,* finally decided as reported in 55 S. C., 207; 33 S. E., 366; 45 L. R. A., 567, was heard at a term prior to October, 1898; on October 31, 1898, *the opinion of the Court was filed,* affirming the judgment of the Circuit Court, by a divided Court (which at that time was composed of four Justices); the Chief Justice (McIver) and Justice Gary dissenting. See 31 S. E., 362. Thereafter the defendant appellant filed a petition for a rehearing. It does not distinctly appear in the report of the case that a

rehearing before the Court *en banc* was asked, but upon the petition the Court made the following order:

"A question arising under the Constitution of the United States being presented for the determination of this Court in these cases, *and the opinions which have been filed* showing that 'the entire Court is not agreed' as to the determination of that question, *it is* necessary, under the provisions of Section 12 of Article 5 of the Constitution of this State, that all of the Circuit Judges shall be called to the assistance of the Supreme Court for the decision of such question. *Upon this ground* the petition for a rehearing *must be granted,* and these cases are set, therefore, down for hearing," on January 3, 1899, before the Court *en banc.*

The case was reargued before the Court *en banc,* at the date stated, and on June 2, 1899, the judgment of the Court, "thus constituted," was rendered, reversing the judgment of the Circuit Court. This Court did not decline to convoke the Court *en banc* upon the ground that the opinions had been filed; nor did it hesitate to act upon the patent situation that, although no clause of the Constitution was up for *interpretation or construction,* a constitutional question was involved, in *the application* of the Constitution to the admitted facts of the case. It is of interest to observe that the present Chief Justice, then a Circuit Judge, sat as a member of the Court *en banc* and concurred in the opinions of Chief Justice McIver and Justice Gary, reversing the action *of the Circuit Court.* It is significant that in the judgment of the Supreme Court as then constituted, the Court *en banc,* no reference whatever was made to the judgment of the Supreme Court as ordinarily constituted, which had been filed, but stayed by order, clearly showing that the judgment of the Circuit Court was the judgment being reviewed on appeal, and not that of the Supreme Court.

The case of *Traynham v. Railroad Co.,* finally decided as reported in 92 S. C., 43; 75 S. E., 381, was heard at the

June term, 1911, of this Court; on July 8, 1911, *the opinion of the Court was filed,* affirming the judgment of the Circuit Court in favor of the plaintiff. Mr. Justice Gary, later Chief Justice, filed a dissenting opinion. See 71 S. E., 813. On July 12, 1911, the defendant appellant filed a petition for a rehearing before the Court *en banc,* upon the ground that there was involved in the cause a question of constitutional law, upon the determination of which the entire Court was not agreed. I set out below the entire petition:

"PETITION FOR REHEARING

*"To the Honorable the Supreme Court of South Carolina:*

"The defendant appellant, Charleston & Western Carolina Railway Company, hereby petitions for a rehearing of this case in order that this Court may call to its assistance the Circuit Judges as provided by Section 12 of Article 5 of the Constitution of 1895, as well as by Section 19 of an Act entitled 'an Act to provide for the organization of the Supreme Court, to define its jurisdiction and to provide for the appointments of its officers and to define their powers, approved 19th day of January, 1896, 22 Statutes, page 3'; that is to say, for a rehearing before the Court *en banc* upon the following grounds and for the following reasons:

"First. It appears that there is involved a question of constitutional law upon the determination of which the entire Court is not agreed, and this defendant is entitled to a rehearing before the Court *en banc* under the provi‐ sions of the Constitution referred to above and as construed by this Court in the case of *State v. Holleyman,* 55 S. C., 235; 31 S. E., 362; 33 S. E., 366; 45 L. R. A., 567.

"Second. The main opinion of the Court in this case, written by Mr. Chief Justice Jones and concurred in by Messrs. Justices C. A. Woods and D. E. Hydrick, construes the Act of the Legislature of South Carolina involved in this case as applying to interstate commerce, because the opinion holds and decides that the shipment is interstate. It is, therefore, respectfully submitted that the said Act of

the Legislature of South Carolina is unconstitutional, null, and void, as being in conflict with Article 1, Section 8, clause 3, of the Constitution of the United States, which confers on Congress power to regulate interstate commerce with foreign nations and among the several States, and denies to the State of South Carolina the power to pass any Act which undertakes to regulate interstate commerce or burden the same; (b) the Act in question as construed by this Court regulates interstate commerce, in violation of the provisions of the Constitution of the United States above referred to, and places an unreasonable burden on such commerce.

"Third. It is further respectfully submitted that the decision of the Court in effect is a regulation of interstate commerce and in conflict with the provisions of Article 1, Section 8, clause 3, of the Constitution of the United States, which denies to the State, either by Act of the Legislature or by a decision of its Courts, the right to regulate interstate commerce or burden it in any way.

"The decision of the Court in the case determines a question arising under the Constitution of the United States, to wit, under Article 1, Section 8, clause 3, and the opinions which have been filed show that the entire Court is not agreed as to the determination of said question. Mr. Justice Gary dissents in his opinion from the majority of the Court, and holds that the Act is a burden on interstate commerce, and further that a shipment during its actual transportation in interstate commerce cannot be subjected to State legislation at any point along the line of transportation, whether before or after reaching its destination. In this situation this case falls squarely within the provisions · of Section 12 of Article 5 of the Constitution of South Carolina, and entitles this defendant, as a matter of law, it is respectfully submitted, to a rehearing before the Court *en banc,* and particularly so in view of the decision of this

Court as announced in the case of *State v. Holleyman, supra.*

"Wherefore the defendant petitions for a rehearing of the case before the Court *en banc,* and that an appropriate order may be made by this honorable Court in that behalf, and in the meantime the remittitur be stayed until the further order of this honorable Court."

*The petition was granted,* and the case set down for re-argument before the Court *en banc* at the November term, 1911. I have not before me a copy of the order, but it is fair to assume that it was based upon the grounds stated in the petition, for which reason I have incorporated herein the petition. This Court did not decline to convoke the Court *en banc* upon the ground that the opinions had been filed; nor did it hesitate to act upon the patent contingency that, although no clause of the Constitution was up for *interpretation or construction,* a constitutional question was involved, *in the application of the Constitution to the admitted facts of the case.*

It is of interest to observe that the present Chief Justice, then an Associate Justice, sat as a member of the Court *en banc,* and concurred in the leading opinion reversing the action of *the Circuit Court.* And in this connection it is important to observe that the Court *en banc,* as it has come to be designated for convenience, *is not a Court established to hear appeals from the Supreme Court,* as ordinarily constituted. It is the Supreme Court differently constituted, and its province is to pass upon the appeal from the lower Court; the appeal to the Supreme Court, as ordinarily constituted, is thereby transferred to the Court *en banc,* as if it had never been heard or considered by the Supreme Court.

II. I do not agree with the statement in the order that:

"* * * The privilege of calling to the aid of the Court the Circuit Judges *is a matter entirely for the Court* and its Justices; *it is not a right given to a litigant.* The Court, and the Justices thereof, will therefore, when it is deemed

advisable, without petition or suggestion from a party to a cause pending before it, call the *Court en banc.*" (Italics added.)

It does not appear to have been apprehended by the learned Justice who prepared the order that there are two distinct contingencies *in which it is made mandatory* upon the Chief Justice to convoke the Court:

(1) When it shall appear to the Justices, or any three of them, that *there is involved a question of constitutional law,* or of conflict between the federal and State laws, etc., "upon the determination of which the *entire* Court is not agreed."

(2) Whenever the Justices, *or any two of them, desire it, on any cause or question before the Court.*

In *City of Florence v. Brown,* 49 S. C., 332; 26 S. E., 880; 27 S. E., 273, the Court said:

"Both the Constitution and the statute above referred to provide for but two contingencies in which the Circuit Judges shall be called in: (1st) Where a constitutional question is involved; (2d) where at least two of the Justices of this Court desire that the Circuit Judges shall be called in."

It is manifest that the second contingency is the creature of the desire, option, volition, of the entire Court, or of any two of the Justices, in any cause, or upon any question, constitutional or otherwise. The exercise of that *"desire"* is necessarily committed to the Justices, and a suggestion from a litigant, who is vested with no right to such exercise, would obviously constitute at least an act of impropriety, if not impertinence.

But the first contingency is not the creature of the desire, option, volition, of any number of the Justices, or even of the entire Court. If it should appear to the Court, or to any three of the Justices, that in the appeal from the Circuit Court, there is involved a question of constitutional law, upon the determination of which the entire Court is not agreed, the Constitution by its terms, specifically declared to

be mandatory (Article 1, § 29), imposes the inescapable duty upon the Chief Justice to convoke the Court *en banc.* The unbidden and perhaps unwelcome guest is at the door; the Constitution says that he *shall* be admitted. It is not for this Court to say that the exercise of a *right,* guaranteed by the Constitution, to have the question of the invasion of the Constitution tried by a Court constituted as it has prescribed, *"is a matter entirely for the Court and its Justices; it is not a right given to a litigant."*

The vital question, then, is first presented: Does the appeal in this case, *from the judgment of the Circuit Court,* involve a question of constitutional law? I can offer no more convincing evidence of the fact that it does than to quote from the opinion prepared by Mr. Justice Marion, at the time a member of this Court, which has received the approval of four of the Justices of this Court as now constituted:

"Appellants' fourth general proposition is that the trial Judge erred in charging the law of damages. It is contended (exception 14) that the Court erred in charging as follows: 'If the jury find from the evidence, by the greater weight thereof, that the publication in question was libelous, then the plaintiff would be entitled to recover such sum by way of actual damages as the jury in its discretion may think proper to compensate him for his injury, including the humiliation which he may feel and may have suffered by reason of the publication, and the jury are instructed that, if they find the publication was libelous, *the plaintiff would be entitled to substantial damages.'* The error assigned is (a) that the charge was in respect of matters of fact, *and so violated Section 26 of Article 5 of the Constitution;* (b) that the amount of damages was in the sound discretion of the jury, etc.; and (3) that the charge was peculiarly prejudicial, in view of plaintiff's failure to offer testimony of any actual damage, and in view of defendants' testimony going to mitigation and reduction of damages. It is further con-

tended (exception 15) that the Judge, *in violation of the constitutional inhibition,* intimated to the jury his opinion that plaintiff's actual damages should be increased, and not diminished, and that plaintiff should be awarded punitive damages by charging as follows," etc.

Mr. Justice Marion then proceeds to furnish the most conclusive proof that a question of constitutional law *was* involved in the cause, *by considering and deciding it.*

The question is not whether the conclusion reached by Mr. Justice Marion. is correct, but whether the issue, raised by the exceptions, that the Circuit Judge violated the provisions of Article 5, Section 26, of the Constitution, "involved a question fo constitutional law." His consideration of it, and the statement of his conclusion that the charge, *as a matter of law,* was not in violation of the Constitution, leave no possible room for doubt that a question of constitutional law was involved in the appeal. If it was so involved, and it appears that in its determination the entire Court is not agreed, the constitutional right of the appellants to a convocation of the so-called Court *en banc* became complete, *not as a matter of privilege,* to be awarded at the pleasure or will or discretion of this Court, but *as a matter of constitutional right*—demandable; a consideration which clearly marks the distinction between the two contingencies under which the Court *en banc* may be convoked.

That the entire Court is not agreed upon the resolution of the constitutional question involved, it would be sufficient to say that, as a member of the Court, I do not concur in the conclusion of the Court that in the charge of the trial Judge complained of he did not violate the provisions of Article 5, § 26, of the Constitution. I do not, of course, contend that my single opinion that a constitutional question is involved in the appeal entitles the petitioners to a convocation of the Court *en banc.* Under the express constitutional provision, that contingency must appear to at least three of the Justices of this Court. My effort shall

be to convince at least two other members of the Court that that contingency is presented; and, if so, the duty of calling in the Circuit Judges to hear the pending appeal is mandatory.

III. The order which has been proposed, dismissing the petition for a rehearing and a convocation of the Court *en banc,* is I understand it, is based upon two propositions, which in my respectful opinion are entirely erroneous:

A. That a question of constitutional law is presented only where an interpretation or construction of a clause of the Constitution is under investigation.

B. That, where this Court has decided in favor of the constitutionality of a law or other matter, that fact is conclusive that no constitutional question was involved.

A. If this proposition should be sustained I do not doubt but that 90 per cent. of constitutional questions would be held to be *not* constitutional questions. Constitutional questions arise under either of two conditions:

(1) The *interpretation* or construction of a certain clause, which under many circumstances is so plain and unambiguous as to constitute its own interpretation; in others, not.

(2) The *application* of an interpreted clause to a given situation, presenting the issue of the validity of a statute, or of a judicial ruling or determination.

In the case at bar there is no question as to the interpretation or construction of Article 5, § 26; it is perfectly plain and unambiguous: "Judges shall not charge jurors in respect to matters of fact, but shall declare the law." Hence, if there is a question of constitutional law involved, it is in the application of this clause to the admitted facts in reference to the charge of the Circuit Judge. There is no question but that he did charge as complained of:

"* * * The jury are instructed that, if they find the publication libelous, *the plaintiff would be entitled to substantial damages.*"

The defendants moved for a new trial upon the ground that this charge was a violation of the clause quoted; the motion was overruled. The defendants excepted to the judgment entered on the verdict upon the same ground. The matter was fully argued at the hearing before this Court, and was fully discussed and considered in the opinion of Justice Marion, which has been approved by a majority of this Court. The proposed order declares:

"All the appellants have done was to allege that *as a matter of fact—not as a matter of constitutional law*—the Circuit Judge violated the quoted provision. The question, therefore, before this Court, has been, not as to the intention or effect of the constitutional provision, but if the language used by the Circuit Judge in his charge to the jury was within the constitutional inhibition."

Certainly no question *of fact* is involved in that issue. There is no question as to the interpretation of the clause of the Constitution; there is no question as to what the Circuit Judge charged as a matter of fact; and necessarily, upon the conceded facts, the only issue that could have been raised is one of law, *of constitutional law.* Of course, in the illustration employed in the opinion, where the constitutional right to a jury of 12 men might be involved, the primary issue would be one of fact, whether the jury actually was composed of 11 or 12 men. If, as a matter of fact, it should appear that the jury was properly constituted, there could arise, of course, no contitutional question. If, however, it should appear that only 11 men sat on the jury, the integrity of the jury, and the validity of the objection to its action as thus constituted, would necessarily have to be determined by the application of the constitutional provision in question, which of necessity presented a question of constitutional law.

In *Waggoner v. Wichita,* 273 U. S., 113; 47 S. Ct., 271; 71 L. Ed., 566 (decided January 3, 1927), the plaintiff contended that a certain tax assessment was violative of the Fourteenth Amendment; the District Court held that it was

not; on writ of error the Circuit Court of Appeals held the
same; on writ of error the Supreme Court held that, as the
appeal involved a question of constitutional law, it should
have come directly to that Court; rather than remand the
case to the Circuit Court of Appeals, with direction to trans-
fer it to the Supreme Court, that Court entertained the ap-
peal and confirmed the holdings of both of the inferior
Courts. The fact that both had decided the issue against the
constitutional objection did not, manifestly, in the mind of
the Supreme Court, alter the conclusion that a constitutional
question was involved.

A "question of constitutional law" embraces scores of
rights and immunities under the Constitution, the protection
under which, to the citizen, does not at all involve an *inter-
pretation* or construction of any clause of the Constitution,
but the *application* of the Constitution to the state of facts
undisputed: Religious worship, freedom of speech, equal
protection of the laws, taxation, bills of attainder, ex post
facto laws, right of suffrage, elections, dueling, Courts public,
slanders, seizures, double jeopardy, bail, corporal punish-
ment, contempt, habeas corpus, imprisonment for debt, and
many others. Could it be contended that, where a person
claims such rights or immunities, the issue does not involve
a question of constitutional law, for the reason that there
is no question as to the interpretation of the particular clause
under which the right or immunity is claimed? The right or
immunity is often claimed *because* there is no question as
to the interpretation.

There are 46 cases cited in the notes to Article 5, § 26, in
which this Section was considered in its application to the
admitted facts; in some the constitutional contention of the
losing suitor was sustained; in others, not. Can it be said
that not one of those cases involved a constitutional question,
because the interpretation or construction of the clause was
not before the Court?

"Where the constitutionality or legality of a fine is contested, appeal lies, irrespective of the amount." Ex parte Travers, 3 La. Ann., 693.

"* * * Constitutional law treats [of] the relations of the government with the individual from the standpoint of the rights of the individual." Goodenow, Comp. L., 8.

In *Carter v. McClaughry,* 183 U. S., 365; 22 S. Ct., 181; 46 L. Ed., 236, the petitioner filed a petition for a writ of habeas corpus, alleging that his imprisonment was violation of the Constitution of the United States, Fifth Amendment, which provides that:

"Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

The Supreme Court held that it had jurisdiction upon the ground that the case involved *the application* of the amendment to the admitted facts. There was no controversy as to the interpretation of the amendment.

The Illinois statute provides that an appeal shall go directly to the Supreme Court, where the case involves a construction of the Constitution. In *Reid v. Chicago,* 20 Ill. App., 149, it was held that the Supreme Court has jurisdiction when the case involves a question whether drawing off water from a stream, subject to an easement of abutting property owners, amounts to a taking of property within the Constitution. Also a judgment finding defendants guilty of contempt for refusal to permit an inspection of their books, where the defense was that the order violated constitutional rights. *Denison v. Schermerhorn,* 257 Ill., 128; 100 N. E., 491.

In *Wiley v. Sinkler,* 179 U. S., 58; 21 S. Ct. 17; 45 L. Ed., 84, it was held that the right to vote for members of Congress was derived from the Constitution of the United States, and that the Court had jurisdiction of an action for damages for the refusal of the exercise of such right, as one arising from the Constitution. There was no controversy in that case as to the interpretation of the Constitution, but

it was over the application of the Constitution to the admitted facts.

"A question of constitutional law is involved where the question presented by an appeal to the appellate Court is whether the trial Court erred in refusing a demand for the submission of the case to a jury." *Tinsley v. Kemery,* 83 Mo. App., 94.

Also:

"Where the right to a jury trial is claimed, and its denial excepted to, at every stage of the proceedings." *Creve v. Tamm,* 138 Mo., 385; 39 S. W., 791.

The Judicial Code of the United States, in Section 238, provides that a writ of error from the Supreme Court to a lower Court shall lie "in any case that involves the construction or application of the Constitution of the United States." In *Berry v. Davis* (C. C. A.), 15 F. (2d), 488, it was held that the Supreme Court had exclusive jurisdiction of an appeal from a judgment of a District Court, on petition for mandamus to compel county and precinct registrars to register negro voters. It was held to involve a dispute under the Fourteenth and Fifteenth Amendments. The case did not involve an interpretation or construction of those amendments, but their application to the admitted facts.

In *Empire State-Idaho Mining & Developing Co. v. Hanley,* 205 U. S., 225; 27 S. Ct., 476; 51 L. Ed., 779, it is held "\* \* \* that it is only when the Constitution of the United States is *directly and necessarily drawn in question* that such an appeal can be taken, and the case must be one in which the *construction or application of the Constitution* of the United States is involved as controlling."

How it can be doubted, in the present case, that the Constitution of South Carolina is "directly and necessarily drawn in question," in its construction or application to the situation presented, I cannot conceive. If so, it necessarily follows that the appeal involved a "question of constitutional law."

In *Pierce v. Creecy*, 210 U. S., 387; 28 S. Ct., 714; 52 L. Ed., 1113, it was held that, in habeas corpus proceedings, the contention of the petitioner that the indictment upon which extradition papers had been issued did not charge a crime against the federal goverment, within the meaning of the Constitution regulating extradition, involved the construction of the Constitution.

Hundreds of cases might be cited where it was held that a question of the application of the Constitution to a given state of facts, in the Federal Courts, was a question of constitutional law.

The order declares:

"In almost every case decided by a jury now brought to this Court complaint is made, and generally without foundation therefor, that the Circuit Judge has violated the provisions of Article 5, Section 26, by charging on the facts. If this Court should accept this 'pretext' of raising a constitutional question, and on account thereof call in the 14 Circuit Judges of this State every time there is a disagreement as to an exception raising a 'constitutional question' as to charge on the facts, and every time a defeated litigant made demand therefor, because the Constitution, in his opinion, had been violated, we would bring about a situation even more unfortunate than the one suggested by the great McIver."

It should be remembered that the Constitution does not provide for the convocation of the Court *en banc* upon the "pretext" of a constitutional question being involved. Two conditions must be met:  (1) At least three Justices of the Court must be satisfied that there is involved a question of constitutional law; and (2) that in the determination of that question the entire Court is not agreed.  If these conditions appear to be present, it can hardly be that the injection into the case of the constitutional question can justly be characterized as a "pretext."  If the claim of a constitutional question should be considered so devoid of merit

as to constitute a "pretext," it would scarcely pass both of these requirements.

It is not within the province of this Court to consider what it conceives may be the consequences of a plain constitutional mandate; that is a consideration presumed to have been in the minds of the framers of the Constitution; and, whatever inconveniences may appear to result from it, this Court has no right to set its judgment against that of the Constitution makers. As Chancellor Harper states in the *Pell v. Ball* case:

"It concerns the public that the Constitution should be maintained inviolate; and the Legislature [I interpolate, *here the Constitution itself*] made it the duty of the Court to submit all such questions to all the Judges of the State."

B. It is insisted that no question of constitutional law is involved, for the reason that *this Court* has decided that the charge of the Circuit Judge was not in conflict with the Constitution. Here the misapprehension is conspicuous, that the decision of the Court *en banc* is a review of the decision of the Supreme Court which has been filed. I have endeavored to demonstrate that such is not the case. If the Chief Justice, under the constitutional mandate, should order that appeal to the Court *en banc,* the opinions of this Court which have been filed would become absolutely of no force whatever, except as persuasive arguments of the correctness of the opposing views. The appeal would be from the judgment of the Circuit Court, and the decision of the Court and the decision of the Court *en banc* would be "final and conclusive," regardless of the majority decision of this Court, as has occurred in several instances.

The only plausible argument to sustain this position, as I see it, is a supposed analogy between the old Court of Errors and the Court *en banc.* There can be no doubt but that the conception of a Court *en banc* is attributable to the constitution  and powers of the old Court of Errors, but they are so entirely different from the constitution of what

we have come, simply for convenience, to designate as the Court *en banc,* that a comparison between them fails to supply, from a supposed analogy, any light whatever upon the point at issue.

The Court of Errors was an independent Court, composed of the law judges, six in number, and the chancellors, four; the act specifically provides for *an appeal* from either the Court of Appeals at law or the Court of Appeals in equity; it was vested with the power to make its own rules; and it made them (*City Council v. Ahrens,* 4 Strob., 241); and its decisions, as long as it existed as a Court, were reported as the decisions of the Court of Errors, found from Rice's Law, A. D., 1838, to 15 Rich., A. D., 1867.

What we have come to refer to as the Court *en banc* is nothing more than the Supreme Court sitting with the Circuit Judges, who, as the Constitution provides, have been "called to the assistance of the Supreme Court." It has no supervisory control over the Supreme Court; it has no appellate jurisdiction to review the decisions of the Supreme Court; it is more than a *consultative* Court, for each of the Circuit Judges has as potential an influence in the decision as a Justice of the Supreme Court; it makes and is authorized to make no rules for its procedure; and its decisions are the decisions of the Supreme Court, differently constituted, declared to be and enforced as such.

Great stress is laid upon the following extract from the opinion of Chancellor Harper in the case of *Pell v. Ball,* 1 Rich. Eq., 419:

"To decide in favor of the validity of a law which is charged to be contrary to the Constitution is certainly to decide that there is no constitutional question involved in the case. The Constitution does not touch the question."

And from it it is concluded:

"To decide that the charge of the trial Judge does not violate the constitutional inhibition against charging on the facts is certainly to decide that there is no constitutional

question involved in the case. For, as said by the Chancellor, 'The Constitution does not touch the question,' "
—developing against the error, as I see it, of apprehending that this Court *has rendered a decision,* from which an appeal would lie to the Court *en banc.* The declaration of the great Chancellor above quoted must be taken in connection with the question immediately under review in that case, which was whether a litigant, who had failed in his contention before the Court of Appeals in Equity that a certain order of the Chancellor below was in contravention of the Constitution, had the right *suo motu to appeal to the Court of Errors.*

On circuit the defendants contended that, under the Constitution, the Court of Equity was without jurisdiction to divest a party of his title to land (as would be done in cases of partition), except in actions for the partition of *intestate* estates; that it could not be done in other cases of tenancy in common. The Chancellor decided against this contention, and upon appeal to the Court of Appeals in Equity, composed of the four Chancellors of the State, the decree of the Chancellor on circuit was affirmed, the Court holding against the claim of unconstitutionality. The appellants then, of their own motion, had the Clerk of the Court of Errors to enter the case upon the docket of that Court, as an appeal from the Court of Appeals in Equity to the Court of Errors, under the seventh section of the Act of 1836, establishing the Court of Errors. The matter before the Court was a motion by the respondents to strike the case from the docket of the Court of Errors. That was the matter under consideration, and not whether a question of constitutional law was involved in the appeal before the Court of Appeals in Equity, as unquestionably there was. The Court of Errors decided that, as the Court of Appeals had decided that there was nothing in the constitutional contention of the appellants, the entry of the appeal upon its docket, without some direction to that effect by the

Court of Appeals, was invalid, and granted the motion to strike.

The point in the decision was that the *review,* by the Court of Errors, of a decision of the Court of Appeals, was not strictly an *appeal,* which ordinarily implies that it shall be at the option of the losing suitor, but a matter within the discretion of the Court of Errors, and to be ordered by it. The obvious distinction between that case and the case at bar is that in the *Pell v. Ball case* there was a *decision and judgment of the Court of Appeals,* sought to be reviewed by the Court of Errors, while in the case at bar *there has been no decision and judgment of this Court,* final in its character. The fact that an opinion has been filed, affirming the judgment of the Circuit Court, by no means constitutes a final judgment, so long as the remittitur has been stayed, and the whole case is under the control of this Court. It is not in contemplation of the Constitution that the Court *en banc* shall review the judgment of the Supreme Court, which, of course, could be done only in case there had been a final judgment of the Supreme Court. When a Court *en banc* has been convoked, the unmatured judgment of the Supreme Court is suspended, and the whole case, as an appeal from the lower Court, is heard and determined; the judgment rendered is still the judgment of the Supreme Court, although it may be the reverse of the tentative conclusion (made tentative by the convocation of the Court *en banc)* of the Supreme Court.

If, therefore, the above extract from the opinion of Chancellor Harper be correct, it has no application to the case at bar, for the reason that there has been no adjudication by the Supreme Court that the Constitution has not been invaded. The question which would be presented to the Court *en banc* would be whether the action of the lower Court was an invasion of the Constitution, regardless of the tentative conclusion of the Supreme Court, as evidenced

by the opinion which has been filed, but which has not gone into effect.

I do not see the force or correctness of the suggestion that the Court *en banc* is simply "consultative" in character. I do not think that it can be so considered, in view of the conceded fact that it is the Supreme Court still, and that the vote of each Circuit Judge is as potent as that of any Justice. The Constitution provides that the decision of the Court so constituted shall be final and conclusive. It is impossible, in view of this declaration, to consider its conclusion as simply "consultative."

It is not at all certain but that, if timely application had been made to the Court of Appeals in the *Pell v. Ball case,* that Court would have certified the case to the Court of Errors upon the presence of the constitutional objections. What that case decides is that, where there has been no such application to the Court of Appeals and it has pronounced final judgment in the case, the losing party cannot, *suo motu,* docket the case as an appeal case in the Court of Errors. The proper course to pursue is plainly indicated in the following extract from the *Pell v. Ball case:*

"Upon the opening of a cause in one of the Courts of Appeals, the counsel concerned may move or suggest an order for sending the case to the Court of Errors, as plainly involving a constitutional question; but, if the suggestion be adopted, the order will be regarded as made on the Court's own motion. If the order be refused, then, on the hearing on the merits, counsel will be fully heard on any constitutional question which may appear to them to be involved in the cause, and consequently on the propriety of sending the case to the Court of Errors; and they will not be entitled to be heard a second time, if the point should be decided against them. If any constitutional question be not made at the principal hearing, parties ought not to be permitted to make it by an original application at any time after the judgment is rendered."

The motion to strike the case from the docket was, therefore, granted upon two grounds: (1) That no application was made to refer the case to the Court of Errors, and no order made by the Court of Appeals to that effect; (2) that the matter of reference was not suggested until after final judgment by the Court of Appeals. .

Neither of these conditions obtains in the present case, for the case on appeal is still in the bosom of the Court, and subject to its absolute control. I cannot believe that Chancellor Harper meant to declare that the Court of Appeals, *after hearing argument* upon a constitutional question involved, *and considering it,* could have, among themselves, decided against the contention of unconstitutionality, *and for that reason* held that no constitutional question was involved. That is exactly the position taken in the order to which I object. I consider the parallelism complete between this application by the appellants, and an application to the Court of Apeals under the old practice, before a final decision by that Court, and that then, as now, there could be no question that a question of constitutional law was involved. In this case there is no application to be passed upon by the Supreme Court, as a Court; all that is required is a showing that the appeal which *is now pending in the Supreme Court,* in the opinion of the three Justices of this Court, involves a question of constitutional law, upon the determination of which the entire Court is not agreed. Of that I do not see how there can be a question.

It is suggested that the contrary conclusion would open the door of the Court *en banc* to all manner of fictitious claims of unconstitutionality, and greatly hinder the administration of justice. The reply to that suggestion is that under the old practice an order from the Court of Appeals was necessary to establish the presence of an issue of constitutional law, and under the present Constitution three Justices must certify to the presence of such issue. Under either system, the check upon the intrusion of fictitious

constitutional issues, "pretexts," was and is complete. The extract quoted from the case of *City of Florence v. Brown,* 49 S. C., 332; 26 S. E., 880; 27 S. E., 273: "We are not disposed to exercise the power vested *in this Court,* except where some grave question of public concern is involved"— must be interpreted in the light of the application made in that case for the convocation of the Court *en banc.* It is distinctly stated that no question of constitutional law was involved; nothing more than the construction of a Statute involving certain municipal powers. The application was addressed to the exercise of the Court's desire, under the second contingency above stated; and naturally the observation of the Court had reference to the exercise of the power vested in the Court, to convoke the Court at its pleasure. It could not have had reference to the mandate addressed to the Chief Justice when a constitutional question was raised. Besides, I have yet to learn that the infraction of the Constitution is not a "grave question of public concern." As is said by Chancellor Harper in *Pell v. Ball,* 1 Rich. Eq., 419, so copiously quoted from in the order:

"Constitutional questions were regarded by the Legislature as of great importance, and the decision of them as affecting not only the party, but the public."

IV. What is considered a question of constitutional law, and the rule to govern the Courts in such an issue, is clearly stated in the case of *Salinger v. U. S.,* 272 U. S., 542; 47 S. Ct., 173; 71 L. Ed., 398 (decided November 23, 1926):

"The statutes which define and distribute federal appellate jurisdiction, and make the existence of a constitutional question the test of the right to a review, as also of the Court in which the review may be had, always have been construed as referring to a question having sufficient substance to deserve serious consideration, and not one which is so devoid of merit as to be fanciful or frivolous, or which is not open to discussion because settled by prior decisions

[citing cases].   Under a different construction, the restrictions and distributing provisions in the statutes would have little purpose; for constitutional questions of no substance readily could be devised and presented as mere pretexts for obtaining a review on other questions [citing cases]."

That the question here involved, whether the Circuit Judge invaded the province of the jury in charging upon the facts, was one "having sufficient substance to deserve serious consideration, and not one which is so devoid of merit as to be fanciful or frivolous, or which is not open to discussion because settled by prior decisions," is demonstrated by the *fact* that it received, and I assume deserved, serious consideration at the hands of Justice Marion, who devoted one-sixth of his entire opinion, disposing of nearly 40 exceptions, to a consideration of it, in which he distinctly disapproved of the charge, though holding harmless the error.

I think, too, that it is sufficiently demonstrated that the objection is substantial, and not fanciful or frivolous, by the following observations:

The portion of the charge specifically complained of is this:   " *   *   *   the jury are instructed that, if they find the publication was libelous, the plaintiff would be entitled to *substantial* damages," which means, of course, that the jury *must award such substantial damages,* in that event. That this was an invasion of the rights and duty of the jury and an infringement of the constitutional inhibition, "Judges shall not charge juries in respect to matters of fact, *   *   * " I do not entertain a doubt.   There are no less than five decisive reasons why the charge complained of was erroneous:

(1) *In actions for libel, the award of damages is peculiarly within the province of the jury.*

In 17 R. C. L., 429, it is said:

"The amount of damages recoverable is peculiarly within the province of the jury."

"Though the law implies some damage from the utterance of words slanderous *per se,* the amount" of the damages "is for the jury." *Smith v. Singles,* 6 Pen. Del., 544; 72 A., 977.

In *Holmes v. Jones,* 147 N. Y., 59; 41 N. E., 409; 49 Am. St. Rep., 646, the Court said:

"But the amount of damages in an action for libel *is peculiarly within the province of the jury.* The jury may give nominal damages, or damages to a greater or less amount, *as they shall determine."*

To the same effect are *Tracy v. Hacket,* 19 Ind. App., 133; 49 N. E., 185; 65 Am. St. Rep., 398. *Hassett v. Carroll,* 85 Conn., 23; 81 A., 1013; Ann. Cas., 1913-A, 333. *Hines v. Shumaker,* 97 Miss., 669; 52 So., 705. *Arizona Co. v. Harris,* 20 Ariz., 446; 181 P., 373. *Hughes v. Samuels,* 179 Iowa, 1077; 159 N. W., 589; L. R. A., 1917-F, 1088. *Shryock v. Calkins* (C. C. A.), 248 F., 649. *Gambrill v. Schooley,* 93 Md., 48; 48 A., 730; 52 L. R. A., 87; 86 Am. St. Rep., 414; 13 A. & E. Enc. L., 432. *Marks v. Jacobs,* 76 Ind., 216. *Nolan v. Traber,* 49 Md., 460; 33 Am. Rep., 277. *Negley v. Farrow,* 60 Md., 158; 45 Am. Rep., 715. *Devaughn v. Heath,* 37 Ala., 595. *Coffman v. Publishing Co.,* 65 Wash., 1; 117 P., 596; Ann. Cas., 1913-B, 636.

(2) *Even where the publication is admitted libelous and without mitigating circumstances, the jury is vested with the power in its discretion to award only nominal damages.*

"Following the general rule, the question whether plaintiff is entitled to nominal or substantial damages is ordinarily a question for the jury. It is within the province of the jury to allow nominal damages only, in the exercise of its discretion." 37 C. J., 116.

"In an action for libel, where specific allegations and proof as to damages are not made and offered, but the reliance [is] upon the mere publication of the libelous statement, the jury cannot be instructed to limit the amount of

recovery to nominal damages, *though they may in their discretion do so." Starks v. Comer,* 190 Ala., 245; 67 So., 440.

(3) *The award of substantial damages must be based upon the injury sustained by the plaintiff in his wounded feelings, mental suffering, soiled reputation, or lowered standing in the community. To charge that in a particular case a plaintiff is entitled to substantial damages is to assume an issue of fact in this respect, which should be left to the jury.*

In 17 R. C. L., 430, it is said:

"The following elements may be taken into consideration in assessing such damages: Injury to feelings, mental suffering, injury to character and reputation, and similar injuries incapable of definite money valuation; the nature of the imputation, including the time, manner, and language in which the charge was made, and the character, condition, and influence of the parties."

"Under an allegation of general damages only, the issue is: What damages has the plaintiff suffered generally in the community where he is known, by the publication of the defamatory matter? *Id.*"

It is conceivable (and I have not the slightest purpose to intimate, even, that the plaintiff comes within such description) that the person libeled may be so devoid of character, so beggared in reputation, "none so low as to do him homage," that an injury to his character, reputation, or standing in the community is impossible. If, then, the damages are to be measured by the injury one has sustained in such character, reputation, or standing, to charge a jury that the plaintiff, in a particular instance, is, upon proof of the libel, entitled to *substantial damages,* is to assume that there has been an injury to such character, reputation, or standing—that he has sustained in the community a character or reputation susceptible of being injured to a substantial degree.

"The defendant was liable for the natural consequences of the tort which it had committed. * * * Whether those were of a character to entitle the plaintiff to substantial damages, or only to nominal damages, was for the jury to decide, and they were, in effect, so instructed." *Bishop v. Journal,* 168 Mass., 327; 47 N. E., 119.

"There is no presumption as to general reputation or character, and requested charge that law presumes plaintiff, in action for slander, to be woman of good character, held properly refused." *Tingle v. Worthington,* 215 Ala., 700; 110 So., 143.

In *Astruc v. Star Co.* (D. C.), 195 F., 349; affirmed by (C. C. A.), 204 F., 776, the plaintiff assigned error in the refusal of this request:

"The plaintiff is entitled to substantial damages, in view of the gravity of the libel, intending to hold him up to public ridicule and injure him in his occupation."

The Court held that there was no error in such refusal, for the reason that the amount of damages for a libel is peculiarly within the province of the jury, whose duty it is to consider all the circumstances under which the libel was published and the character and reputation of the plaintiff. The Court said:

"I prefer, however, to rest my conclusion on the broader ground that it would have been error to charge the jury that the plaintiff was entitled to substantial damages," —citing several cases and quoting the following from the case of *Amory v. Vreeland,* 125 App. Div., 850; 110 N. Y. S., 859:.

"Many elements enter into an action for libel and slander, which are not present in other actions for personal wrongs. A man may be grossly libeled, and still his character and reputation may be such that he suffers no injury, or the circumstances under which the libel is published or the slander uttered [may] be such that no substantial damage ought to be given."

In that case it was held:

"While the trial Judge, in an action for libel or slander, has the right to set aside a verdict of the jury for nominal damages, where the facts disclosed are such, that in his judgment substantial damages should have been awarded, still, in the first instance, the jury should not be instructed that they cannot give such verdict as they deem proper, even if it shall be one for nominal damages only."

(4) *To charge that, upon proof of the libelous character of the publication, the plaintiff was entitled to substantial damages, amounted to an absolute elimination of all mitigating circumstances connected with the transaction.*

It is not deemed necessary to repeat what I have said upon this subject in my dissenting opinion; but as a parting shot I cannot refrain from saying that never have I known of a more scathing and slanderous denunciation than was the unprovoked volcanic eruption of Mr. Duncan, delivered under strained "official and personal privilege" of the Senate, and admittedly based upon "atmospheric evidence."

"The poison of asps is under their lips, whose mouth is full of cursing and bitterness."

The cruel enormity of the admittedly baseless attack should have gone far, if not to the limit, in the mitigation of *substantial* damages, which consideration was not allowed, by the charge complained of, to enter the minds of the jury.

(5) *To charge as complained of amounted to an absolute elimination of the defense of qualified privilege.*

Nor need I amplify what I have said in reference to this matter, further than to say that Mr. Duncan's letter had been written two years before his speech in the Senate. During that time, although Mr. Robertson felt keenly the embarrassment which it placed him in, he opened not his mouth. That the publication of the letter was provoked by the speech no one can doubt. He who deliberately brings on a quarrel receives little sympathy in his complaint

that his adversary went further in retaliation than a powdered courtier would have gone.

There is a vast difference between an action for libel and an action for dishonoring a check. In the latter the Court has held that the plaintiff is entitled to "substantial, but temperate," damages, and it is sought to align actions for libel with such an action. In the case of a dishonored check, the law presumes "substantial, but temperate," damages. In an action for libel, the plaintiff must prove that his reputation, etc., have been injured.

Upon the merits of the appeal my views have already been elaborated. I still think that the judgment has crystalized an act of injustice to the defendants, and for that reason that the petition for a rehearing should be granted. I am firmly convinced that to deny the request, a righteous *demand,* in my opinion, under the Constitution, for the convocation of the Court *en banc,* would be a denial of the constitutional rights of the defendants.